# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

No 13-CR-607 (JFB)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ OCT 04 2019 ★
LONG ISLAND OFFICE

UNITED STATES OF AMERICA,

VERSUS

PHILLIP A. KENNER AND TOMMY C. CONSTANTINE,

Defendants.

## MEMORANDUM AND ORDER
October 4, 2019

JOSEPH F. BIANCO, Circuit Judge (sitting by designation):

On July 9, 2015, following a nine-week trial, a jury convicted defendant Phillip A. Kenner ("Kenner") of one count of conspiring to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One of the superseding indictment); four counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Two, Three, Four, and Seven); and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Nine).[1] (ECF No. 324.) In addition, the jury convicted defendant Tommy C. Constantine ("Constantine," and

together with Kenner, "defendants") of one count of conspiring to commit wire fraud (Count One); five counts of wire fraud (Counts Two through Six); and one count of conspiracy to commit money laundering (Count Nine).

Now pending before the Court is Constantine's motion for a new trial on the basis of ineffective assistance of counsel.[2] Constantine asserts generally that his retained trial counsel did not adequately prepare for trial, declined to cross-examine an important government witness, was unable to comprehend the business transactions at issue, did not understand and prepare a theory

---

[1] The jury also acquitted Kenner of three wire fraud counts (Counts Five, Six, and Eight). (ECF No. 324.)

[2] The Court previously denied Constantine's motion for a new trial on the basis of jury confusion and newly-discovered evidence on October 13, 2017 ("the October 13, 2017 Order"). *United States v. Kenner*, 272 F. Supp. 3d 342 (E.D.N.Y. 2017). The Court reserved decision on Constantine's ineffective

assistance of counsel argument in support of his Rule 33 motion because it was a supplemental motion that was not fully briefed at the time of the Court's decision. (*Id.*) Since that time, Constantine has further supplemented that motion and the motion is now fully submitted. The summary of the evidence set forth in detail in the October 13, 2017 Order is incorporated by reference herein.

of defense to the government's theory of prosecution, did not present exculpatory evidence, refused to call witnesses favorable to the defense, and had the defendant prepare the opening statement, questions for witnesses, and summation. (IAC Supp. Br. 7, ECF No. 483.)

For the reasons set forth below, the Court denies the motion without an evidentiary hearing.[3] Specifically, having presided over the nine-week trial and having personally observed the performance of counsel (and his in-court interactions with Constantine), it was abundantly clear to the Court that Constantine's trial counsel was conscientious, diligent, thorough, well-prepared, and effective in all aspects of his trial performance, including his jury addresses and questioning of witnesses. The assertion that his performance was below an objective standard of reasonableness is completely without merit based upon this Court's knowledge of the case and observations of trial counsel's performance. Moreover, although Constantine asserts that he was forced to take an active and primary role in the preparation of his defense because of alleged deficiencies in trial counsel's performance, that claim is completely inconsistent with the Court's extensive observations of Constantine's demeanor during the years that this case has been pending (including the trial). In particular, the courtroom dynamics between Constantine and trial counsel throughout the case demonstrated that Constantine's role in the preparation and implementation of his defense strategy (including decisions about questioning of witnesses and jury addresses) was not triggered by lack of effort, preparation, or ability by his trial counsel; instead, based upon the Court's extensive in-court observations, Constantine's role was the product of his personality and his apparent belief that no lawyer could ever understand the facts of what occurred better than he could, and that he (Constantine) could craft a defense strategy more effectively than even the most skilled and diligent attorney. The Court's observations are consistent with the numerous emails between trial counsel and Constantine, which are uncontroverted and reveal Constantine's desire to have a primary role and firm grip over his trial attorney's presentation of evidence and jury addresses. In addition, many of the assertions made by Constantine (such as questions that purportedly should have been put to witnesses and defense witnesses that Constantine believed should have been called) are addressed in exhaustive detail in trial counsel's response to Constantine's allegations, and all fall within matters of strategy that were well within the sound discretion of trial counsel. Similarly, to the extent Constantine points to the drug problems of co-counsel as a basis for his motion, that counsel essentially performed a paralegal role in the courtroom during the trial (as observed by the Court) and any alleged issues with his performance did not undermine in a constitutionally-significant way the overall performance of trial counsel in every aspect of the trial. Finally, even assuming arguendo Constantine were able to demonstrate that trial counsel should have performed in the manner urged by Constantine, there is no indication that any of the alleged errors, either individually or collectively, would have affected the outcome of the trial. In fact, in many instances, Constantine only speculates that some additional witness or line of cross-examination would have been helpful to his defense, in the complete absence of any basis

---

[3] It is within this Court's discretion to deny a request to conduct an evidentiary hearing. *See, e.g.,* *United States v. Sasso*, 59 F.3d 341, 350 (2d Cir. 1995)

("We will not reverse the denial of a new-trial motion or the refusal to conduct an evidentiary hearing absent an abuse of discretion.").

to support those conclusory assertions. In other words, the government presented overwhelming evidence of Constantine's involvement in the charged frauds, including his unlawful diversion of investor funds for personal use. It was that overwhelming evidence, rather than any alleged errors by trial counsel in his trial performance or strategy, that led to Constantine's conviction. Given that the meritless nature of Constantine's claims is apparent from the record (based upon the Court's own observations of trial counsel's performance during the trial, the uncontroverted information contained in emails supplied by trial counsel, and the clear lack of prejudice given the overwhelming nature of the evidence), the Court need not resolve the factual discrepancies in the affidavits (including the substance of certain conversations between Constantine and his counsel) and, in its discretion, denies the motion without an evidentiary hearing.

I.    BACKGROUND

A.  Evidence Introduced at Trial

The Court incorporates by reference the extensive summary of the trial evidence contained in the October 13, 2017 Order, familiarity with which is assumed.

As noted in that Order, the trial in this action lasted approximately nine weeks, and the evidence consisted of testimony from over 40 witnesses and more than 1,000 exhibits. In light of this voluminous record and the October 13, 2017 Order, the Court will provide a limited overview of the evidence here as it relates to the instant motion.

In brief, the government advanced three theories of fraud at trial pertaining to the Hawaii Project, Eufora, and the Global Settlement Fund ("Global Settlement Fund" or "GSF"). With respect to the Hawaii Project, the government introduced evidence demonstrating that Kenner defrauded several professional hockey players who were clients of his. Those witnesses testified that they contributed money to that endeavor based on Kenner's representations that their investments would finance a real estate development in Hawaii; however, Kenner subsequently diverted his clients' money— without their authorization—to another property development in Mexico that involved Ken Jowdy ("Jowdy"). In addition, witnesses testified that Kenner used several lines of credit in their names to divert money in an unauthorized manner. When Kenner failed to make interest payments, those accounts were closed, and his clients lost the collateral used to secure those lines of credit. Further, and unbeknownst to Kenner's clients, bank records introduced at trial showed that Constantine received money intended for the Hawaii Project. The government also adduced evidence of forged consulting agreements that purportedly justified those payments, as well as an audio recording of a conversation between Kenner and Constantine indicating that they colluded to conceal their fraud.

Similarly, with respect to the Eufora objective, the government demonstrated at trial that Kenner solicited funds from several investors who believed that their money would be used to finance that company. However, bank records and testimony indicated that Constantine converted those investments to cover his personal expenses, such as legal fees, without the investors' authorization. Specifically, the government showed at trial that the transactions underlying the wire fraud charges in Counts Two through Six of the superseding indictment were derived from Eufora investments, and that Kenner and Constantine used that money for unapproved

expenditures. Contemporaneous text messages between Kenner and Constantine from the relevant period also evinced an agreement by defendants to use Eufora money for their personal benefit.

Finally, several government witnesses testified at trial that Kenner and Constantine convinced them to invest in the Global Settlement Fund because they believed that their contributions would principally finance litigation against Jowdy. However, bank records and testimony again demonstrated that both defendants used GSF funds for personal expenses. In particular, the evidence showed that Constantine covered his rent, various legal expenses, and automotive work with money from the GSF.

## B. Relevant Procedural History

By superseding indictment dated April 22, 2015, the government charged Kenner with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Nine); and seven counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Two through Eight). (ECF No. 214.) In addition, the government charged Constantine with conspiracies to commit wire fraud and money laundering (Counts One and Nine) and five counts of wire fraud (Counts Two through Six). (*Id.*)

Following a trial that began on May 4, 2015 (ECF No. 239), the jury returned a verdict on July 9, 2015 (ECF No. 324). The jury found Constantine guilty on all charges and Kenner guilty on both conspiracy counts. (*Id.*) In addition, the jury found Kenner guilty on the wire fraud charges in Counts Two through Four and Seven in the superseding indictment, but it acquitted him of the wire fraud charges in Counts Five, Six, and Eight. (*Id.*)

On November 23, 2015, Constantine filed his Rule 29 and Rule 33 motions. (ECF No. 346.) The government submitted its opposition on April 4, 2016 (ECF No. 370), and Constantine replied on June 9, 2016 (ECF No. 382). Constantine supplemented his motion for a new trial, raising an additional ground of newly-discovered evidence, by brief filed on October 21, 2016. (ECF No. 407.) The government submitted its response to Constantine's supplemental brief on January 16, 2017 (ECF No. 438), and the Court heard oral argument on Constantine's motions on February 17, 2017 (ECF No. 453). In October 2017, the Court denied the motion for a judgment of acquittal and motion for a new trial on the basis of jury confusion and newly-discovered evidence, and reserved decision on Constantine's ineffective assistance of counsel argument in support of his Rule 33 motion. *United States v. Kenner*, 272 F. Supp. 3d 342 (E.D.N.Y. 2017).

Constantine supplemented his motion for a new trial, raising an additional ground of ineffective assistance of counsel by brief filed on July 7, 2017. (ECF No. 483.) Constantine and trial co-counsel, Andrew Oliveras, Esq. (hereinafter, "co-counsel"), filed affidavits in support of the ineffective assistance of counsel argument on the same date. (ECF Nos. 484-85.) Trial counsel, Robert LaRusso, Esq. (hereinafter, "trial counsel"), submitted an affidavit and supporting exhibits in opposition to the motion for a new trial on the basis of ineffective assistance of counsel on October 10, 2017. (ECF No. 499.) Trial counsel's partner, and Constantine's initial lead counsel, Joseph Conway, Esq. (hereinafter, "initial lead counsel"), filed an affidavit in opposition on the same date. (ECF No. 500.) On November 21, 2017, the government submitted its response to Constantine's supplemental brief (ECF No. 513), and

Constantine submitted a reply brief on January 12, 2018 (ECF No. 521), along with a supplemental affidavit (ECF No. 522). The Court heard oral argument on the ineffective assistance of counsel ground for relief on January 16, 2018. (ECF No. 523). Constantine submitted supplemental letters on March 29, 2019 (ECF No. 634) and August 30, 2019 (ECF No. 704) in support of his motion for a new trial on the ground of ineffective assistance of counsel. The government submitted an additional response on September 12, 2019 (ECF No. 712), and Constantine submitted a reply on September 18, 2019 (ECF No. 716).

The Court has fully considered all of the parties' submissions on the instant motion.

### C. Affidavits in Support of and in Opposition to the Motion

Set forth below is a summary of the affidavits submitted in connection with Constantine's motion for a new trial based upon ineffective assistance of counsel:

#### a. Affidavits in Support of the Motion

Constantine filed two affidavits in support of the ineffective assistance of counsel ground for a new trial. The Court has attempted to categorize the numerous allegations contained in the affidavits and has summarized them below.

1. Trial Counsel's Desire to Take the Case

Constantine alleges that trial counsel, who is the partner of his initial lead counsel and took over the representation several months prior to trial, did not want to take the case. (Constantine Aff. ¶¶ 3-4.) Trial counsel allegedly represented to Constantine that he had limited business experience and was not good with numbers. (*Id.* ¶ 4.) Allegedly, throughout the trial, trial counsel made statements to Constantine expressing that he should never have taken the case and wanted to find a way out of the representation. (*Id.* ¶ 24.)

2. Issues Regarding Constantine's Co-Counsel[4]

Constantine asserts that he retained co-counsel (who already worked with trial counsel) because co-counsel had a greater understanding of the business and financial transactions involved in this case. (*Id.* ¶ 7.) However, Constantine makes allegations throughout his affidavit that co-counsel was under the influence of crystal methamphetamine throughout the trial.[5] (*Id.* ¶¶ 8, 13, 74, 76.) Constantine alleges that co-counsel's drug use impaired his ability to effectively participate in the trial, particularly

---

[4] Co-counsel submitted an affidavit in support of Constantine's motion for a new trial. Co-counsel's affidavit reiterates many of Constantine's allegations, including that trial counsel did not understand the transactions at issue in the case, asked Constantine to draft the opening statement and summation, was distracted by personal issues including his mother's illness and death, failed to introduce relevant evidence with respect to Grdina, did not anticipate the Home Depot recording being introduced at trial and did not conduct cross-examinations with respect to the recording, and ultimately thought Constantine was lying to him and to potential witnesses. (Co-Counsel Aff. ¶¶ 10, 12-15, 17-18, 20-23, 25-31.) Co-counsel further asserts that Constantine asked him to take over trying the case, but he declined to do so due to his lack of trial experience. (*Id.* ¶ 24.)

[5] Co-counsel subsequently pled guilty in February 2017 to conspiracy to distribute and possess with intent to distribute methamphetamine, but the information was dismissed prior to sentencing. *See United States v. Oliveras*, No. 17 Cr. 00082 (JS) (E.D.N.Y. July 10, 2018).

regarding co-counsel's unreliability in attending meetings for trial, preparation of exhibits for trial, and co-counsel's failure to properly use a PowerPoint presentation during the summation by trial counsel. (*Id.* ¶¶ 8, 9, 25, 74).

Constantine asserts that co-counsel's impairment significantly impacted the effectiveness of his defense because "[trial counsel] relied on [co-counsel] to an unusual degree." (*Id.* ¶ 75.) However, Constantine also asserts that he "insisted" that co-counsel "take over as lead counsel," but that co-counsel "emphatically refused to do so, upon information and belief, because he knew he was under the influence of crystal meth, although the reason he gave [Constantine] was that he had limited trial experience and was unqualified to do so." (*Id.* ¶ 76.)

### 3. Trial Preparation Issues

Constantine generally alleges that his trial counsel abdicated his responsibilities in preparing for trial.[6] Constantine asserts that he was "only afforded an opportunity to meet with [trial counsel] in person and prepare for trial on one occasion for approximately five hours," and that otherwise, Constantine only had "minimal" preparation with either his initial lead counsel or trial counsel via phone calls and email. (*Id.* ¶ 11.) Specifically, Constantine alleges that trial counsel requested that Constantine draft the opening statement, and then read the statement "almost verbatim" to the jury. (*Id.* ¶ 14.) Further, Constantine alleges that trial counsel did not know what questions to ask witnesses, and so Constantine wrote the questions for cross-examination of government witnesses, often just prior to the cross-examination beginning, which trial counsel did not review and read for the first time verbatim in front of the jury (even though some questions were improperly formed and drew objections from the government). (*Id.* ¶¶ 15-18.) Similarly, Constantine asserts that he had to advise trial counsel as to the validity and relevance of government witnesses' testimony and as to how trial counsel should respond. (*Id.* ¶ 25.) Further, Constantine asserts that he had to hand additional questions to trial counsel during trial counsel's direct and cross-examinations in order to "enable [trial counsel] to follow up or drill down to the desired answer when a witness did not give a satisfactory answer" to a question that Constantine had written. (Constantine Supp. Aff. ¶ 32.) With respect to government witness John Kaiser, Constantine alleges that trial counsel failed to cross-examine him with regard to "evidence which was critical to [Constantine's] defense." (*Id.* ¶ 43.) Constantine also alleges that trial counsel failed to cross-examine Kenner as to the authenticity of text message conversations between Kenner, Kaiser, and Constantine. (*Id.* ¶ 25.)

With respect to the summation, trial counsel allegedly asked Constantine to write the "entire closing statement . . . which [trial counsel] only saw just moments prior to reading it to the jury and did so almost verbatim." (Constantine Aff. ¶ 19.) Constantine asserts that there were three versions of the summation—including two versions prepared by Constantine and one prepared by co-counsel—and that trial counsel read the version that Constantine

---

[6] Constantine also asserts that trial counsel, as well as his initial lead counsel, submitted pre-trial motions on Constantine's behalf but did not participate in the writing of those motions, causing Constantine to need to retain another attorney ("additional counsel") to assist with the writing of the motions. (*Id.* ¶ 10.)

Constantine does not make any ineffective assistance claims with regard to the attorney who allegedly helped Constantine write the pre-trial motions.

prepared during Kenner's summation "for the first time to the jury." (Constantine Supp. Aff. ¶ 30.) Constantine further alleges that trial counsel failed to advise him that the summation could not reference documents or other matters that were not admitted into evidence, despite representing during the trial that the summation could be used "as an alternative to not introducing the evidence during the trial." (Constantine Aff. ¶ 30.) Constantine makes several other allegations relating to the summation and trial counsel's alleged representations that the summation would be the opportunity to present much of the defense "in lieu of admitting the hundreds of documents, multiple witnesses and questions that [trial counsel] refused to include" during the trial. (Id. ¶ 33.)

To the extent that trial counsel utilized his own questions or statements, Constantine asserts that trial counsel "was clearly lost" and made false statements incriminating Constantine. (Id. ¶ 20.) Specifically, Constantine alleges that: trial counsel was unable to comprehend the facts surrounding Constantine's supposed $1.5 million capital contribution to the Urban Expansion deal and thus did not use this to defend Constantine (Constantine Supp. Aff. ¶ 17); during the summation, trial counsel substantiated the government's argument that Constantine failed to make the required $1.5 million capital contribution to the Urban Expansion deal in a timely fashion (Constantine Aff. ¶ 21); when cross examining Kristin Peca, trial counsel suggested to Peca that she requested her investment back even though she had not testified to that fact (id. ¶ 22); and when cross-examining Tyson Nash ("Nash"), trial counsel confused Nash's entitlement to an ownership interest in a Cessna 414 aircraft rather than his actual ownership interest in a Falcon 10 aircraft in connection with his contribution to the GSF, leading the jury to believe that Constantine had defrauded Nash (id. ¶ 23).

### 4. Failure to Call Defense Witnesses

Constantine alleges that trial counsel failed to call witnesses who were "critical" to the defense. (Id. ¶ 34; Constantine Supp. Aff. ¶¶ 3, 8.) Constantine asserts in connection with these allegations that trial counsel informed Constantine that the Court would be upset if the defense called additional witnesses, and Constantine's initial lead counsel stated that they had only been paid for a five-week trial. (Constantine Aff. ¶ 34; Constantine Supp. Aff. ¶ 24.) Specifically, Constantine asserts that his trial counsel should have called the following witnesses to testify in his defense:

Todd Lockwood ("Lockwood"): Constantine asserts that Lockwood, a corporate attorney who worked on the Urban Expansion deal, would have testified regarding a bonus check that he allegedly received for developing the pre-payment penalty clause, and would have testified, in effect, that Constantine was not the mastermind of the pre-payment penalty. (Constantine Aff. ¶ 28.)

Bob Sonnenblick ("Sonnenblick"): Constantine alleges that trial counsel should have called Sonnenblick to testify in order to establish that Sonnenblick existed and was not a fictitious character of Constantine's creation in furtherance of the fraud. (Id. ¶ 35.) Additionally, Sonnenblick allegedly could have authenticated the phone calls with Constantine, as well as the Memorandum of Understanding ("MOU") relating to the Global Settlement Fund and the Diamante Cabo San Lucas property, and would have testified that Jowdy blocked a $15 million transaction that would have made the hockey players whole. (Id.)

Steve Hilton ("Hilton"): Constantine alleges that Hilton should have been subpoenaed to testify regarding

Constantine's efforts to finance the Hawaii Project, and that Hilton would have authenticated emails between Hilton and Constantine regarding Constantine's efforts to solicit a multi-million dollar investment for the Hawaii Project. (*Id.* ¶ 37.) Hilton also supposedly would have testified regarding the Avalon Airpark Hangar/Office project, and would have contradicted the government's characterization that the property was of no value and was subject to a bankruptcy. (*Id.* ¶ 38.)

Michael Reiff ("Reiff")/Ben Selcow ("Selcow"): Constantine asserts that Reiff and Selcow of Netspend Corporation should have been called to testify regarding the negotiations on a licensing transaction between Netspend Corporation and Eufora, to contradict the government's assertions that Eufora and its patents were worthless and that there were no licensing deals occurring during the time period in question. (*Id.* ¶ 39.)

Brad Hanson ("Hanson"): Similarly to Reiff and Selcow, Constantine asserts that Hanson, the President of MetaBank, would have testified that MetaBank was in negotiations with Eufora regarding a licensing agreement, establishing that Eufora's patents still held value. (*Id.* ¶ 40.)

Captain Dave Letourneau ("Letourneau")/Detective Jeff Gentry ("Gentry"): Constantine asserts that Letourneau and Gentry would have testified that Constantine was the whistle blower for the Gaarn/Eufora fraud (the same fraud that was the subject of Counts One through Five of the Indictment), and that there was no evidence to support the theory that Constantine knowingly participated in the alleged crime. (*Id.* ¶ 42.)

Agent Matthew Galioto ("Galioto"): Constantine asserts that Galioto should have been called to testify for the defense, but does not offer any examples of exculpatory testimony that Galioto would have provided. (*Id.* ¶¶ 45, 47.)

Jowdy: Constantine alleges that Jowdy should have been called because he was "clearly an integral part of the case and has received the vast majority of the victims' money," but does not offer any examples of exculpatory testimony that Jowdy would have provided. (*Id.* ¶¶ 45-46.)

Jack Larsen ("Larsen"): Constantine asserts that Larsen, an accountant for Eufora, would have been able to establish that the hockey player investors received ownership interest in Eufora through the AZ Eufora Partners I entity and would have identified Constantine as a "whistle blower" rather than a participant in the Eufora fraud. (Constantine Supp. Aff. ¶¶ 4-6.)

Neptune Capital Representative (unnamed): Constantine further argues that his trial counsel should have called a representative of Neptune Capital ("Neptune") to authenticate the Patent Security Agreement and who would testify that Constantine did not pledge Eufora's patents as collateral at the time that investors were making investments, and that the loan was paid in full a few months after the loan was originated. (*Id.* ¶ 11.) Constantine asserts that a Neptune representative would have been able to testify to this information, in contrast to Kristen Peca, whom trial counsel unsuccessfully attempted to question to elicit this information. (*Id.* ¶ 12.)

Will Turner ("Turner"): Constantine alleges that Turner would have authenticated the Race Car Sales Agreement for the BMW M6 race car, which resulted in Constantine receiving a $125,000 deposit from Northwest Value Partners into attorney Ron Richards' trust account, and which rightfully belonged to Constantine. (Constantine Aff. ¶ 48;

Constantine Supp. Aff. ¶ 13.) Constantine asserts that this was critical to his defense with respect to the Global Settlement Fund, and would have challenged the government's position that Constantine was using the victims' money for personal expenditures. (Constantine Aff. ¶ 48.) Constantine argues that trial counsel was unable to authenticate the Race Car Sales Agreement via another witness, Robert Semple ("Semple"), because he was not a party to the agreement and had no first-hand knowledge of the agreement. (*Id.* ¶ 49; Constantine Supp. Aff. ¶ 13.)

In a more general allegation, Constantine asserts that he suggested many other defense witnesses in "real-time" throughout the trial to respond to the government's allegations and theories, but that his trial counsel rejected the notion that additional witnesses were needed. (Constantine Supp. Aff. ¶¶ 8-9.)

### 5. Failure to Utilize "Readily Available" Exculpatory Evidence

Constantine alleges that his trial counsel failed to introduce or seek admission of exculpatory evidence, stating that the trial was taking too long. (Constantine Aff. ¶ 26.) Trial counsel allegedly assured Constantine that all relevant exculpatory evidence would come in or would be discussed during summation. (*Id.* ¶ 29.) Relatedly, Constantine alleges that trial counsel failed to publish documentary evidence to the jury, and while trial counsel asserted that the jury would see the evidence during deliberations, he did not inform Constantine that the jury would have to request specific exhibits. (*Id.* ¶ 51-52.) Constantine specifically references documentary evidence relating to James Grdina's ("Grdina") testimony and the Urban

Expansion deal (which allegedly led to Grdina's later recantation of his testimony) that he wanted trial counsel to use during Grdina's cross-examination. (*Id.* ¶ 27.) Constantine also points to a bonus check in evidence by stipulation made out to Lockwood, which Constantine argues trial counsel should have used to establish that the pre-payment penalty in the Urban Expansion loan deal was not Constantine's idea, but rather was Lockwood's idea.[7] (*Id.* ¶ 28.) Further, Constantine asserts that trial counsel should have introduced into evidence a text message conversation between Kenner and Mattias Norstrom ("Norstrom"), indicating that Kenner disclosed that Norstrom was purchasing his interest in Eufora from Constantine Management Group. (*Id.* ¶ 44.)

### 6. Accounting Evidence

Related to his allegations regarding other exculpatory evidence, Constantine alleges that trial counsel should have, but failed to, retain a forensic accountant or present any evidence to contradict the government's assertion that Constantine used investors' money for unauthorized purposes. (*Id.* ¶ 53.) Also with respect to accounting evidence, Constantine alleges that there were "hundreds of bank statements and other records which contradicted the Government's allegations which [trial counsel] did not use," and that trial counsel both relied on and failed to object to an erroneous spreadsheet introduced by the government. (*Id.* ¶¶ 54-56.)

---

[7] In his Supplemental Affidavit, Constantine asserts that until trial, he incorrectly believed the pre-payment penalty clause was Grdina's, rather than Lockwood's, idea. (Constantine Supp. Aff. ¶ 20.) In this regard, Constantine alleges that he immediately notified trial counsel once he "refreshed his recollection," but that trial counsel refused to cross-examine Grdina regarding the pre-payment bonus check, or pursue other proposed defense strategies regarding the pre-payment penalty clause. (*Id.*)

### 7. Issues Regarding the Home Depot Recording

#### i. Kenner's Admission

Though the allegations in Constantine's affidavit are somewhat unclear on this issue, the Court construes these allegations to be that Constantine is asserting that trial counsel was confused about the identity of the third-party who was present when Kenner allegedly admitted that the Home Depot recording was altered, and that trial counsel identified Greg DeVries ("DeVries") as the third-party, rather than a defendant in an unrelated case who happened to be in this Court's cellblock with Kenner and Constantine when the admission occurred. (*See* Constantine Supp. Aff. ¶¶ 14-16.) As a result of this confusion, Constantine asserts that trial counsel "tainted" DeVries by making a direct inquiry with DeVries regarding the Home Depot recording, resulting in DeVries refusing to testify on Constantine's behalf. (*Id.* ¶ 15.)

#### ii. Forensic Audio Expert Issue

Constantine alleges that trial counsel should have engaged a forensic audio expert to refute the authenticity of the Home Depot recording, in light of the fact that though the government did not introduce the recording during its case-in-chief, Kenner introduced the recording during the presentation of his case. (Constantine Aff. ¶ 57.) In his Supplemental Affidavit, Constantine asserts that the forensic audio expert he intended to retain required an original recording for the analysis, and trial counsel and co-counsel failed to subpoena the original recording, and Constantine was unaware that the original recording was available otherwise. (Constantine Supp. Aff. ¶¶ 18-19.) Constantine asserts that prior to trial "there was a lot of conjecture as to whether or not Mr. Kenner would be testifying and whether

or not the recording would even be admitted," and that trial counsel advised him that even if Kenner testified and the recording were admitted, Constantine's "severance motion would likely be granted and therefore, there would be no need for the expert." (*Id.* ¶ 19.)

#### iii. Communications with Kenner and Cross-Examination Regarding the Home Depot Recording

Constantine makes several allegations regarding his communication with Kenner about the Home Depot recording, and trial counsel's failure to cross-examine witnesses regarding the Home Depot recording after that communication. (Constantine Aff. ¶¶ 58-65.) Specifically, Constantine alleges that trial counsel advised that he (Constantine) could provide Kenner with the questions trial counsel was going to ask on cross-examination regarding the Home Depot recording, but that Constantine could not advise Kenner how to answer the questions. (*Id.* ¶ 58.) After Constantine agreed not to advise Kenner how to answer, he "vetted" the questions with co-counsel. (*Id.* ¶¶ 59-60.) Constantine then asserts that Kenner's trial counsel accused Constantine's trial counsel of violating "a code of conduct" for permitting Constantine to give Kenner the questions, and Constantine's trial counsel subsequently refused to cross-examine Kenner and government forensic FBI Agent Robert Crisalli ("Agent Crisalli") regarding the Home Depot recording. (*Id.* ¶¶ 61-62, 64, 72.) With respect to Agent Crisalli, Constantine asserts that trial counsel had pre-determined not to cross-examine him before hearing his testimony. (*Id.* ¶ 73.) Trial counsel then made comments to Constantine, in the presence of co-counsel and Constantine's mother and sister, about the trouble he could face for having allowed Constantine to communicate with Kenner

about the questions for cross-examination. (*Id.* ¶¶ 64-65.)

Constantine also makes several allegations regarding allegedly false and inconsistent testimony elicited at trial and other exhibits relating to the Home Depot recording. (*Id.* ¶¶ 63, 66-71.) The Court construes these allegations to relate to issues that Constantine believes trial counsel should have pursued on cross-examination. Specifically, Constantine alleges that Kenner testified inconsistently with respect to authenticating the Home Depot recording (*id.* ¶ 63), Kenner's and Agent Crisalli's testimony was inconsistent regarding the time of the meeting at Home Depot between Kenner and Constantine (*id.* ¶¶ 66-68), and the recording of the Home Depot interaction was modified, contrary to Agent Crisalli's testimony, as evidenced by a screenshot of metadata from Kenner's iTunes account (*id.* ¶¶ 67, 69-71). Constantine asserts that he was unaware that trial counsel was "not going to point out the inconsistencies regarding the time stamp of the Home Depot recording for strategic reasons," and alleges that trial counsel failed to pursue that defense, and others, regarding the Home Depot recording. (Constantine Supp. Aff. ¶¶ 22-23.)

### b. Affidavits in Opposition to the Motion

Trial counsel and initial lead counsel both submitted affidavits in opposition to the instant motion. The Court has summarized those affidavits below. Trial counsel, in his affidavit, generally asserts that Constantine's affidavit "contains misrepresentations and deliberate falsehoods," and is replete with "lies or half-truths" and "falsehoods." (TC Aff. ¶¶ 2, 91.) Trial counsel's responses to

Constantine's specific allegations are summarized below.

#### 1. Choice of Counsel

Trial counsel rebuts Constantine's assertion that he was denied an attorney of his choice because of the substitution of trial counsel for Constantine's initial lead counsel, arguing that Constantine expressly stated that he was "willing to go with [trial counsel] as lead counsel even though that is not what [he] signed up for" in an email to trial counsel. (*Id.* ¶ 4.)[8] Initial lead counsel notes that Constantine "fully accepted the change in 'lead' counsel." (ILC Aff. ¶ 4.) Trial counsel further asserts that initial lead counsel played an "instrumental and significant role throughout the entire pre-trial period, and more importantly, during the trial itself," including by reviewing 3500 material, outlining and summarizing witnesses' testimony to assist with preparation for cross-examination, consulting with trial counsel and with Constantine about potential defense witnesses, obtaining a "bullet point" presentation from Constantine of potential witnesses and relevant exhibits, and communicating directly with Constantine about different aspects of the trial preparation. (TC ¶¶ 5, 30-31; ILC Aff. ¶¶ 4, 8.)

#### 2. Issues with Co-Counsel

Trial counsel asserts that co-counsel "played absolutely no role in the in-court examination of witnesses and presentation of evidence, and, in effect served only as a paralegal responsible primarily for the trial exhibits." (TC Aff. ¶ 122 n.16.)

---

[8] Constantine's initial lead counsel filed a separate affidavit in opposition to the motion for a new trial regarding his participation in the case and his knowledge of the issues raised in Constantine's

motion. (ILC Aff. ¶ 2, ECF No. 500.) Initial lead counsel's assertions are described in the summary of trial counsel's affidavit where relevant.

### 3. Pre-Trial Motions

Trial counsel asserts that Constantine "deliberately misrepresented the facts" with respect to trial counsel's participation in the writing of the pre-trial motions, and that in fact, trial counsel was solely responsible for the pre-trial motions, and he "supervised the entire pre-motion process, and was responsible for reviewing and editing the several drafts prepared by [additional counsel]," and ensured that Constantine's supporting affidavits accurately recounted the facts. (*Id.* ¶ 14.) Trial counsel references, and attached as exhibits, multiple emails between Constantine, himself, and the additional counsel retained for pre-trial motion practice in support of his position that trial counsel was responsible for and had supervision over the preparation and contents of the pre-trial motions. (*See id.* ¶¶ 15-26.) Trial counsel highlights his "insistence on truthfulness and accuracy" with respect to the contents of the pre-trial motions (*id.* ¶ 21), noting that Constantine wanted to argue that the government withheld exculpatory documents, and trial counsel refused to include that argument because it was "based upon facts known to be or reasonable [sic] known to be false" (*id.* ¶¶ 21-23). Trial counsel describes this scenario as an "instance[] when [trial counsel's] legal responsibility conflicted with the Defendant's position leading to verbal confrontations." (*Id.* ¶ 93.)

### 4. Pre-Trial Communication with Constantine

Trial counsel asserts that, contrary to Constantine's allegations, there was more than one in-person meeting prior to trial (trial counsel also notes that there were only a few such meetings because Constantine resided in Arizona), and also that trial counsel communicated with Constantine "often and usually several times a week for many months prior to trial, either by telephone or emails or both." (TC Aff. ¶ 6; *see also* ILC Aff. ¶ 6.) In the period prior to the submission of pre-trial motions, trial counsel asserts that he and Constantine were "in almost constant contact for a month primarily by email communication but often by telephone to discuss important issues that required direct contact." (TC Aff. ¶ 28.) Trial counsel also states that he communicated frequently with Constantine about the Rule 17(c) letter requesting permission from the Court to subpoena business records from Jowdy (*id.*), and that the "preparation through telephone calls, but primarily through email messaging, continued unabated and unchanged" from the date on which the pre-trial motions were submitted on January 29, 2015, up until the beginning of trial on May 4, 2015 (*id.* ¶ 29). In support of these assertions, trial counsel notes that there were hundreds of email communications with Constantine, and attaches as exhibits copies of some of those communications, including email communications about providing 3500 material to Constantine (*id.* ¶ 33), and the government's response to Constantine's pre-trial motion as well as Constantine's reply (*id.* ¶¶ 34-35). Trial counsel notes that Constantine also had "substantial interaction" with co-counsel, and co-counsel would then communicate with trial counsel about those discussions. (*Id.* ¶ 32.)

Further, trial counsel asserts that he corresponded with Constantine "about every aspect of the case, including cross-examination of Government witnesses, the selection and preparation of defense witnesses, the necessity of hiring and consulting handwriting and audio experts concerning the Home Depot recording and numerous documents, principally the consulting agreements that played an important part in the Government's case against the Defendant, and even the

continued submission of legal documents . . . ." (*Id.* ¶ 29.)

### 5. Preparation for Trial

Trial counsel strongly refutes Constantine's allegations that he was unwilling or unable to perform his legal responsibilities, and therefore abrogated those responsibilities to Constantine.

With respect to trial counsel's preparation, he asserts that after assuming the responsibility as lead counsel, he worked principally on this case, and was involved in trial preparation almost every day, including reviewing the voluminous discovery material provided by the government and Constantine's previous counsel, and worked for 10 to 14 hours per day, including the weekends, to prepare for trial (*id.* ¶¶ 8, 36, 90). Trial counsel further asserts that once trial began, he would work every night, usually until 10:00 or 11:00 p.m., with Constantine present, to prepare for the next day. (*Id.* ¶ 36.)

Further, trial counsel and Constantine continued the preparation via email and telephone calls over each three-day weekend during the trial. (*Id.* ¶ 36.) Trial counsel also notes that in addition to his own "thorough and extensive" preparation, Constantine's initial lead counsel played a significant role in the pre-trial preparation and trial, including by assisting with preparation for cross-examination of government witnesses and for direct examination of defense witnesses. (*Id.* ¶ 90; ILC Aff. ¶ 8.)

As to Constantine's involvement in trial preparation, trial counsel asserts that defendant had a "compulsion to orchestrate, control, and participate in almost every aspect of the trial preparation and trail [sic] itself." (TC Aff. ¶ 9; *see also id.* ¶¶ 10, 92.) Constantine's initial lead counsel also notes

that Constantine "displayed a compulsion to orchestrate, control, and participate in almost every aspect of trial preparation." (ILC Aff. ¶ 7.)

Trial counsel references many examples of materials that Constantine provided to him to assist with preparation for trial, including: Constantine's computerized version of the government's discovery material (TC Aff. ¶ 8); Constantine's own files related to the charges and "thousands of email communications" that related to trial preparation (*id.*); two substantial "exculpatory packages" which included factual analysis of counts in the indictment, exhibits in support of Constantine's position, and evidentiary outlines (*id.* ¶¶ 10-11, 37); flow charts relating to the sale of Eufora stock, the Hawaii and Eufora transactions, and the Lehman-Urban Expansion transactions (*id.* ¶ 12); and "a 38 page, single-spaced document, hand-written by the Defendant analyzing allegations in . . . the original Indictment relating to Eufora Investments and the Global Settlement Fund" (*id.* ¶ 13). Trial counsel also asserts that Constantine insisted on receiving materials, "especially the discovery material received from the Government." (*Id.* ¶ 33.)

While acknowledging that Constantine's contributions were helpful, trial counsel asserts that the transactions involved in this case were "well known and understood . . . before the beginning of the trial." (*Id.* ¶ 12; *see also id.* ¶¶ 18-19, 24, 27-28, 32, 35, 92.) Trial counsel notes that he reviewed all of Constantine's materials, edited them, and ensured that "each presentation was comprehensive and factually accurate." (*Id.* ¶ 92.)

Further, with respect to trial preparation, trial counsel asserts that Constantine "played a supporting role" in assisting with cross-examinations, the presentation of the defense,

and writing drafts of the opening and closing statements (which trial counsel reviewed, edited, and presented). (*Id.* ¶ 37.) With respect to the opening statement, trial counsel notes that after a discussion with Constantine about the accuracy of the contents of the opening, Constantine volunteered to draft the opening statement, and trial counsel then "spent many hours reviewing the Defendant's draft to fulfill [his] legal obligations." (*Id.* ¶ 94 n.12; *see also* ILC Aff. ¶ 7.)

As to the summation, trial counsel describes and attaches as exhibits extensive communications with Constantine about the drafts, noting that Constantine "was insistent on preparing the draft of the summation" and "expressed complete confidence" in doing so. (TC Aff. ¶¶ 93-94, 100-01.) Initial lead counsel asserts that Constantine had a "desire to have unfettered input into the summation" and repeatedly requested certain things be included, "many of which were improper or not supported by the evidence at trial." (ILC Aff. ¶ 9.) Ultimately, trial counsel "was satisfied that the [summation] document prepared by Defendant under [his] supervision was a competent and legally acceptable execution" of trial counsel's duties to Constantine. (TC Aff. ¶ 111.) Trial counsel asserts that he at all times was reviewing, correcting, and insisting on evidentiary support from the trial record for any arguments in the summation, and oversaw the preparation and submission of the summation. (*Id.* ¶¶ 94-112.) Contrary to Constantine's allegation that trial counsel had never seen the summation draft until moments prior to reading it to the jury, trial counsel describes the multiple drafts of the summation that he reviewed, his detailed recommendations to Constantine regarding the substance of the summation including what portions of the trial record should be referenced in the summation, his instructions to Constantine that the summation should be compartmentalized, and the arguments must be supported by evidence in the record. (*Id.* ¶¶ 98, 102-03, 106-11; *see also* ILC Aff. ¶ 9.) Trial counsel highlights that Constantine was insistent on creating a PowerPoint presentation to use during the summation, which trial counsel advised "was of secondary importance to presenting evidentiary support" for the arguments. (TC Aff. ¶¶ 94, 96, 122 n.16.) Trial counsel notes that there was only a single outstanding issue relating to witness Nicholas Privitello ("Privitello") requiring trial counsel's review on the day that he delivered the summation. (*Id.* ¶¶ 109, 111.)

### 6. Ineffective Assistance Claims at Trial

Trial counsel refutes Constantine's allegations regarding his failure to present exculpatory documents or witnesses with respect to various aspects of the trial. Trial counsel asserts generally that Constantine presents "half-truths or outright misrepresentations of the facts" with regard to the various flaws in trial counsel's performance that Constantine alleges. (*See id.* ¶¶ 73, 85.) Trial counsel's specific assertions in response to Constantine's allegations are summarized below with respect to trial counsel's decisions during trial.

#### i. Failure to Call Witnesses

As an initial matter relevant to Constantine's claim that trial counsel failed to call certain defense witnesses, trial counsel denies that he declined to call defense witnesses for the "absurd and unprofessional reasons" advanced by Constantine, including that trial counsel thought calling additional witnesses might upset the Court or that he was only paid for a five-week trial. (*Id.* ¶ 113.) Trial counsel addresses the reasons for

not calling the specific witnesses Constantine identifies as follows:

Neptune Executives, Reiff and Selcow, and Metabank President, Hanson: Trial counsel asserts that Constantine did not request for Reiff, Selcow, or Hanson to be called. Further, Constantine's initial lead counsel was responsible for preparing and contacting defense witnesses, and former counsel did not select these individuals as potential witnesses. (*Id.* ¶¶ 113-14.)

Lockwood: Trial counsel notes that Constantine did not disclose to either trial counsel or to initial lead counsel that Lockwood was responsible for engineering the pre-payment penalty, and in fact, Constantine had represented that Grdina engineered the penalty. (*Id.* ¶ 113 n.13.)

Sonnenblick: Constantine's initial lead counsel interviewed both Sonnenblick and Hilton, and noted that "both either provided damaging information or flat out refused to talk about testifying." (ILC Aff. ¶ 10.) While Constantine alleges that Sonnenblick's testimony would have provided evidence that Constantine was helping the hockey players recover investments via an agreement whereby Sonnenblick would purchase the Cabo Diamante property, trial counsel asserts that this testimony would have been cumulative of other evidence before the jury, including an email about the agreement with an attached document from Sonnenblick, which was testified about throughout the trial. (TC Aff. ¶¶ 115-16.)

Hilton: As referenced above, initial lead counsel interviewed Hilton, and determined that he was uncooperative and would have provided damaging testimony. (*Id.* ¶ 115; ILC Aff. ¶ 10.) Specifically, in a conversation between trial counsel's associate and Hilton, Hilton refused to testify, and stated that Constantine "screwed

him pretty bad and stole his money." (TC Aff. ¶ 118.) Trial counsel asserts that he strategically did not call Hilton as a witness so as to prevent Hilton from sharing that sentiment with the jury. (*Id.* ¶¶ 118-19.) Further, trial counsel asserts that Hilton's testimony was cumulative of what was already in the record, because trial counsel had already successfully introduced email communications establishing that Constantine had made efforts to attract investors for the Hawaii Project, and Hilton could not debunk the accurate factual presentation by the government that Constantine had received a "million dollars for nothing" prior to the Urban Expansion loan. (*Id.* ¶¶ 119-20.)

Witnesses regarding Eufora: Trial counsel asserts that Constantine never requested that counsel call the unnamed witnesses who would have testified to the viability and legitimacy of Eufora, but that in any event, substantial evidence was introduced at trial to establish that there was a group including Kaiser, Privitello, Bryan Berard, and Stolper who were attempting to take over Eufora because of the company's value. (*Id.* ¶¶ 121-22.)

ii. The Home Depot Recording

Trial counsel makes the following assertions about the Home Depot recording:

(a) Home Depot Recording Authenticity

Trial counsel rebuts Constantine's allegations that he did not challenge the authenticity of the Home Depot recording for reasons of "self-preservation" in light of potential ethical issues presented by Constantine providing Kenner with the questions for cross-examination. (*Id.* ¶ 39.) Specifically, trial counsel asserts that he did not challenge the authenticity of the

recording because he had a good faith belief that the recording was an authentic and accurate recording, he had a reasonable and good faith belief that Constantine was attempting "to orchestrate and participate in another unlawful scheme with Kenner by presenting false testimony to the jury regarding the reliability of the recording," and to avoid opening the door to a government redirect that could elicit facts that might allow the jury to implicate Constantine in attempting to orchestrate false testimony regarding the recording. (*Id.*) Trial counsel notes that aside from Constantine's self-serving representations, there was no evidence that supported that the recording had been altered. (*Id.* ¶¶ 40-41.)

Trial counsel requested a hearing outside the presence of the jury on the authenticity of the Home Depot recording. (*Id.* ¶ 42.) Trial counsel acknowledges that he gave the "okay" for Constantine to present written questions to Kenner regarding the recording, without considering the consequences, and then utilized those questions and Kenner's "yes" answers to cross-examine Kenner at the hearing. (*Id.* ¶¶ 43-44.) After cross-examining Kenner at the hearing, trial counsel then suspected that Kenner had lied and that Constantine had "orchestrated perjured testimony and was directly responsible for an attempt to obstruct justice." (*Id.* ¶ 46.) Trial counsel did contact DeVries in an attempt to obtain additional evidence about the authenticity of the Home Depot recording, and although DeVries did recall talking to Kenner about the recording, his recollection was that the conversation he had with Kenner would be problematic for Kenner or Constantine, and he declined to testify. (*Id.* ¶ 47.)

Ultimately, trial counsel reiterates that his "strategy in refusing to discredit the integrity of the recording stems from the decision to prevent the jury from hearing the

circumstances of Kenner's recantation . . . and from actually preventing the Defendant's own conduct from adversely impacting the jury's consideration of the evidence." (*Id.* ¶ 48; *see also id.* ¶ 49.)

(b) Audio Expert Retention

Trial counsel asserts that, although he did move to suppress the recording based on Constantine's assertions, Constantine did not authorize retention of an audio expert. (*Id.* ¶ 41.) Trial counsel asserts that his team located and contacted an expert in New Jersey, and provided the information to Constantine to determine whether to retain that expert to analyze the Home Depot recording. (*Id.* ¶ 51.) Further, trial counsel asserts that it was Constantine's decision whether or not to hire the expert, and Constantine never gave the authorization. (*Id.* ¶ 52.)

Trial counsel asserts that, despite Constantine's allegations that he did not know the recording would be admitted, Constantine was aware for many months before trial that the Home Depot recording would only be admitted into evidence if Kenner testified about the recording. (*Id.* ¶¶ 52-56.) In addition, trial counsel points to the renewed motion for severance, filed more than a week before the trial began, which highlighted that the Home Depot recording would be introduced through Kenner, and requested additional time to have the recording examined. (*Id.* ¶ 57.) Trial counsel and Constantine continued to discuss the question of retaining an audio expert throughout the trial. (*Id.* ¶¶ 58-59.)

iii.   The Urban Expansion Deal

Trial counsel refutes Constantine's allegations that he was ineffective with respect to the Urban Expansion deal, noting at the outset that he requested Constantine's

assistance in understanding the factual background of the Urban Expansion deal. (*Id.* ¶ 61.) Trial counsel asserts that he engaged in "extensive preparation" regarding the Urban Expansion deal by reviewing Constantine's explanations of the facts, the "exculpatory package" provided by Constantine containing relevant exhibits, relevant discovery documents, and 3500 material, and by consulting with initial lead counsel regarding the cross-examination of Grdina. (*Id.* ¶ 64.) With respect to the $1.5 million payment at issue, trial counsel asserts that Constantine misrepresented that the payment could be made over time, but that trial counsel did introduce evidence of payments from Constantine to Kenner totaling $1.5 million, though the strength of that presentation was undermined by the lack of documentary evidence or Constantine's testimony. (*Id.* ¶¶ 66-67.) Trial counsel asserts that any documentary evidence relating to the Urban Expansion deal did not alone establish that the "random payments" were part of the $1.5 million contribution to the deal, and that Grdina's post-trial recantation of his trial testimony was based "on the self-serving and unreliable representations of [Constantine]." (*Id.* ¶ 69.)

Additionally, with regard to Constantine's claims as to the pre-payment penalty (which trial counsel asserts is "most representative of Defendant's pattern of deception and misrepresentation"), trial counsel asserts that Constantine never disclosed that Lockwood was responsible for engineering the pre-payment penalty or should be called as a defense witness, and also that Constantine maintained throughout the trial that Grdina was the mastermind behind the pre-payment penalty. (*Id.* ¶¶ 70-71.)

iv.    Global Settlement Fund

As with the other transactions at issue, trial counsel asserts that he spent a substantial amount of time reviewing the escrow account transactions relating to the Global Settlement Fund, and understood the transactions. (*Id.* ¶ 74.) Trial counsel explains that his pre-trial review of the evidence indicated that Constantine and Kenner used substantial sums of the hockey players' money "for personal reasons and payment of financial obligations," including the payment of loans for airplane hangars, airplanes, Palms condominium units, Eufora, pending bills for race cars and equipment, and other expenditures. (*Id.* ¶ 75.) Thus, trial counsel's defense strategy included obtaining admissions from the hockey players and Kristin Peca that their contributions were authorized for multiple purposes beyond funding the Jowdy litigation. (*Id.* ¶¶ 76, 88.) Trial counsel also asserts that the defense strategy included calling Sergi Gonchar ("Gonchar") to testify that Constantine was authorized to use Gonchar's contributions to the escrow account, which totaled over $1 million, for his personal use as long as Constantine paid it back. (*Id.* ¶¶ 76-77.) Overall, trial counsel notes that his strategy was to account for all of the money taken from the account, which totaled over $3 million, that was removed prior to either of the two deposits that Constantine raises in the instant motion. (*Id.* ¶ 84.) Additionally, trial counsel notes that he "purposely sought to avoid a line-by-line analysis of the deposits and withdrawals from the escrow account," in part to prevent the jury from learning "that the Defendant was engaged in a separate fraud from the outset of the Global Settlement Fund," involving Constantine attempting to deceive a lender so that the lender would not foreclose on a building with $3 million in equity. (*Id.* ¶ 89.)

Contrary to Constantine's allegations, trial counsel asserts that he was never informed of Constantine's supposed $15,000 deposit of funds to which he was entitled, and does not recall any request from Constantine to call a witness from Neptune to testify about the origin of that deposit. (*Id.* ¶ 80.) Further, trial counsel asserts that he correctly elicited testimony that a $124,982 deposit by Constantine was a "repayment of money owed to the Settlement Fund," and does not recall Constantine wanting to call witnesses to substantiate the deposit of the money. (*Id.* ¶¶ 82-83.) With respect to Constantine's allegations involving trial counsel using a spreadsheet prepared by Kenner regarding the GSF, trial counsel asserts that though he was initially under the mistaken belief that the spreadsheet was produced by Kenner and objected to its admission, he later learned that the spreadsheet was prepared by Semple's employees, and he then used the spreadsheet intentionally as a defense exhibit to "bolster Semple's upcoming testimony and attempt to enhance his credibility with the jury by questioning Gonchar first on aspects of the document." (*Id.* ¶ 86.) Trial counsel has no recollection of Constantine requesting that a spreadsheet of Constantine's creation be used instead. (*Id.* ¶ 88.)

Ultimately, trial counsel asserts that his strategy, and the "best approach to convincing the jury that the Defendant used the GSF for the 'intended purposes,'" was to examine the hockey players' emails disclosing the multiple purposes of the GSF, to elicit Gonchar's testimony regarding the authorization for Constantine to use his contribution for personal expenditures, and to utilize Semple's analysis and spreadsheet. (*Id.* ¶ 88.)

## I. STANDARD OF REVIEW

Defendant moves for a new trial pursuant to Federal Rule of Criminal Procedure 33.

Rule 33 states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court may grant a Rule 33 motion only in "extraordinary circumstances," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009), and only if there exists "'a real concern that an innocent person may have been convicted,'" *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)); *accord United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009); *see also United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000) ("Granting Rule 33 motions is not favored and is done with great caution."). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134. In deciding a Rule 33 motion, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (citation omitted). It is well settled that a motion under Rule 33 can be asserted for ineffective assistance of trial counsel. *See United States v. Brown*, 623 F.3d 104, 113 n.5 (2d Cir. 2010) ("[W]e hold that the proper procedural avenue for defendants who wish to raise ineffective assistance claims after conviction but prior to sentencing is a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33.").

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Legal Standard

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of

counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.'" *Id.* (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). In assessing performance, a court "must apply a 'heavy measure of deference to counsel's judgments.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,'" *id.* at 588 (quoting *Strickland*, 466 U.S. at 690). "However, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690-91).

The second prong focuses on prejudice to a defendant. A defendant is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that they "'undermine[] confidence in the outcome.'" *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "'[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland*, the determination of prejudice may be made with the benefit of hindsight." *Hemstreet v. Greiner*, 491 F. 3d 84, 91 (2d Cir. 2007) (internal citation and quotation marks omitted).

The Supreme Court has made clear that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. Consequently, if the conviction is supported by overwhelming evidence, even serious errors by trial counsel would not warrant granting relief under *Strickland*. *Lindstadt*, 239 F.3d at 204; *see also Wynters v. Poole*, 464 F. Supp. 2d 167, 176 (N.D.N.Y. 2006) ("[T]he determination of prejudice necessarily is affected by the quantity and quality of other evidence against

defendant." (citing *Strickland*, 466 U.S. at 695)). Where the Second Circuit has found insufficient prejudice, the evidence against defendants was very strong, and counsel's error (or purported error) minor in comparison. *See, e.g.*, *Murden v. Artuz*, 497 F.3d 178, 199 (2d Cir. 2007) (finding insufficient prejudice from counsel's failure to investigate certain non-eyewitnesses who could have supported particular defense, where testimony of multiple eyewitnesses contradicted this defense); *Hemstreet*, 491 F.3d at 91-92 (finding prosecution's case "independently strong" even if counsel erred where, *inter alia*, defendant "arguably confessed" to murder to "two separate individuals"); *Bennett v. Fischer*, 246 F. App'x 761, 765 (2d Cir. 2007) (finding that even if counsel had interviewed alibi witness, witness was not credible and would have contradicted defendant's version of events); *Lynn v. Bliden*, 443 F.3d 238, 253 (2d Cir. 2006) (finding insufficient prejudice in part because jury was already aware of evidence counsel failed to admit); *Bridges v. United States*, No. 04 Civ. 2715 (HB), 2005 WL 1798084, at *4-5 (S.D.N.Y. Aug. 1, 2005) (failing to find prejudice due to failure to call defense witnesses and a voice exemplar where prosecution presented, *inter alia*, accomplice testimony and recordings of defendant's incriminating conversations with accomplices).

Moreover, in examining errors by defense counsel, the Court should "consider these errors in the aggregate" because "'[s]ome errors [] have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture.'" *Lindstadt*, 239 F.3d at 199 (quoting *Strickland*, 466 U.S. at 695-96). This Court proceeds to examine defendant's claims, keeping in mind he bears the burden of establishing both deficient performance

and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004).

## B. Application

Constantine argues that trial counsel provided ineffective assistance by (1) not adequately preparing for trial, including failing to adequately understand the theories of prosecution and failing to prepare a defense for the theory of prosecution; (2) relying on Constantine to prepare the opening statement and closing summation; (3) failing to cross-examine government witnesses or otherwise challenge the authenticity of the Home Depot recording; (4) failing to present exculpatory documentary evidence relating to the Urban Expansion deal and GSF frauds (Eufora patents); and (5) failing to call favorable defense witnesses. (IAC Supp Br. 7.)

As a threshold matter, the Court concludes that it need not resolve the factual discrepancies between the conflicting affidavits submitted in connection with the instant motion. First, the vast majority of Constantine's allegations relate to trial counsel's purported lack of preparedness and ineffectiveness in the courtroom, including jury addresses and questioning of witnesses, which the Court was able to observe first-hand during the nine-week trial. Second, the Court notes that trial counsel's affidavit regarding his preparation and extensive consultation with Constantine on numerous trial issues is supported by more than 100 exhibits, totaling hundreds of pages, including many email exchanges with Constantine, initial lead counsel, and co-counsel. To the extent that these email exchanges are relevant to the Court's analysis, and where the authenticity of the email correspondence is not challenged by Constantine, the Court considers these exhibits in its analysis (though the Court

notes that its conclusion would be the same even if the email exchanges provided by trial counsel were not considered. Third, the disputes over conversations regarding potential witnesses need not be resolved at an evidentiary hearing because those are strategic decisions left to the sound discretion of trial counsel and, in any event, trial counsel has explained his decision-making in his detailed affidavit. *See United States v. DiTomasso*, 932 F.3d 58, 69-70 (2d Cir. 2019) ("Trial counsel's '[a]ctions or omissions . . . that might be considered sound trial strategy,' including decisions not to 'call specific witnesses—even ones that might offer exculpatory evidence—[are] ordinarily not viewed as a lapse in professional representation.'" (quoting *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000))). Finally, even if the Court credited Constantine's version of numerous conversations and counsel had conducted the trial as Constantine now claims he should have, there is no basis for the Court to conclude that any of the disputed issues, individually or cumulatively, would have changed the outcome of the trial given the overwhelming evidence of Constantine's guilt. Thus, under these particular circumstances, no evidentiary hearing is necessary to resolve any remaining factual disputes.

In sum, as set forth below, the Court concludes that Constantine has not met the high burden established under *Strickland*. With respect to the first *Strickland* prong, Constantine has not demonstrated that counsel's performance fell below an objective standard of reasonableness. Constantine has also failed to satisfy the second *Strickland* requirement because, based on the totality of the evidence presented to the jury, there is no reasonable probability that even if trial counsel had

erred, the result of the trial would have been different.

### 1. Counsel's Preparedness

As a threshold matter, with respect to Constantine's claim that trial counsel was either unwilling or unprepared to defend this case, having presided over the trial (and the pre-trial motion practice), it was apparent to the Court that defense counsel was prepared throughout the course of the trial and had a thorough understanding of the complex factual and legal issues in this case. The Court has no doubt that trial counsel took his responsibility as defense counsel in this case very seriously, that he is an experienced and talented defense lawyer, and that he used that experience to strategically undermine the government's case. Defense counsel's effort was apparent, his courtroom performance was effective in many respects, and his professionalism was at the highest level. Thus, the Court emphatically rejects any suggestion by Constantine that trial counsel was completely lacking in effort, preparation, or willingness to try this case. To the extent that Constantine alleges that he was denied his choice of counsel and that he did not want trial counsel to try this case, it is clear that Constantine waived any objection to the substitution of trial counsel for his initial lead counsel, when he accepted trial counsel's role as lead counsel for trying the case to this Court. (*See* TC Aff. ¶ 4, Ex. 1.) Constantine did not make any representations to the Court at any point that he did not consent to trial counsel being substituted for initial lead counsel.

### 2. Counsel's Performance Relating to the Home Depot Recording

The Court concludes that trial counsel did not provide ineffective assistance with respect to the Home Depot recording. First, the Court notes that trial counsel did seek to

suppress the Home Depot recording prior to trial, and in the alternative, sought a hearing on the authenticity of the recording (ECF No. 156 at 1). In fact, trial counsel was successful in that the government agreed not "to seek admission of the recording during its case-in-chief," but "reserve[d] the right to seek admission of appropriately redacted excerpts in the event either or both defendants choose to testify in [sic] their own behalf" (ECF No. 168 at 32).

Once it became apparent that the Home Depot recording would be introduced through Kenner's direct examination testimony, trial counsel requested a hearing to challenge the authenticity of the recording. (Tr. 4380-81, 4409-10.) At the hearing, trial counsel used questions prepared by Constantine, and which Constantine had shown to Kenner, to examine Kenner as to authenticity of the recording. (Constantine Aff. ¶ 58; TC Aff. ¶¶ 44-45; see also Tr. 4414-17.) In effect, Kenner testified at that hearing that the recording had been altered and that references to Jowdy had been omitted, changing the context of the recorded conversation to incriminate Kenner and Constantine, rather than Kenner and Jowdy. (See Tr. 4414-17.) When the proceedings resumed after the weekend, trial counsel put on the record, with Constantine's permission, that trial counsel told Constantine that he could prepare questions regarding the recording and show them to Kenner. (Tr. 4534-38.) Kenner then testified again and authenticated the recording, indicating that he believed the recording to be accurate. (Tr. 4541-43.)

The Court acknowledged at that hearing that, if trial counsel were to attempt to impeach Kenner "regarding the fact that he, outside the presence of the jury, testified differently, [trial counsel] would then be implicating [his] client's communications

with him, which is problematic." (Tr. 4538.) As the government notes in its opposition brief to the Rule 33 motion on ineffective assistance of counsel grounds, trial counsel did make efforts to address the authenticity of the recording in front of the jury, and advanced arguments that encouraged the jury to give little weight to the Home Depot recording evidence, such as arguing that only Kenner had authenticated the recording. (Gov't Br. 15; Tr. 5141, 5143, 5938-39.) In his summation, trial counsel also argued to the jury that the recording was not incriminating as to Constantine because on the recording, Constantine never referred to "we" when discussing criminal liability, and encouraged the jury to reject the government's argument that Constantine compared himself to a "getaway driver," incriminating himself on the recording. (Tr. 5940-42.)

The Court concludes that trial counsel's decision not to attempt to impeach Kenner using his testimony from the hearing was an eminently reasonable decision and strategy. "An attorney's decision not to impeach a witness may fall within the range of objectively reasonable trial strategies at counsel's disposal." Lewis v. United States, No. 10-CV-00718 (ENV), 2012 WL 2394810, at *4 (E.D.N.Y. June 25, 2012) (citing Dunham v. Travis, 313 F.3d 724, 732 (2d Cir. 2002)). A decision not to impeach is reasonable where "there are plausible evidentiary and strategic reasons why counsel did not pursue an impeachment strategy." Id. Here, as the Court noted at the oral argument on this motion, any attempt to impeach Kenner using his earlier testimony could have been detrimental to Constantine's defense case, because it was clear that Kenner had been lying outside the presence of the jury, and alerting the jury to Constantine's role in providing the questions to Kenner could have negatively impacted the jury's

view of Constantine. The Court rejects any suggestion by Constantine that trial counsel declined to impeach Kenner for reasons of "self-preservation" or in an effort to protect himself from consequences resulting from permitting Constantine to provide questions to Kenner. Instead, the Court concludes that trial counsel's decision to avoid raising the circumstances of Kenner's recantation to the jury, in an attempt to prevent Constantine's conduct from adversely impacting the jury's consideration of the evidence, and because there was no evidence that the recording was altered, was an entirely reasonable strategic decision.

Further, the Court concludes that trial counsel's decision not to cross-examine Agent Crisalli, including not questioning him regarding a screenshot of metadata from Kenner's iTunes account, was a tactical decision left to the discretion of counsel, and was a reasonable strategic decision. *See Taylor v. Fischer*, No. 05 Civ. 3034(GEL), 2006 WL 416372, at *5 (S.D.N.Y. Feb. 21, 2006). In light of Kenner's testimony and the results of the original forensic examination of the computer demonstrating that the recording was not altered, trial counsel made a sound strategic decision not to attempt to use a single screenshot to try to establish that the recording was in fact altered. Moreover, the timestamps on the screenshot that Constantine claims are evidence that the recording was doctored could have been explained by the government, and the screenshot could then have been used against Constantine in front of the jury. Specifically, the government points out that the screenshot does not pertain to the version of the Home Depot recording that was introduced into evidence, but rather was related to copies that Kenner made after the record was extracted from his iPhone pursuant to a search warrant. (Gov't Br. 17.) Further, the government notes that the title of the screenshot file

contains information that corroborates Kenner's and Agent Crisalli's testimony, and the differences between the timestamps can be explained by "time zone slippage." (*Id.*) Thus, the Court concludes, in light of the risks associated with attempting to impeach Kenner and using the screenshot to cross-examine Agent Crisalli, trial counsel's strategy was sound, and he was not constitutionally ineffective.

Additionally, with respect to Constantine's allegations that trial counsel was ineffective for failing to retain a forensic audio expert, the Court need not determine who is "at fault" for failing to retain a defense audio expert to examine the recording, though the Court is skeptical of Constantine's claim that he was unaware the recording would come in through Kenner given Constantine's level of involvement in his defense case. However, the Court need not resolve this factual dispute because the Court concludes that the ultimate determination by trial counsel (whether or not Constantine agreed) was a reasonable strategic decision, even assuming *arguendo* that the decision not to retain a forensic expert could be attributed solely to trial counsel. *See Swaby v. New York*, 613 F. App'x 48, 50 (2d Cir. 2015) ("[T]he failure to seek an expert does not satisfy the performance prong of *Strickland* where counsel chooses a strategy that does not require an expert."); *see also Harrington v. Richter*, 562 U.S. 86, 111 (2011) ("*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.") On his motion for a new trial, Constantine has not put forth any possible testimony his own forensic expert could have offered that would have furthered trial counsel's theory of the defense. Current counsel conceded as much at oral argument on the instant motion, when acknowledging that he did not have any

forensic expert that could rebut the government's forensic expert.

As discussed above, the Court concludes that trial counsel's strategy with respect to the Home Depot recording, including trial counsel's decision not to argue to the jury that the recording was doctored or altered in any way in light of the lack of evidence in support of that position, was sound and reasonable. Further, based on the absence of any evidence that the audio recording was "doctored" as opposed to simply "incomplete," Kenner's testimony to the jury that the recording was not altered, trial counsel's good faith belief that the recording was not altered, and trial counsel's pursuit of an alternative strategy to deal with the Home Depot recording, the Court concludes that any failure to retain a defense forensic evidence does not satisfy the first prong of *Strickland*.

In an abundance of caution, the Court also concludes that Constantine has failed to satisfy the prejudice prong of *Strickland* with respect to the Home Depot recording. Even assuming *arguendo* that trial counsel erred in not attacking the authenticity of the Home Depot recording by: not introducing evidence of Kenner's recantation to the jury; not introducing the screenshot containing metadata from Kenner's computer; and not calling a defense forensic expert, Constantine has failed to establish any prejudice resulting from these alleged errors. Of note, Constantine has not offered any evidence, other than the single screenshot, in support of the argument that the recording actually was doctored. Thus, the Court would be hard-pressed to find prejudice in light of the lack of any actual exculpatory evidence other than Constantine's conclusory allegations in his affidavit.

Further, as the government notes, it was prepared to prove its case against Constantine

even without the Home Depot recording coming into evidence. (Gov't Br. 19.) The Court agrees that, although the Home Depot recording ultimately supported Constantine's involvement in Eufora fraud, the government could have proven its case against Constantine without that recording, given the substantial evidence introduced at trial as discussed in this Court's October 13, 2017 Order. Specifically, the Court discussed many other pieces of relevant evidence introduced at trial, including bank records, business records, text messages, and other testimony and documents demonstrating that Constantine made efforts to cover up the Eufora fraud. *Kenner*, 272 F. Supp. at 400. In that Order, the Court also noted that the jury was entitled to assess the weight of the Home Depot recording and to choose which inferences to draw from it, noting that "viewing the Home Depot recording in its totality **and in conjunction with the other evidence of collaboration between Kenner and Constantine**, . . . , a rational juror could conclude that Constantine sought Kenner's assistance in dissembling the Eufora conspiracy." *Id.* (emphasis added) (citation omitted). Given the overwhelming evidence of Constantine's culpability described above, even without considering the Home Depot recording, the Court concludes that assuming trial counsel erred with respect to his handling of the Home Depot recording, Constantine suffered no prejudice.

### 3. Evidence and Witnesses Related to the Global Settlement Fund Fraud

Constantine alleges that trial counsel was ineffective with respect to the defense relating to the GSF fraud because trial counsel failed to introduce exculpatory documents or witnesses that established that Constantine contributed to the GSF via deposits to the escrow account, and thus there

were expenditures, beyond those that were specifically authorized by GSF funders, that were non-fraudulent. (*See* IAC Supp. Br. 21.) Specifically, Constantine makes refers to an approximately $125,000 deposit from Northwest Value Partners from the sale of Constantine's race car and a $15,000 deposit from Constantine's personal line of credit from Neptune Company. (*Id.* at 21-22.)[9] Constantine also alleges that trial counsel was ineffective because he used a spreadsheet prepared by a government witness for calculations regarding the GSF rather than a spreadsheet created by Constantine and allegedly provided by Constantine to trial counsel. (*Id.* at 24-26.) The Court disagrees.

Trial counsel clearly articulated his strategy with respect to the GSF in his affidavit submitted in opposition to the instant motion:

> Our defense strategy to explain the millions of dollars spent to cover the payment of the Defendant's personal expenses and financial obligations, with the hockey players' contribution, was a two-fold approach. First, during cross-examination of the hockey players, and Michael Peca's wife, we utilized email communications, provided by the Defendant, and obtained admissions from them that their 'contributions' were for multiple purposes, beyond funding the Jowdy litigation, including

> buying out unsatisfied investors, resolving lawsuits, acquiring significant assets and 'transferring interest to [the hockey players] in Avalon Air Park real estate projects, a Falcon 10 aircraft and the two Palms condominium units.' And secondly, to provide an explanation for the Defendant's withdrawals of funds from the Global Settlement Fund for unauthorized personal expenses, we called Sergi Gonchar . . . who testified that the Defendant was authorized to use his contributions to the escrow account, which totaled over $1 million, for the Defendant's personal use 'as long as he's going to pay it back. That's the deal we had.'

(TC Aff. ¶¶ 76-77) (citing Tr. 452, 773-77, 1919-21, 2003-04, 2252-81, 2792-93, 3544-46, 4806-14, 4826-27). Trial counsel further asserts that the $125,000 was "a repayment of money owed to the Settlement Fund, and not deposits of the Defendant's personal money beyond that deposited by Gonchar to pay for personal expenses," and that he had no recollection either of a discussion of the $15,000 deposit and supposed request to call a Neptune representative, or that Constantine presented a bill of sale for the race car and the accompanying request to call a witness to substantiate that deposit. (*Id.* ¶¶ 80-83) (internal quotation marks omitted).

---

[9] Constantine submitted a supplemental letter on March 29, 2019 to address issues surrounding the GSF raised at oral argument. (ECF No. 634.) In particular, Constantine asserts that trial counsel's failure to address certain "line items" from the GSF transactions, including Constantine directing the return of funds on two occasions and Constantine's deposits and personal use of funds in the Escrow Account but not in the GSF was ineffective because explanation of these transactions was necessary to "refute[] [Constantine's] intent to defraud." (*Id.*)

25

As an initial matter, having presided over this trial and having observed trial counsel question witnesses both on direct and cross-examination regarding the GSF fraud and present arguments about the GSF funds during his summation, the Court is confident that trial counsel understood the GSF transactions, engaged in substantial preparation on this issue, and made a "conscious, reasonably informed decision . . . with an eye to benefitting his client" as to his strategy for addressing the GSF fraud to the jury. *Cox v. Donnelly*, 387 F.3d 193, 198 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Pavel v. Hollins*, 261 F.3d 210, 218 (2d Cir. 2001)).

Further, the Court concludes, indulging "the presumption that, under the circumstances, the challenged action 'might be sound trial strategy,'" that trial counsel's two-fold strategy for addressing the GSF fraud was eminently reasonable. *Strickland*, 466 U.S. 668 at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The transactions involving the GSF totaled millions of dollars, with only a small percentage of that fund actually being used for legal defense funds. Additionally, as the Court concluded in the October 13, 2017 Order, "although there was evidence at trial that the Global Settlement Fund's purposive ambit was broad and encompassed goals beyond financing litigation against Jowdy, none of the government's witnesses testified that they approved using the GSF for defendants' individual gain. Moreover, financial statements show that Constantine's personal expenditures from the GSF exceeded the defense witness's investments." *Kenner*, 272 F. Supp. at 348.

Thus, given the significant documentary and testimonial evidence presented at trial regarding the millions of dollars involved in the GSF fund, trial counsel's strategy to address all of the money taken from the GSF account by attempting to elicit from witnesses the broad intended purposes of the GSF, and seeking to avoid a line-by-line analysis of the deposits and withdrawals from the escrow account because some of the withdrawals for Constantine's personal expenditures could not be explained, was certainly reasonable. (*See* TC Aff. ¶¶ 84, 89.) Though Constantine argues that trial counsel did not effectively refute the evidence of Constantine's intent to defraud by failing to introduce evidence substantiating the $125,000 and $15,000 deposits (or repayments), the Court disagrees. *See United States v. Davis*, 41 F. App'x 493, 495 (2d Cir. 2002) (finding no ineffective assistance where defendant alleged that her trial counsel failed to introduce evidence to rebut her intent to participate in a conspiracy but there was substantial evidence of her knowledge and intent in the record).

Trial counsel's strategy of attempting to account for all of the money, though ultimately unsuccessful, was certainly a reasonable attempt to persuade the jury that Constantine was not, in fact, attempting to defraud investors, but rather was using the fund for broadly defined intended purposes. *See Eze v. Senkowski*, 321 F.3d 110, 125 (2d Cir. 2003) ("Our scrutiny of counsel's performance is 'highly deferential' because '[i]t is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.'" (alteration in original) (quoting *Strickland*, 466 U.S. at 689)); *United States v. Svendsen*, 8 F. App'x 101, 104 (2d Cir. 2001) ("[W]e have repeatedly noted our reluctance to second-guess matters of trial strategy simply because the chosen strategy was not

successful.") (alteration in original) (quoting *Cuevas v. Henderson*, 801 F.2d 586, 590 (2d Cir. 1986)).

Moreover, the Court concludes that trial counsel's handling of the spreadsheet (identified as Exhibit 767) used at trial, which trial counsel initially objected to because he was under the impression it was created by Kenner, but later used as a defense exhibit when he learned it was prepared by Semple's employees, was reasonable. Trial counsel asserts that his "strategy was to bolster Semple's upcoming testimony and attempt to enhance his credibility with the jury by questioning Gonchar first on aspects of the document" (TC Aff. ¶ 86) and to use the spreadsheet "to support Gonchar's testimony and Semple's conclusion that 'the majority of the funds were used for their intended purpose'" (*id.* ¶ 87 (citing Tr. 5529)). Though Constantine asserts that trial counsel should have used a spreadsheet of Constantine's creation to explain the GSF transactions, Constantine has not provided the Court with the spreadsheet, nor has Constantine addressed the fact that if trial counsel had used Constantine's spreadsheet, Constantine himself would have had to be called as a witness to authenticate it. Thus, the Court concludes that trial counsel's choice to utilize Semple's spreadsheet as a defense exhibit, even after initially objecting to its admission, was a strategic decision that does not constitute ineffective assistance of counsel.

Turning to the second prong of *Strickland*, even assuming Constantine was able to show that counsel's performance was deficient, he has failed to show that he was prejudiced as a result, because he has failed to show that "but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 694. Here, the Court has already concluded that:

> even crediting the testimony that the Global Settlement Fund's purposive ambit extended beyond financing litigation against Jowdy to encompass additional goals including asset acquisition, there was no evidence at trial (save for Gonchar's testimony) that GSF contributors authorized Constantine to spend their money on his personal pursuits. Even accounting for Gonchar's and Semple's testimony, when viewing the entire record and drawing all inferences in the government's favor, a rational juror could conclude that Constantine participated in the Global Settlement Fund conspiracy based on his repeated and undisclosed use of the Richards Escrow Account for his individual gain through unauthorized diversions that exceeded Gonchar's investments. The jury could have rationally rejected Gonchar's testimony, or, even assuming *arguendo* that the jury credited Gonchar's testimony, the jury could have still rationally found that it could not explain the personal expenditures that exceeded Gonchar's investments.

*Kenner*, 272 F. Supp. 3d at 404-05. Constantine's assertions here—that trial counsel should have presented exculpatory evidence regarding a total of $140,000 of funds and should have used Constantine's spreadsheet rather than the Exhibit 767

27

spreadsheet—do not disturb this conclusion. The Court concludes that, in light of the millions of dollars at issue with the GSF, even if trial counsel had established that the $140,000 of funds from the race car sale and the Neptune deposit were Constantine's personal funds, Constantine's intent as to that small percentage of funds is immaterial as compared to the substantial evidence of Constantine's intent to defraud and participation in the conspiracy as to the vast majority of the GSF. Thus, even assuming that trial counsel's performance was deficient, the Court's confidence in the jury's verdict is not undermined. *See Strickland*, 466 U.S. at 694. Similarly, even if true, Constantine's contention that trial counsel was ineffective for allegedly failing to address an error in the Exhibit 767 spreadsheet relating to a transfer of $155,000 to "az falcon partners," fails because Constantine can demonstrate no prejudice from trial counsel's performance. The government did not seek to establish that the AZ Falcon transaction was diverted for Constantine's personal use, nor would $155,000 have made a material difference in Constantine's defense case in light of the magnitude of the GSF, as discussed above. Thus, the Court concludes that Constantine has failed to establish that counsel was ineffective with respect to the defense of the GSF fraud.

### 4. Evidence Regarding Text Messages about GSF

Finally, in a supplemental letter to the Court, filed on August 30, 2019, Constantine alleges that the government either failed to produce, or trial counsel unreasonably failed to introduce, exculpatory text messages indicating that investors other than Gonchar authorized the broad purposes of the GSF. (ECF No. 704.) Specifically, Constantine references the following: a May 9, 2009 text message exchange between McKee and Kenner regarding McKee's contribution to the GSF, in which Kenner informed McKee that his contribution would result in the acquisition of shares of the Airpark and Eufora, and a "small piece of the jet" (*id.* at 2) and a May 9, 2009 text message exchange between Michael Peca and Kenner in which Michael Peca asked Kenner "[h]ow much in ea [sic] of the two companies" he would receive in exchange for his $250,000 contribution (*id.* at 3). Constantine asserts that these text messages "establish that the McKee's and/or the Pecas were aware of the expenditures described in the Emails" and thus, "dramatically change[ ] the accounting and permissible uses by defendant for the GSF money contributed by the hockey players and by Gonchar." (*Id.* at 6.) He further argues that "[t]he ultimate effect of the McKee and Peca authorizations is that, in reality, Constantine had access to a much larger portion of the GSF for personal expenses than was portrayed at trial." (*Id.* at 9.) Constantine argues that trial counsel unreasonably failed to introduce these text messages at trial to cross-examine McKee and the Pecas with respect to their knowledge of the broader purpose of the GSF beyond the funding of the Jowdy litigation. (*Id.* at 7.) The government filed a response to Constantine's supplemental letter on September 12, 2019 (ECF No. 712) and Constantine filed a reply on September 18, 2019 (ECF No. 717).[10]

---

[10] In its opposition, with respect to Constantine's uncertainty as to whether certain Kenner text messages were part of the discovery, the government notes that non-privileged materials obtained from Kenner's devices (including his laptop and cellphone) were produced to Kenner and Constantine. Moreover, as noted *infra*, many of these text messages were utilized at the trial. In his reply, Constantine appears to abandon any assertion that there was a discovery

As the government notes in its response, the Court had already considered these specific text messages, which were quoted in Kenner's November 28, 2016 motion for a new trial as an example of evidence that government witnesses allegedly committed perjury. (ECF No. 712 at 1 (citing ECF No. 416 at 106, 122).) The Court concluded in the October 13, 2017 Order, having considered these specific text message exchanges as well as other supposed evidence of perjury that Kenner raised, that:

> Kenner's counsel extensively cross-examined each government witness at trial—indeed, the time expended on cross-examination often exceeded the length of direct testimony—and Kenner spent several days on the stand attempting to impugn the honesty of government witnesses with much of the same testimony and documents. The Court has no doubt that, after nine weeks of trial and the admission of more than 1,000 exhibits, the jury had ample opportunity to evaluate the credibility of each and every witness and to consider Kenner's version of events. The Court will not usurp that function by arrogating the power to resolve conflicting statements and narratives.

*Kenner*, 272 F. Supp. 3d at 434. The Court also concluded that the text messages provided by Kenner in support of his motion "merely furnish[ ] an additional basis on which to impeach" those witnesses and are therefore cumulative." *Kenner*, 272 F. Supp. 3d at 432 (internal quotation marks omitted)

(quoting *United States v. Payne*, 63 F.3d 1200, 1210 (2d Cir. 1995)).

Though the Court previously considered these text messages in the context of Kenner's perjury claim in support of his Rule 33 motion for a new trial, the Court has now considered the text messages with respect to Constantine's Rule 33 motion on the basis of ineffective assistance of counsel, and similarly finds that Constantine's arguments based on these text messages are unpersuasive. These text messages were not exculpatory. First, the testimony at trial (from witnesses such as Michael and Kristin Peca) was that they were told that the interests in the jet or Eufora were additional benefits that they were to receive in exchange for participating in the GSF, not that their investment would be used for such purposes. The text messages are consistent with that testimony. Second, the text messages do not disclose or explain multiple personal expenditures that Constantine made with the GSF or that Eufora's patents had been pledged as collateral, that the airplane hangars were in bankruptcy, and the airplane had been re-possessed.

In sum, under the circumstances, trial counsel's decision not to introduce the text messages to cross-examine and attempt to impeach government witnesses was a reasonable strategic decision. *See Lewis*, 2012 WL 2394810, at *4; *Taylor*, 2006 WL 416372, at *5. Moreover, even assuming *arguendo* that trial counsel's performance was deficient, the Court concludes that Constantine suffered no prejudice. As noted, the Court concludes that the text message evidence would have been cumulative of other evidence introduced at trial, and in light of the overwhelming evidence produced by the government and credited by the jury that

---

violation. In any event, Constantine has failed to make any such showing.

Constantine fraudulently diverted the GSF contributions for his personal gain, the Court's confidence in the jury's verdict is not undermined. *See Strickland*, 466 U.S. at 694.

### 5. Evidence and Witnesses Related to the Hawaii Project Fraud and Urban Expansion Loan Deal

Constantine argues that trial counsel was ineffective with respect to the Urban Expansion loan deal, specifically alleging that trial counsel "bolster[ed] the government's argument" by highlighting in summation that Constantine paid the $1.5 million balance "after the Lehman deal closed," and by failing to introduce the "Urban funding documents" or calling Lockwood as a defense witness during trial to refute the government's arguments. (IAC Supp. Br. 16-20.) Furthermore, as he did in the initial Rule 29 and 33 motions, Constantine again raises Grdina's post-trial recantations with respect to the Urban Expansion loan, and argues that trial counsel should have produced such recantations at trial. (*Id.* at 20.) The Court disagrees, and concludes that trial counsel effectively represented Constantine with respect to the Urban Expansion loan.

First, having observed trial counsel conduct witness examinations regarding the Urban Expansion deal and discuss the deal during the summation, it is clear that trial counsel had engaged in preparation for and had a sophisticated understanding of the Urban Expansion deal and surrounding transactions.

With respect to trial strategy, trial counsel discussed in his affidavit that he "cross-examined Grdina utilizing bank records showing that the Defendant had wire transferred $1.5M to Kenner before and after

the loan, and actually introduced evidence of the payments to Kenner" (TC Aff. ¶ 67 (citing Tr. 2412-31)), and cross-examined Chris Petrolese, the government's FBI forensic accountant, who "agreed that $1.5M dollars was transferred to Kenner" (*id.* (citing Tr. 3958-68).). Trial counsel also noted that "without the Defendant's testimony or documentary evidence establishing that these random payments to Kenner were part of the Defendant's $1.5M contribution to the Urban Expansion Loan, the strength of our presentation was severely undermined . . . ." (*Id.*) As an exhibit to his affidavit, trial counsel provides an email exchange with Constantine, dated January 30, 2015, in which Constantine states the following:

> . . . KENNER and my partner allowed me to make my $1.5 M contribution over time . . . . It should be noted and is very important, that the $2 million prepayment penalty which the Government alleges was engineered by me and KENNER (as a mechanism to kick back to KENNER) was actually my partner's idea . . . . Because I had only paid for a portion of my $1.5 M commitment for my share of the deal by the time Lehman came in, I was still obligated to pay the balance . . . . So in effect, when Lehman closed and I received my respective share of the proceeds (30%) I simply paid Kenner the balance of the $1.5 M that I owed . . . .[I]f [Galioto] did his job, and added up all the money that I paid to KENNER prior to that and after Lehamn [sic] closed, and looked at the documents that show I owed a total of $1.5M, [Galioto] would see that it's $1.5 million in total

which I was obligated to pay to be a part of the deal to begin with.

(TC Aff. Ex. 69.) Further, in a May 29, 2015 email, Constantine says the following:

> The key will be to get [Grdina] to admit that he didn't care when I put my $1.5M in and that I shouldn't be penalized because Lehman bought in before I was done paying off. In other words, whether Lehman came in or not, I still had to pay the $1.5M and the fact that some of it was paid after Lehman happened shouldn't matter . . . . It will be critical to show [Grdina] the bank records in front of the jury adding up to $1.5 million.

(TC Aff. Ex. 70 (emphasis omitted).) Constantine does not dispute that he sent those emails or the accuracy of their contents[11], but asserts in his affidavit that:

> . . . [Trial counsel], during the summation, appeared to substantiate the Government's argument that I did not make my $1.5 capital contribution to the Urban Expansion deal in a timely fashion by suggesting that I did it after the Lehman deal closed or in essence, better late than never . . . . I did in fact make my capital contribution when I was supposed to, long before the Lehman deal closed and his suggestion that I only made it

after the Lehman deal paid off, after representing to Mr. Grdina that I would do so as agreed upon in the Operating Agreement, was essentially the Government's fraud allegation.

(Constantine Aff. ¶ 21.) Constantine's assertion now, that he paid off his $1.5 million contribution in a timely fashion, stands in complete contradiction to his statement in the January 30, 2015 pre-trial email that he was permitted to make his capital contribution over time, and that he did contribute $1.5 million in total—both before and after the Lehman deal closed. The Court concludes that trial counsel's reliance on Constantine's pre-trial representation that the payment could be made over time, and that funds from both before and after the Lehman deal closed were used to satisfy Constantine's $1.5 million obligation for the Urban Expansion loan, was eminently reasonable, and was a strategic decision that was a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." *Cox*, 387 F.3d at 198 (internal quotation marks omitted) (quoting *Pavel*, 261 F.3d at 218). Further, Constantine's disagreement with trial counsel's strategy is not grounds for finding that trial counsel was constitutionally ineffective. *See United States v. Salameh*, 16 F. App'x 73, 76 (2d Cir. 2001) ("[A] defendant cannot prevail on a claim of ineffective assistance merely because he believes that his counsel's strategy was inadequate.").

---

[11] Constantine asserts that trial counsel provided as an exhibit to his affidavit regarding the Urban Expansion loan "a multiple page, hand-written (stream of consciousness letter that I wrote under the stress of being incarcerated) to [initial lead counsel] just a few weeks after I was arrested, regarding a transaction that occurred almost seven years prior . . . ." (Constantine Supp. Aff. ¶ 20.) However, Constantine does not dispute the authenticity of any such letter, or that he authored the January 20, 2015 or May 29, 2015 emails to trial counsel regarding the Urban Expansion deal.

With respect to Constantine's allegations about supplementary documentary evidence that trial counsel should have used to cross-examine Grdina (and which was used at the post-trial proceeding and led to Grdina's supposed recantation of his trial testimony), the Court disagrees that this provides a basis for Constantine's ineffective assistance of counsel claim. As this Court already concluded in the October 13, 2017 Order, even if trial counsel had utilized the supplementary documentary evidence at trial, "all of these documents are cumulative of Constantine's efforts at trial—which included presenting various documents—to elicit testimony from Grdina that Constantine contributed to the Urban Expansion loan . . . ." *Kenner*, 272 F. Supp. 3d at 418. Thus, any decision by trial counsel not to introduce cumulative evidence and to focus on the strategy that he deemed the most likely to prevail was reasonable, even if ultimately the jury was not persuaded by such tactics. *See Weingarten v. United States*, 865 F.3d 48, 53 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1309 (2018) ("It is the very function of an effective legal counselor to select among the available arguments and raise only 'the most promising issues for review.' Such a tactic avoids cluttering the court with unnecessary arguments that would 'dilute the force of the stronger ones.'" (quoting *Jones v. Barnes*, 463 U.S. 745, 752 (1983))).

Moreover, the Court concludes that trial counsel was not ineffective with regard to the pre-payment penalty issue. Like with the timing requirements for Constantine's $1.5 million contribution, Constantine's pre-trial statements in two emails, including a May 29, 2015 email, clearly articulate that the pre-payment penalty was Grdina's idea. (TC Aff. Exs. 69, 70.) However, in his Supplemental Affidavit, with respect to the pre-payment penalty, Constantine asserts that ". . . through much of the trial, I believed [the pre-payment

penalty] was Mr. Grdina's idea. But when I expressed this view to [co-counsel] in front of Mr. Kenner during trail [sic], Mr. Kenner started shaking his head side to side and said 'it wasn't Jimmy's idea, it was the lawyer's' . . . . I then remembered that we had paid Mr. Lockwood a bonus for coming up with the prepayment penalty idea." (Constantine Supp. Aff. ¶ 20.) Constantine alleges that trial counsel was then ineffective for failing to cross-examine Grdina regarding Lockwood's role in the pre-payment penalty clause, for not introducing a bonus check from Constantine to Lockwood that would have established that Lockwood engineered the pre-payment penalty, and for failing to call Lockwood as a defense witness. (Constantine Aff. ¶ 28.) Trial counsel asserts that Constantine never informed initial lead counsel or himself that Lockwood designed the pre-payment penalty. (TC Aff. ¶ 71.) The Court disagrees that trial counsel was ineffective with respect the pre-payment penalty issue.

First, the Court notes that, similar to the timing issues regarding the $1.5 million contribution discussed above, trial counsel's strategy regarding the pre-payment penalty, especially in light of Constantine's pre-trial representations, was a reasonable course of action. Even assuming *arguendo* that Constantine alerted trial counsel during the trial that Lockwood, rather than Grdina, was the architect of the pre-payment penalty, it would not have been reasonable to call Lockwood in the face of Grdina's testimony that Constantine engineered the pre-payment penalty (Tr. 2372), and the government's introduction of emails from Constantine *to Lockwood*, describing the pre-payment penalty and the terms of the pre-payment penalty (GX 3811). In addition, Grdina testified that he did not have any objection to the pre-payment penalty (Tr. 2445), which was helpful to Constantine. Moreover,

Lockwood's potential testimony regarding who originated the idea regarding the pre-payment penalty would not have undermined the government's overall evidence regarding the transaction. In any event, with respect to all of Constantine's allegations surrounding trial counsel's defense relating to the Urban Expansion loan deal, the Court concludes that, even if trial counsel had committed all of the alleged errors, Constantine would not have suffered any prejudice as a result. Importantly, the Court notes that the alleged fraud related to the Urban Expansion loan was not charged as a separate fraud, but rather was used as part of the evidence linking Constantine to the Hawaii Project fraud scheme and was not a critical piece of the government's case. Thus, completely apart from the Urban Expansion loan, "there was sufficient evidence to prove beyond a reasonable doubt that [Constantine] participated in the Hawaii Project object of the conspiracy charge, as well as the Eufora and the Global Settlement Fund objectives," and the Hawaii Project, Eufora, and the Global Settlement Fund objectives each could have sustained the jury's verdict as to the conspiracy charges. *Kenner*, 272 F. Supp. 3d at 417. In particular, with respect to the Hawaii Project objective of the fraud, the Court has already concluded that "apart from the Urban Expansion transaction, the government introduced evidence linking Constantine to the Hawaii Project fraud scheme through records and testimony showing that Constantine received money from that endeavor." *Id.* at 418. That conclusion continues to be accurate and leads the Court to conclude that, even assuming *arguendo* that there was ineffectiveness with respect to the Urban Expansion evidence, it did not prejudice Constantine in light of the other compelling evidence of his guilt.

6. Evidence and Witnesses Relating to Eufora

Constantine alleges that trial counsel was ineffective because he failed to call witnesses who would have refuted the government's position that "Eufora and its patents were worthless." (Constantine Aff. ¶ 38.) In particular, Constantine alleges that trial counsel should have called witnesses from Netspend Corporation (Reiff and Selcow) who would have testified that Netspend was negotiating a licensing transaction with Eufora, and a witness from Metabank (Hanson) who was also negotiating with Eufora for a licensing agreement. (*Id.* ¶¶ 39-40.) Constantine also asserts that representatives from Neptune would have authenticated the Patent Security Agreement, "which shows that the loan did not yet exist, and the patents were not yet pledged as collateral at the time the investors were making their investments in Eufora." (Constantine Supp. Aff. ¶ 11.) Relatedly, Constantine asserts that trial counsel should have called Larsen, Eufora's accountant, to establish that the hockey player investors received ownership in Eufora through shares of an LLC rather than through stock certificates (*id.* ¶ 4-5) and DeVries, who would allegedly have testified "regarding the legitimacy of the Eufora sales proceeds going to Constantine Management Group," as well about other aspects of the Eufora and GSF schemes (Constantine Reply Br. 27.).

With respect to Reiff, Selcow, Hanson, and any unnamed Neptune representatives, trial counsel and initial lead counsel refute that Constantine ever asked for these witnesses to be called. (TC Aff. ¶¶ 113-14; ILC Aff. ¶ 10.) As to Larsen, Constantine mentions him only in his Supplemental Affidavit filed with his reply, and trial counsel does not make any representations with respect to Larsen. However, even

assuming *arguendo* that trial counsel had been aware of these witnesses, Constantine has not established that he suffered any prejudice as a result of Reiff, Selcow, Hanson, and unnamed Neptune representatives not being called to testify about the value of Eufora or the timing of the loan, or as a result of Larsen not being called to testify either about the ownership interest in Eufora or Constantine's involvement in allegedly informing law enforcement about fraud involving Eufora. First, as trial counsel noted, there was substantial evidence introduced that a group, including Kaiser, Privitello, Berard, and Stolper, was seeking to take over Eufora from Constantine, which was an attempt to demonstrate the value of Eufora. (*See* Tr. 4830-31, 4368.) Thus, the jury was presented with evidence that the Eufora company had value. However, the government presented substantial evidence at trial that the Eufora patents were posted as collateral for a loan, indicating that the company was in debt, that Constantine did not disclose that fact to investors, and that Constantine knew, and did not disclose, that Eufora was not a profitable pursuit. Further, the Court has already concluded that "a rational juror could conclude, based on bank records and witness testimony, that Constantine regularly diverted money intended for Eufora to pay his personal expenses out of CMG's and Eufora's coffers." *Kenner*, 272 F. Supp. 3d at 400.

As to DeVries, Constantine asserts that DeVries had agreed to testify on his behalf, but that trial counsel's inquiry to DeVries about the Home Depot recording "tainted" DeVries and caused him not to testify. (Constantine Supp. Aff. ¶ 15.) Trial counsel does not dispute that he inquired with DeVries about the recording, and provides as an exhibit to his affidavit an email exchange in which DeVries acknowledges that he was aware of the recording, indicates that he is

concerned that his testimony about the recording "will create issues" for both Kenner and Constantine, and informed trial counsel that he was not going to testify. (TC Aff. ¶ 47, Ex. 51.) Trial counsel then responded to DeVries, informing him that he would not be questioned about the recording and asked him to testify "to rebut Kaiser's false testimony about calling you about Tommy trying to defraud you by offering 50 cents on the dollar" and asserting that DeVries' "awareness about the Eufora loan and the patents being pledged . . . is significant." (*Id.*) Constantine does not dispute the contents or the fact that these emails were exchanged. Thus, it is apparent to the Court that trial counsel was aware that Constantine wanted DeVries to testify, contacted DeVries about this testimony, but that DeVries ultimately refused to testify, at least in part because he believed his testimony might be harmful to Constantine. The Court concludes that trial counsel's decision not to subpoena DeVries to testify, against his will was a sound strategic decision. Even prior to trial counsel's inquiry, Constantine himself acknowledged that DeVries was only willing "reluctantly" to testify on his behalf, and that it took weeks to even get DeVries to agree to testify initially. (Constantine Aff. ¶ 15.) Thus, in light of DeVries' reluctance to testify and the possibility that his testimony would be harmful to Constantine, the Court concludes that trial counsel's decision not to force him to testify was "grounded in some strategy that advances the client's interests." *Eze*, 321 F.3d at 129. Further, the Court's deference to attorney's strategic decisions not to call a particular witness "is particularly apt where, as here, an attorney decides not to call an unfriendly witness to the stand." *Greiner*, 417 F.3d at 323.

Moreover, even assuming *arguendo* that trial counsel erred in failing to compel

DeVries to testify, Constantine has failed to establish that he suffered prejudice as result. As noted previously, the Court has already concluded that there was substantial evidence introduced at trial regarding the Eufora fraud, including the value of the company and Constantine's misrepresentations to investors, and Constantine has failed to establish a reasonable probability that the trial outcome would have been different if trial counsel had called DeVries as a witness, particularly in light of DeVries' assertion that he was concerned that his testimony could negatively impact Constantine's case. *See Strickland*, 466 U.S. at 688.

### 7. Other Defense Witnesses[12]

Constantine names several other witnesses whom he attests should have been called to testify in his defense.

With respect to Sonnenblick, Constantine asserts that Sonnenblick would have "substantiated his own existence" as an investor, and would have authenticated phone calls between himself and Constantine and the MOU to purchase a portion of the Diamante Cabo San Lucas property in connection with the GSF. (Constantine Aff. ¶ 35.) Trial counsel asserts that Sonnenblick's testimony was unnecessary because evidence that Constantine was attempting to help the hockey players recover their investments by securing an investor for the Cabo Diamante property was introduced through an email that attached the executed MOU, and testimony from Michael Peca, Kristen Peca, Jay McKee, Tyson Nash, William Ranford, and Glen Murray about the email indicating that Sonnenblick was the

investor. (TC Aff. ¶ 116 (citing Tr. 503-06, 635, 1880-81, 2007-08, 2882-83, 3574-76).)

As to Hilton, Constantine asserts that Hilton would have testified about Constantine's efforts to solicit investments for the Hawaii Project and to contradict the government's position that the Avalon Airpark/Hangar Project was subject to a bankruptcy. (Constantine Supp. Aff. ¶¶ 37-38.) Trial counsel asserts that Hilton was not called as a witness because his testimony could have been damaging to Constantine, as Hilton had stated in an email—which is not challenged by Constantine—that Constantine had "screwed him pretty bad and stole his money," and that Hilton would not have been able to refute that Constantine received a million dollars prior to the Urban Expansion loan without giving anything in exchange. (TC Aff. ¶¶ 118-19.) Trial counsel further asserts that anything Hilton might have testified to that was favorable to Constantine in terms of establishing that Constantine had made efforts to secure investors for the Hawaii Project was already established in the evidence through email communications showing that Constantine had approached investors. (*Id.* ¶ 119.)

As discussed previously, "[c]ourts applying *Strickland* are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury." *Greiner*, 417 F.3d at 323. Further, "[c]ounsel's decision as to 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'" *Best*, 219 F.3d at 201 (quoting *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997)). Here, it is clear from

---

[12] Constantine lists numerous witnesses (some named and some identified only by the entity with which they are affiliated) that he alleges should have been called in his defense. The Court has addressed

many of these witnesses elsewhere in this Order as they relate to the various frauds for which Constantine was implicated.

the record that trial counsel, initial lead counsel, or another associate working on this case communicated with both Sonnenblick and Hilton, and trial counsel then made an informed and strategic decision not to call them as witnesses. Trial counsel has articulated sound strategic reasons for not calling Sonnenblick and Hilton to testify as defense witnesses—namely that their testimony would be cumulative of other documentary evidence and testimony in the record supporting the position that Constantine had made efforts to secure Sonnenblick and Hilton as investors in connection with the GSF and the Hawaii Project, respectively. *See United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) ("[W]e conclude that counsel's choices were within the range of acceptable strategic and tactical alternatives and did not cause the representation to fall below the constitutionally acceptable level mandated by *Strickland* . . . . Here, the witness [defendant] asserts should have been called would have testified in a manner corroborative of another witness; counsel might well have regarded the testimony as unnecessarily cumulative." (citation omitted)). The Court agrees that in light of the documents in evidence and testified to by other witnesses, including the MOU signed by Sonnenblick and the email communications regarding Hilton, trial counsel's decision to rely on that evidence rather than risk potentially unfavorable testimony from Sonnenblick and Hilton was an entirely reasonable strategic decision that should not be second-guessed by the Court.[13]

Turning to the second prong of *Strickland*, even assuming *arguendo* that it was error for trial counsel not to call Sonnenblick and/or Hilton, Constantine has failed to establish prejudice as a result. Specifically, as noted above, neither Sonnenblick's nor Hilton's testimony would have introduced any novel evidence into the evidentiary record, but rather would have been cumulative of other documentary and testimonial evidence in the record. As to Sonnenblick, while Constantine alleges that his testimony would have substantiated his existence as a potential investor, establishing the fact of Sonnenblick's existence as an actual person and actual investor likely would have been diminished in significance as the jury heard testimony from Michael Peca that the deal with Sonnenblick was never consummated. (*See* Tr. 536). Further, as the government notes, Sonnenblick's testimony could have been detrimental to Constantine, as it would have highlighted that Constantine had received a million dollars from the Hawaii accounts years prior to the MOU with Sonnenblick, and by the time the MOU was executed, the hockey players' Northern Trust accounts were in default. (*See* Gov't Br. 27.) Further, with respect to Hilton, in addition to his testimony being cumulative of evidence already in the record, Constantine has failed to establish prejudice because he has not addressed the risk that Hilton's testimony could have worked to his severe detriment, given Hilton's uncontroverted statement to trial counsel's associate that Constantine had "screwed him pretty bad and stole his money" (TC Aff. ¶¶ 118-19; TC Aff. Ex. 102), and the possibility

---

[13] The Court notes that there is some dispute about the degree to which Sonnenblick and Hilton were willing to testify and whether their testimony would have been beneficial to Constantine. (*See* Constantine Aff. ¶ 37, Constantine Supp. Aff. Ex. B; TC Aff. ¶ 114-15; ILC Aff. ¶ 10; ILC Aff. Ex. 2.) The Court need not resolve these issues as the Court concludes

that, as discussed below, even assuming *arguendo* that Sonnenblick and Hilton would have testified willingly and that their testimony would have been favorable to Constantine, trial counsel's decision not to call them as defense witnesses was sound trial strategy in light of other evidence in the record.

that Hilton might have made a statement to that effect in front of the jury.

However, more importantly, regardless of Constantine's alleged efforts to get Sonnenblick to provide the $15 million dollars for the Cabo Diamante investment relating to the GSF or to get Hilton to invest in the Hawaii Project, the evidence was overwhelming that Constantine fraudulently diverted money from the Hawaii Project and the GSF for his personal use, as discussed in detail above and in the Court's October 13, 2017 Order. *See Kenner*, 272 F. Supp. 3d at 348 ("[B]ank records show that both defendants routinely diverted third-party funds intended to finance the Hawaii Project, Eufora, and the GSF to pay for undisclosed personal expenditures, such as— in Constantine's case—race cars, rent, and lawsuits unrelated to those investments."). Thus, Constantine has failed to establish prejudice resulting from any alleged failure on the part of trial counsel to call Sonnenblick and Hilton as defense witnesses.

### 8. Trial Counsel's Performance Relating to the Opening Statement, Summation, and Witness Examinations

Constantine makes many allegations, outlined in detail above, about trial counsel's alleged shortcomings and supposed "abdication" of his legal responsibilities relating to preparation and delivery of the opening statement and summation, as well as trial counsel's cross-examination of government witnesses.

The Court here observed both trial counsel and Constantine at every stage of this trial, from the opening statement through the summation, and notes that trial counsel effectively delivered his opening and closing statements, vigorously conducted cross-examinations of government witnesses, and effectively introduced evidence in Constantine's defense. Despite Constantine's allegations to the contrary, it was apparent to the Court throughout the trial that trial counsel was well-versed in the facts and legal theories of the case. Further, as the Court noted at oral argument, it was clear throughout the trial that Constantine was extremely active in his own defense. Far from being compelled to insert himself into the case because of any incompetency on the part of his counsel, it was exceedingly clear throughout the trial that Constantine wanted to be involved in his defense, wanted to tell trial counsel what to do, and wanted to have input on every aspect of the case and on every component of trial counsel's strategy.

Trial counsel acknowledges that Constantine "played a supporting role in assisting [trial counsel] in the cross-examination of Government witnesses and the presentation of [the] defense . . . and prepared drafts of the opening and closing statements which [trial counsel] reviewed, edited and presented after assuring [him]self the final product represented a thorough presentation of [the defense's] position." (TC Aff. ¶ 37.) Constantine has offered no legal authority, and the Court can find none, that suggest that an attorney is ineffective simply by virtue of requesting that a client prepare drafts of trial materials when the client has extensive knowledge of the facts at issue or utilizing drafts prepared by a client to prepare for jury addresses or witness examinations.[14]

---

[14] The Court also notes that, as discussed at oral argument, any statement by trial counsel during the summation that he "did not always get it right" or references to Constantine correcting him during trial is neither an admission of ineffective assistance of counsel nor proof that trial counsel did not prepare for the summation. Rather, the statements may be an

As a general matter, an attorney's approach to opening statements, summations, and cross-examinations are matters of trial strategy that are not to be second-guessed by reviewing courts. *See Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) ("[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage."); *United States v. Wilson*, 216 F.3d 1074, 1074 (2d Cir. 2000) ("[E]ven waiving an opening statement does not constitute ineffective assistance of counsel . . . . Indeed . . . it may often be preferable for a defense counsel to avoid committing prematurely to a theory." (citation omitted)); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are similarly strategic in nature.").

With respect to the opening statement, trial counsel effectively presented his theory of the case to the jury—including that Jowdy was responsible for the hockey players' lost investments, that Agent Galioto withheld and misconstrued evidence to protect Jowdy and implicate Constantine, that Constantine was actually a whistle blower for the frauds at issue—and challenged the government's and Kenner's counsel's theories. (Tr. 103-22.) As to Constantine's allegation that trial counsel was unprepared for and ineffective in conducting cross-examinations of government witnesses, the Court again, based on observing trial counsel, rejects this claim. Trial counsel vigorously cross-examined numerous government witnesses. To the extent that Constantine argues that certain

witnesses should have been cross-examined or certain issues such as the authenticity of text messages should have been addressed on cross-examination, the Court concludes that trial counsel's decisions about which witnesses to cross-examine, and the extent to which those witnesses were cross-examined are strategic decisions left to counsel. *See Nersesian*, 824 F.2d at 1321. Constantine's dissatisfaction with trial counsel's decisions in this regard is of no significance in light of the Court's conclusion that these decisions were reasoned, informed, strategic decisions by trial counsel. *See United States v. Rivernider*, 828 F.3d 91, 107 (2d Cir. 2016) ("Only a few decisions in connection with trial strategy are reserved to the defendant to make personally . . . ; for the rest, strategic decisions are confided to counsel." (citation omitted)).

The focus of many of Constantine's allegations relating to trial counsel's lack of involvement in preparation of trial materials is the summation—which Constantine alleges he wrote nearly in its entirety and trial counsel only read for the first time moments before presenting the summation to the jury. It is clear to the Court, having heard trial counsel effectively present the lengthy, complex, and detailed summation, that he had spent time reviewing and preparing for the summation, and was not robotically reading a pre-prepared script, as Constantine suggests. Further, trial counsel has provided many emails between June 25, 2015 and July 5, 2015 (the date before the summation was presented), in which he discusses the summation with both Constantine and with co-counsel, advises Constantine on what to include and not include in the summation, and marks up drafts of the summation. (*See*

---

acknowledgment of the complexity and length of the trial, and a showing of humility by trial counsel to the jury, an approach that the Court considers entirely

reasonable in light of the complicated subject matter at issue during the trial.

TC Aff. Exs. 76-96, 99-100.)[15] The emails make abundantly clear that trial counsel was involved throughout the drafting of the summation, ensured the summation was legally and factually accurate, and maintained supervision and oversight of the summation drafting. In addition, the emails make clear that Constantine's active role in the preparation of the summation was by choice, and not because of a lack of involvement and/or ability by trial counsel. For example, on Friday, July 3, 2015, at 12:18 p.m., trial counsel sent a lengthy, three-page, single-spaced email outlining in detail some of the key points he wanted to make in response to the government's summation. (TC Aff. Ex. 80.) Those emails continued throughout the course of the day and, after Constantine provided the first draft, counsel sent an email at 9:16 p.m. with additional suggestions and stating: "I've been here since 7:30 and 14 hours later, I'm tired. Heading home[.]" (TC Aff. Ex. 88.)

In his emails, Constantine made clear that he wanted to maintain control over the summation, with input from trial counsel.[16] For example, on July 3, 2015, Constantine stated in an email to trial counsel, *inter alia*, the following: "Bob, I welcome any input you may have particularly with subject matter, *but please rest assured that I've been working on this like an animal since I left New York*. I actually missed the flight and had to fly to LA and I spent the night at my sister's. She has also been helping. *I feel very strongly about the material I have so far and I will be incorporating our rebuttal to the Government's summation in the overall presentation. I took very good notes and also have the transcript so I feel like I have most if not all the bases covered*." (TC Aff. Ex. 82 (emphasis added).) Trial counsel responded, in part: "Tommy, I know you have it. I'll forward suggestions as I review the trial testimony." (TC Aff. Ex. 83.) Constantine's desire to control the content of the summation is further demonstrated by cover email with his first draft of the summation, which begins: "Please do NOT remove anything without it being redlined so I can track the changes." (TC Aff. Ex. 86 (capitalization in original).) Moreover, rather than expressing displeasure about trial counsel's role or effort, Constantine seemed fully satisfied during the summation preparation process. For example, in one email on July 3, 2015, at 9:45 p.m., Constantine agreed with one of trial counsel's suggestion and ended by stating: "Thank you very much for all your hard work." (TC Aff. Ex. 89.)

In short, it is clear both from the emails and from trial counsel's performance in the courtroom (and the Court's observations of his interactions with Constantine) that Constantine sought an active and primary role in the preparation of the summation, that trial counsel was fully engaged in the preparation of the summation, and trial counsel delivered a thorough and effective summation to the jury.

Furthermore, Constantine suffered no prejudice because the summation as delivered by trial counsel was not ineffective, regardless of who actually wrote it. "Closing arguments should 'sharpen and clarify the

---

[15] Constantine's only disputes regarding the emails are that the cover sheet for Exhibit 98 appears to be missing (leading Exhibits 97 and 98 to appear as one) and that the trial transcripts enclosed relate to preparation for a mistrial motion and a Rule 29 motion. Because Constantine disputes the purposes of the transcripts, the Court does not rely upon those portions of the emails for the purposes of the instant motion.

[16] Although Constantine indicated in an email to initial trial counsel on June 27, 2015, that he wanted help with the summation (Constantine Supp. Reply Ex. H), it is clear that by July 3, 2015, he wanted primary responsibility for the drafting of the summation.

issues for resolution by the trier of fact,' but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether." *Yarborough*, 540 U.S. at 6 (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)). Here, trial counsel made strategic decisions as to what to include and how to present and summarize nine weeks of evidence for the jury in approximately three hours. As the government noted, trial counsel highlighted issues such as inadequacies in the government's investigation (Tr. 5898-99), discrepancies in witness testimony (Tr. 5898), errors in the government's analysis of bank records (Tr. 5908), and proposed alternative interpretations of the Home Depot recording (Tr. 5940-42), among many other arguments. Although Constantine's current counsel advanced the argument that the summation as delivered did not hit every relevant point and articulated that he believed the summation could have been more effective, the role of the Court in assessing an ineffective assistance of counsel claim is not to "second-guess matters of trial strategy simply because the chosen strategy was not successful." *Svendsen*, 8 F. App'x at 104 (quoting *Cuevas*, 801 F.2d at 590); *see also Yarborough*, 540 U.S. at 6 ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.").

The Court concludes that, regardless of the level of Constantine's involvement in the preparation of drafts of the opening statement and summation and in drafting questions for witness examinations, Constantine has not suffered any prejudice, and thus fails to satisfy the second prong of *Strickland*. Here, as discussed above, having presided over this trial and having already concluded that there was overwhelming evidence produced at trial of Constantine's culpability on all charges in the superseding indictment, the Court cannot conclude—even assuming *arguendo* that there were any errors relating to the jury addresses or cross-examinations—that there is a "reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

### 9. Co-Counsel

The Court has also considered Constantine's assertions of ineffective assistance of counsel as to co-counsel because of co-counsel's alleged use of methamphetamine during the course of the trial. As an initial matter, the Court notes that, having presided over the trial, the Court did not observe any indication that co-counsel was impaired during the pendency of the trial. Throughout the nine-week trial, the Court observed co-counsel to be attentive, and assisted trial counsel as necessary.

In any event, however, even assuming that co-counsel was under the influence of crystal methamphetamine during the trial itself or was using methamphetamine at any point during the preparation for or pendency of the trial, Constantine has failed to establish any prejudice as a result of co-counsel's alleged impairments. *See Berry v. King*, 765 F.2d 451, 454 (5th Cir. 1985) ("[U]nder *Strickland* the fact that an attorney used drugs is not, *in and of itself*, relevant to an ineffective assistance claim. The critical inquiry is whether, for whatever reason, counsel's performance was deficient and whether that deficiency prejudiced the defendant. We therefore concentrate on [the defendant]'s specific allegations of deficient performance and prejudice.") (emphasis in original); *see also Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996) ("[W]ithout enthusiasm, this Court has extended the *per*

40

*se* rule to cases where the person appearing as defense counsel was not a member of the bar, and cases where counsel had a conflict of interest arising from the lawyer's implication in the defendant's crime . . . . We are reluctant to extend a rule of *per se* prejudice in any new direction.") (internal citation and quotation omitted); *Tucker v. United States*, No. 11 Civ. 6469 (SAS), 2012 WL 4354806, at *11 (S.D.N.Y. Sept. 24, 2012) ("Tucker's allegations that LeBow was under the influence of drugs during his trial do not independently support vacating Tucker's conviction because counsel's mental incapacity, including drug addiction, is not a *per se* Sixth Amendment violation. Rather, as every court to address this issue has held—and the Second Circuit has strongly suggested—*Strickland* still applies.").

Most importantly to the Court's consideration here is that co-counsel's substantive role inside the courtroom appeared to be minimal. Trial counsel conducted the entirety of the trial proceeding, including delivering the opening statement and summation and conducting all of the witness examinations. Co-counsel did not make any presentations to the jury, nor did co-counsel examine any witnesses. It was clear to the Court that co-counsel was essentially functioning in a paralegal capacity, such as organizing trial exhibits and operating a PowerPoint presentation during the summation—all of which were secondary to trial counsel's responsibilities. Moreover, the Court has already concluded that trial counsel's representation was constitutionally effective, and that Constantine has failed to satisfy the *Strickland* standard as to trial counsel. Given the clear effectiveness of trial counsel, the Court has no basis on which to conclude that Constantine suffered any prejudice as a result of any alleged shortcomings on the part of co-counsel inside or outside the courtroom due to drug use or

any other issues. Thus, any ineffective assistance by co-counsel did not materially impact the overall effectiveness of trial counsel and, thus, does not warrant a new trial.

## II. CONCLUSION

For the foregoing reasons, the Court denies Constantine's motion for a new trial on the basis of ineffective assistance of counsel.

SO ORDERED.

s/ Joseph F. Bianco

JOSEPH F. BIANCO
United States Circuit Judge
(sitting by designation)

Dated:    October 4, 2019
          Central Islip, NY

\*\*\*

The United States is represented by Assistant United States Attorneys Saritha Komatireddy and Matthew Haggans of the United States Attorney's Office for the Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201.

Defendant Phillip A. Kenner is proceeding *pro se*.

Defendant Tommy C. Constantine is represented by Sanford Talkin of Talkin, Muccigrosso & Roberts LLP, 40 Exchange Place, 18th Floor, New York, New York 10005; and by Michael Morrissey of Mitchell Stein Carey P.C., One Renaissance Square, 2 North Central Ave., Suite 1900, Phoenix, Arizona 85004.