# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

Nº 13-CR-607 (JFB) (AYS)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 10 2020 ★

LONG ISLAND OFFICE

UNITED STATES OF AMERICA,

VERSUS

PHILLIP A. KENNER AND TOMMY C. CONSTANTINE,

Defendants.

**MEMORANDUM AND ORDER**
March 10, 2020

JOSEPH F. BIANCO, Circuit Judge (sitting by designation):

On July 9, 2015, following a nine-week trial, a jury convicted defendant Phillip A. Kenner ("Kenner") of one count of conspiring to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One of the superseding indictment); four counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Two, Three, Four, and Seven); and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Nine).[1] (Jury Verdict, ECF No. 324.) In addition, the jury convicted defendant Tommy C. Constantine ("Constantine," and together with Kenner, "defendants") of one count of conspiring to commit wire fraud (Count One); five counts of wire fraud (Counts Two through Six); and one count of conspiracy to commit money laundering (Count Nine). Now pending before the Court is the government's request

for entry of an Order of Forfeiture. (Gov. Mot., ECF No. 401; Revised Gov., ECF No. 780; Prop. Forf. Order, ECF No. 693; Gov. Ltrs., ECF Nos. 795, 799.) For the reasons set forth below, the Court enters the preliminary forfeiture order.

First, as explained in greater detail below, the Court finds that *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), does not preclude finding defendants jointly and severally liable under 18 U.S.C. § 982(a)(1) for a money-laundering conviction. The plain text of the statute, which is materially different from 18 U.S.C. § 853 as analyzed in *Honeycutt*, does not require that the defendant actually acquire the property in order for the property to be subject to forfeiture; rather, the property need only be involved in, or traceable to, defendants' money-laundering conspiracy.

---

[1] The jury also acquitted Kenner of three wire fraud counts (Counts Five, Six, and Eight). (ECF No. 324.)

Second, the government has demonstrated, by a preponderance of the evidence, that the assets (i.e., the Falcon 10 Airplane, Sugar Mill property, and the Diamante Cabo San Lucas ("DCSL") property, as well as the corporate ownership entities for the DCSL property), are forfeitable because defendants stole or diverted victims' funds for their purchase, and laundered money from the fraud through those properties.

Finally, the government has proven that the money judgment amount (as amended by the Court) is warranted because defendants used these funds to facilitate the money-laundering conspiracy for which they were convicted, including the commingling of tainted and untainted funds to disguise the illegal fraud schemes. In particular, the Court finds that the government has proven that defendants must forfeit $8,554,853, representing the total value of the property involved in the money-laundering conspiracy for which defendants are jointly and severally liable. In addition, the Court finds that defendant Kenner must forfeit an additional $9,151,542, representing the money judgment amount pertaining to the victims' lines of credit, which Kenner obtained by fraud and then laundered through various accounts and entities.

Accordingly, for these reasons and those that follow – and after careful consideration of the parties' submissions and arguments, the extensive trial record, and the evidence adduced at the forfeiture hearing – the Court will enter the government's preliminary forfeiture order as amended by this Memorandum and Order.

## I. BACKGROUND

### A. Factual Background

Defendants were convicted of participating in a conspiracy involving three separate fraud schemes: (1) the "Hawaii Project," whereby investors were told funds would go to land development in Hawaii, but were used instead for other unauthorized purposes; (2) "Eufora," a prepaid credit card company run by Constantine where investors' funds were used for personal use; and (3) the Global Settlement Fund ("GSF"), where defendants induced investment to fund litigation against developer Ken Jowdy ("Jowdy"), but money was diverted for unauthorized and personal uses. As explained in detail below, funds acquired through these fraudulent schemes facilitated, and were disguised through, property purchases that are now subject to forfeiture.

The Court assumes the parties' familiarity with the factual background and only addresses facts relevant to the present forfeiture motion.[2] The government seeks forfeiture of three assets: (1) Falcon 10 Airplane; (2) Sugar Mill property; and (3) the DCSL property and its corporate ownership entities. (Prop. Forf. Order.) The government also seeks a money judgment for the balance of the proceeds of defendants' wire fraud convictions, as well as property involved in or traceable to their money-laundering conspiracy. (*Id.*)

### B. Procedural History

On July 9, 2015, following a nine-week trial, Kenner was convicted of one count of conspiring to commit wire fraud, in violation of 18 U.S.C. § 1349 (Count One of the superseding indictment); four counts of wire

---

[2] The specific facts for the underlying offenses and the subsequent trial are summarized in detail in this Court's October 13, 2017 Order denying defendants' Rule 33 and Rule 29 motions. (Order, ECF No. 501.)

fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts Two, Three, Four, and Seven); and one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) (Count Nine). (Jury Verdict, ECF No. 324.)   The jury also convicted Constantine of one count of conspiring to commit wire fraud (Count One); five counts of wire fraud (Counts Two through Six); and one count of conspiracy to commit money laundering (Count Nine). (*Id.*)

On November 23, 2015, Constantine filed a motion for a judgment of acquittal as to all counts or, in the alternative, for a new trial. (ECF No. 346.)   On November 28, 2016, Kenner filed his own motion for a new trial. (ECF No. 416.)   Both of these motions were denied on October 13, 2017.   (Order, ECF No. 501.)

The forfeiture hearing was held on a series of dates: February 12, 2016 (2/12/2016 Forf. Tr.,[3] ECF No. 688), March 9, 2016 (3/9/16 Forf. Tr., ECF No. 369), April 4, 2016, and April 6, 2016 (4/4/2016 and 4/6/2016 Forf. Trs., ECF No. 377).[4]

On October 7, 2016, the government filed its motion for forfeiture of property as to

defendants, pursuant to 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 982(a)(1). (Gov. Mot.)   Specifically, the government contends that, as to Counts One through Eight of the indictment regarding wire fraud and conspiracy to commit wire fraud, defendants are required, pursuant to 18 U.S.C. § 981(a)(1)(C), to forfeit all proceeds of these offenses.   The government also contends that, as to defendants' money-laundering conviction in Count Nine of the indictment, defendants are required to forfeit all property involved in or traceable to their laundering of fraud proceeds, pursuant to 18 U.S.C. § 982(a)(1). (*Id.*)

On September 10, 2018, Kenner filed his opposition. (Kenner Opp'n, ECF No. 579.) Kenner then filed a motion to re-open forfeiture proceedings, requesting documentation related to one of the government's forfeiture exhibits on November 28, 2018. (ECF No. 597.)[5] Constantine filed his own opposition on December 10, 2018, primarily relying on *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), to argue that joint and several liability is inapplicable to the present forfeiture motion. (Constantine Opp'n, ECF No. 599.)

---

[3] "Forf. Tr." refers to forfeiture hearing transcripts with the relevant date preceding it.

[4] At the forfeiture hearing, the Court reserved decision on the admission of certain government exhibits because of objections by one or both defendants. First, to the extent that defendants had a standing objection to certain documents because those documents related to properties that defendants claimed they did not receive notice would be subject to forfeiture prior to trial (such as Frailes, the Palms Units, and Del Mar), those objections are moot because the Court has determined that funds related to those properties (beyond the funds that originated from GSF, the Hawaii Project, and the lines of credit) are not subject to forfeiture. Any other objections to those documents are likewise moot because the Court does not rely upon them in connection with its forfeiture decision. Any objections to notice for the properties/funds that

are subject to forfeiture are without merit for the reasons discussed *infra*. Second, objections to certain exhibits (namely, Chart 26 and Exhibit 36) based on the contention that Ken Jowdy's attorneys provided them to the government are overruled because the exhibits were based upon bank records and other financial records in the government's possession whose authenticity was not questioned. In any event, even if the documents to which objections were made were excluded by the Court, the Court's determination would be the same based upon the other extensive evidence cited herein that sufficiently supports the forfeiture being ordered by the Court.

[5] The Court agrees with the government (ECF No. 623), that Kenner seeks these documents only to challenge his criminal conviction and denies the motion.

On December 12, 2018, Constantine submitted a forensic accounting report supplementing his opposition. (ECF No. 600.) On December 14, 2018, Constantine moved to join Kenner's opposition. (ECF No. 604.) The same day, the government then requested permission to bifurcate legal and factual issues relating to *Honeycutt* in its reply (i.e., first address the applicability of *Honeycutt* and then submit additional briefing if this Court were to determine that *Honeycutt*, in fact, does apply). (ECF No. 603.) This request was granted on December 26, 2018. (ECF No. 605.) On January 11, 2019, the government filed its reply addressing *Honeycutt*'s applicability to the present motion. (ECF No. 607.) On January 14, 2019, Kenner served the Court and the government with his Forfeiture Supplement. (ECF No. 713.) The government responded to this filing on February 22, 2019. (ECF No. 623.) On March 1, 2019, the closing arguments took place with respect to the forfeiture proceeding. (ECF No. 630.)

Following the closing arguments, several status conferences were held to address various issues raised by the forfeiture motion. Those discussions focused, in part, on concerns about the potential negative impact of a forfeiture order regarding DCSL on innocent third parties, and efforts to alter the language of the government's proposed preliminary orders of forfeiture to address those concerns. Various third parties had urged the Court orally at these conferences, and in writing, to consider these issues before issuing any forfeiture order. The parties engaged in negotiations with respect to these issues, and the parties agreed to attempt to resolve some of these issues with the assistance of a Magistrate Judge. On May 17, 2019, the government submitted revised proposed preliminary orders of forfeiture to incorporate recommendations made by Magistrate Judge Anne Shields. (ECF No. 655.)

After another status conference on July 2, 2019 (7/2/19 Forf. Tr., ECF No. 674), the government submitted a new iteration of its proposed forfeiture orders on August 14, 2019, addressing the Court's concerns regarding the forfeiture's scope as to DCSL (ECF No. 693). The government also submitted revised forfeiture orders on October 17, 2019, and December 20, 2019, to address concerns raised at additional status conferences. (ECF Nos. 751, 780.) As noted above, the Court has also received numerous letters from third parties regarding the potential impact of the proposed forfeiture order, as well as additional submissions from the government and defendants over the course of this extensive forfeiture litigation.

The Court has fully considered all the submissions and arguments, as well as the evidence in the underlying record, both from the trial and the forfeiture hearing.

II.    STANDARD OF REVIEW

A.  Rule 32.2 Criminal Forfeiture

Pursuant to Rule 32.2:

As soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute. If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense. If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

Fed. R. Crim. P. 32.2(b)(1)(A). Moreover, a court's "determination may be based on evidence already in the record," which may include "any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable. If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty." Fed. R. Crim. P. 32.2(b)(1)(B).[6]

In the forfeiture stage, "the government must establish the nexus between the offense and the forfeiture request by a preponderance of the evidence." *United States v. Peters*, 732 F.3d 93, 98 (2d Cir. 2013) (citing *United States v. Capoccia*, 503 F.3d 103, 110 (2d Cir. 2007)); *see also United States v. Fruchter*, 411 F.3d 377, 382 (2d Cir. 2005) (holding that the preponderance of the evidence standard is the standard for criminal forfeiture findings). Once the government has met its burden, "the court must promptly enter a preliminary order of forfeiture." *United States v. Kahale*, No. 09-CR-159 KAM, 2010 WL 3851987, at *29 (E.D.N.Y. Sept. 27, 2010) (citing Fed. R. Crim. P. 32.2(b)(2)(A)), *aff'd sub nom.*, *United States v. Graham*, 477 F. App'x 818 (2d Cir. 2012).

If the defendant lacks the assets to satisfy the order, the court can award the government a forfeiture money judgment. *See, e.g.*, *United States v. Roberts*, 696 F. Supp. 2d 263, 269 (E.D.N.Y. 2010) (collecting cases), *vacated on other grounds*, 660 F.3d 149 (2d Cir. 2011); *United States v. Awad*, No. 06 Cr. 600(DLC), 2007 WL 3120907, at *4 (S.D.N.Y. Oct. 24, 2007), *aff'd*, 598 F.3d

76 (2d Cir. 2010); *see also United States v. Bermudez*, 413 F.3d 304, 307 (2d Cir. 2005) (affirming a forfeiture money judgment in the money laundering context up to the amount laundered, "even if [defendant] merely handled the laundered property – i.e., even if he never retained those funds and consequently never obtained profits from them").

"The only determination that must be made when the government seeks a money judgment is the amount that the defendant will be ordered to pay." *United States v. Perkins*, 994 F. Supp. 2d 272, 275 (E.D.N.Y. 2014) (quoting *United States v. Galestro*, No. 06-CR-285 (ARR), 2008 WL 2783360, at *11 (E.D.N.Y. July 15, 2008)). "[I]f the government does not seek specific property, but rather a personal money judgment, the court itself determines the amount of money that the defendant will be ordered to pay." *Id.*

However, because the "calculation of forfeiture amounts is not an exact science," the "court 'need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information.'" *Treacy*, 639 F.3d at 48 (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)). Therefore, a court need not "conduct an investigative audit to ensure that a defendant 'is not deprived of a single farthing more than his criminal acts produced,'" *United States v. Roberts*, 660 F.3d 149, 167 (2d Cir. 2011) (quoting *United States v. Lizza Indus., Inc.*, 775 F.2d 492, 498 (2d Cir. 1985)), and a court "may make

---

[6] All parties consented to the Court deciding the forfeiture issues, rather than a jury. (Trial Tr. at 5672-73.) Moreover, because criminal forfeiture is "viewed as part of the sentencing process," *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011), the Federal Rules of Evidence do not apply. *United States v. Capoccia*, 503 F.3d 103, 110 (2d Cir. 2007) (citing Fed. R. Evid. 1101(d)(3)). Accordingly, courts may

consider hearsay evidence if the evidence is sufficiently reliable. *United States v. Hatfield*, 795 F. Supp. 2d 219, 220-30 (E.D.N.Y. 2011) (holding that, with criminal forfeiture, the court may consider "any relevant evidence having sufficient indicia of reliability" (quoting *United States v. Brown*, 52 F.3d 415, 425 (2d Cir. 1995))).

reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding" *Treacy*, 639 F.3d at 49 (citing *Uddin*, 551 F.3d at 180).

Finally, the Federal Rules of Criminal Procedure establish that a court may not enter an order of forfeiture "unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of the property." Fed. R. Crim. P. 32.2(a). However, "[t]he indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks." *Id.* Additionally, because defendants were charged and convicted for conspiracy to commit wire fraud and money laundering, the government can seek forfeiture of proceeds from uncharged violations when part of the same overall scheme. *Capoccia*, 503 F.3d at 118 (holding that when the conviction itself is for executing a scheme or engaging in a conspiracy, "the government need only establish that the forfeited assets have the 'requisite nexus'" (quoting Fed. R. Crim. P. 32.2(b)(1))); *see also Kahale*, 2010 WL 3851987, at *30 ("[A]lthough defendants generally cannot be ordered to forfeit funds which are proceeds of uncharged or acquitted conduct, where an indictment charges a conspiracy or scheme to defraud, the proceeds of uncharged or acquitted conduct may become forfeitable because the government may be able to prove that money 'involved in the uncharged or acquitted [conduct] nevertheless constituted the proceeds of, or was traceable to, or was involved in, [the conspiracy or scheme to defraud] crime of conviction.'"

(quoting *Capoccia*, 503 F.3d at 117)). Accordingly, the Superseding Indictment (ECF No. 214) and the August 20, 2015 Bill of Particulars (ECF No. 328), provided defendants with sufficient notice.[7]

1. Forfeiture of the Wire Fraud Proceeds

The government seeks forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), which provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such an offense" is subject to forfeiture.

Because the Second Circuit has held that wire fraud is "unlawful activity" under § 1956(c)(7), *United States v. Szur*, 289 F.3d 200, 213 (2d Cir. 2002), "proceeds" are defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense," 18 U.S.C. § 981(a)(2)(A). Essentially, "[p]roceeds are property that a person would not have but for the criminal offense." *United States v. Grant*, No. S4 05 CR 1192 (NRB), 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008).

Although courts have held that this statutory language allowed for joint and several liability, as explained in greater detail below, the Supreme Court's decision in *Honeycutt* has placed into question whether such liability may now be precluded under § 981(a)(1)(C). *See* 137 S. Ct. 1626 (2017).

---

[7] Specifically, the government expressly stated that it would seek forfeiture of "any property, real or personal, constituting or derived from proceeds traceable to a violation of such offenses, or a

conspiracy to commit such offenses." (ECF No. 214 ¶¶ 31, 34.)

However, as discussed below, even assuming *arguendo* that *Honeycutt* would apply to § 981(a)(1)(C), this Court holds that *Honeycutt* does not preclude joint and several liability under 18 U.S.C. § 982(a)(1) based upon the defendants' conviction for the money-laundering conspiracy.[8]

2.   Money Laundering Forfeiture

As stated above, the government also seeks forfeiture under 18 U.S.C. § 982(a)(1). (Gov. Mot. at 7.)   18 U.S.C. § 982(a)(1) provides that the "court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."

Courts have consistently held that the term "involved in" should be interpreted broadly to "include any property involved in, used to commit, or used to facilitate the money laundering offense." *United States v. Schlesinger*, 396 F. Supp. 2d 267, 271-72 (E.D.N.Y. 2005) (collecting cases), *aff'd*, 514 F.3d 277 (2d Cir. 2008).[9]   Referring to *Schlesinger*, district courts have correctly observed that the Second Circuit has "affirmed forfeiture of property as involved in money laundering transactions when it has served as a conduit for the proceeds of the illegal transactions." *United States v. Prevezon Holdings, Ltd.*, 251 F. Supp. 3d 684, 698 (S.D.N.Y. 2017).

Property is "traceable to" forfeitable property (and thus forfeitable itself) when "the acquisition [of the property] is attributable to the money laundering scheme

---

[8] Likely in recognition of *Honeycutt*'s potential implications under § 981(a)(1)(C), the government's reply focuses on 18 U.S.C. § 982(a)(1), arguing that *Honeycutt* does not preclude joint and several liability as to that statute. (*See generally* Gov. Reply, ECF No. 607.)   However, in a footnote, the government also argues that, because defendants were each "masterminds of their wire fraud conspiracy," they are both individually liable to forfeit the full amount under § 981(a)(1)(C) even if *Honeycutt* applies. (Gov. Reply at 8 n.6 (citing *United States v. Ward*, No. 2:16-CR-6, 2017 WL 4051753, at *3 (W.D. Mich. Aug. 24, 2017), *report and recommendation adopted*, No. 2:16-CR-06-01, 2017 WL 3981160 (W.D. Mich. Sept. 11, 2017), *aff'd*, 757 F. App'x 507 (6th Cir. 2019)).) The Court agrees that joint and several liability exists under § 981(a)(1)(C) given the respective roles of defendants in this case (as it relates to the forfeiture ordered by the Court as to each defendant).   As set forth in detail in the Court's October 13, 2017 Memorandum and Order, Kenner was the mastermind of the wire fraud conspiracy and, therefore, is jointly and severally liable for all the proceeds of that offense, including its various objectives.   With respect to Constantine, although he was not the "mastermind" of the entire conspiracy, he was not a "low-level" member of the conspiracy, but rather had substantial control and supervision of the specific portions of the fraud schemes that are the bases of the forfeiture

money judgment against him – including the Eufora/Centrum Loan frauds and the GSF fraud (and receiving a substantial sum of money from the Hawaii Project) – and thus is jointly and severally liable under § 981(a)(1)(C) for the wire fraud proceeds resulting from those frauds.   *See, e.g., United States v. Gioeli*, 08-cr-240 (BMC), 2019 WL 6173421, at *3 (E.D.N.Y. Nov. 20, 2019) ("Even if *Honeycutt* applied retroactively, I would still find defendant jointly and severally liable for the forfeiture amounts.   *Honeycutt* based its rationale on drawing distinctions between a mastermind who controlled the criminal operation and a lowly figure who only had access to and control over a small fraction of the tainted property directly in his possession."); *see also United States v. Leyva*, 916 F.3d 14, 30 (D.C. Cir. 2019) ("[P]roperty obtained indirectly [may] include property received by persons or entities that are under the defendant's control, such as an employee or other subordinate to the defendant." (internal quotation marks and citation omitted)), *cert. denied*, 140 S. Ct. 413 (2019).   In any event, as discussed *infra*, defendants are jointly and severally liable under § 982(a)(1), to which *Honeycutt* clearly does not apply.

[9] As explained above, the fact that defendants were convicted of a conspiracy to commit money laundering further broadens potential forfeiture.

rather than from money obtained from untainted sources." *United States v. Nicolo*, 597 F. Supp. 2d 342, 348 (W.D.N.Y. 2009) (quoting *United States v. Bornfield*, 145 F.3d 1123, 1134 (10th Cir. 1998); *see also United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 158 (3d Cir. 2003) ("in the criminal forfeiture context[,] . . . 'the term "traceable to" means exactly what it says,'" and where tainted property has been commingled in a bank account with untainted property, the government is only required "to prove '*some* nexus to the property "involved in" the money laundering offense'" (quoting *United States v. Voigt*, 89 F.3d 1050, 1087 & n.22 (3d Cir. 1996))); *United States v. Baker*, 227 F.3d 955, 970 (7th Cir. 2000) ("Limiting the forfeiture of funds under these circumstances to the proceeds of the initial [illegal] activity would effectively undermine the purpose of the forfeiture statute. Criminal activity such as money laundering largely depends upon the use of [other] monies to advance or facilitate the scheme." (quoting *United States v. Tencer*, 107 F.3d 1120, 1135 (5th Cir. 1997))).

Facilitation, in turn, "occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." *United States v. Approximately Six Hundred & Twenty Thousand Three Hundred & Forty-Nine Dollars & Eighty-Five Cents*, No. 13 CV 3966 RJD SMG, 2015 WL 3604044, at *3 (E.D.N.Y. June 5, 2015) (quoting *Schlesinger*, 396 F. Supp. 2d at 272).

Courts have also correctly held that the commingling of stolen and legitimately gained property or funds facilitates money laundering, justifying forfeiture. *See United States v. Portillo*, No. 09-CR-1142 (LAP), 2019 WL 1949861, at *2-3 (S.D.N.Y. Apr. 17, 2019) (holding "that otherwise 'clean' property used to conceal or otherwise

facilitate money laundering is also forfeitable" (citing *In re 650 Fifth Ave. & Related Props.*, 777 F. Supp. 2d 529, 563-64 (S.D.N.Y. 2011))). While "the mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture[,]" forfeiture of such commingled funds "is proper when the government demonstrates that the defendant pooled the funds to facilitate or 'disguise' his illegal scheme." *Nicolo*, 597 F. Supp. 2d at 351 (quoting *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003)). Accordingly, "in many cases '[i]t is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue.'" *Id.* (quoting *United States v. Braxtonbrown–Smith*, 278 F.3d 1348, 1353 (D.C. Cir. 2002)); *see also United States v. Certain Funds on Deposit in Account No. 01-0-71417, Located at the Bank of New York*, 769 F. Supp. 80, 85 (E.D.N.Y. 1991) (same).

Defendants contend that the Supreme Court's decision in *Honeycutt* precludes joint and several liability in the forfeiture order. The Court will address this argument before turning to the forfeiture order itself.

III.   DISCUSSION

A. *Honeycutt*'s Application

Defendants point to *Honeycutt* to argue that joint and several liability should not apply to them. Ultimately, the Court agrees with the government's argument that due to substantial differences in language between 18 U.S.C. § 982 and 21 U.S.C. § 853, the Supreme Court's holding in *Honeycutt* regarding § 853 does not affect forfeiture proceedings under § 982.

1. *Honeycutt v. United States*

In *Honeycutt*, two brothers were convicted for the illegal sale of a product used to manufacture illicit drugs. 137 S. Ct. at 1630. The government sought to hold the brothers jointly and severally liable for $269,751.98 in conspiracy profits. *Id.* Tony Honeycutt, who owned the hardware store that sold the product, pleaded guilty and willingly forfeited $200,000. *Id.* Terry Honeycutt, who managed sales for the store, proceeded to trial and was convicted. *Id.* The government sought to hold Terry jointly and severally liable for the remaining amount of $69,751.98. *Id.* at 1631. Although the district court declined to enter forfeiture against Terry, as he had no controlling interest in the store and did not receive any profits from the sales, the Sixth Circuit reversed the decision, holding that the brothers were co-conspirators who should be jointly and severally liable for the proceeds from the crime. *Id.* Terry Honeycutt then appealed to the Supreme Court to decide whether 21 U.S.C. § 853 "embraces joint and several liability for forfeiture judgments." *Id.*[10]

The Supreme Court held that co-defendants could not be held jointly and severally liable, pursuant to 21 U.S.C. § 853(a)(1), for several reasons. *Id.* at 1632.

First, the Court analyzed the statute's language, concluding that forfeiture is limited to "property flowing from . . . or used in . . . the crime itself." *Id.* at 1632 (citing § 853(a)(1) and (a)(2)). Thus, joint and several liability would not be appropriate since it would "require forfeiture of untainted property." *Id.* Additionally, the Court noted the statute maintains a "personal possession or use" component by limiting forfeiture to

property "'the person obtained, directly or indirectly, as the result of' the crime." *Id.* (quoting 21 U.S.C. § 853(a)(1)). Further, according to the definition and usage of the word "obtain," a person cannot "obtain" property collected by another, neither directly nor indirectly, as those words are adverbs that refer to how that person ultimately gains possession of the property. *Id.*

Second, the Court analyzed the entirety of § 853 and determined that joint and several liability is contrary to the statute's sub-provisions. *Id.* For example, § 853(c), which applies to property subject to subsection (a), applies to tainted property only. *Id.* Section 853(e)(1) allows for "pretrial asset freezes" to preserve property forfeitable pursuant to subsection (a) so long as "the property at issue has the requisite connection to that crime." *Id.* (quoting *Kaley v. United States*, 571 U.S. 320, 324 (2014)). Further, § 853(d) provides a "rebuttable presumption" that property may only be forfeited if the defendant obtained it "during the period of the violation" and if "there was no likely source for" the property except for the crime. *Id.* Moreover, the Court found that § 853(p), the one provision of this section that allows the government to take untainted property, would be rendered obsolete if joint and several liability were allowed. *Id.* Specifically, § 853(p) demonstrates that Congress had "contemplated situations where tainted property itself would fall outside the Government's reach" and, yet, to "remedy the situation," the government did not authorize confiscation from other defendants but only confiscation of assets from "the defendant who initially acquired the property and bears responsibility for its dissipation." *Id.* at 1634.

---

[10] 21 U.S.C. § 853 "mandates forfeiture of 'any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of' certain drug crimes." *Id.* at 1630.

Third, in analyzing the plain text and structure of § 853, the Court concluded that Congress did not "incorporate the principle that conspirators are legally responsible for each other's foreseeable actions in furtherance of their common plan" because Congress "provided just one way for the [g]overnment to recoup substitute property when the tainted property itself is unavailable—the procedures outlined in § 853(p)." *Id.* at 1634.

Ultimately, the Court determined that "[f]orfeiture pursuant to § 853(a)(1) is limited to property the defendant himself actually acquired as the result of the crime . . . [and] [b]ecause [Terry] Honeycutt never obtained tainted property as a result of the crime, § 853 does not require any forfeiture." *Id.* at 1635.[11]

2. Application of *Honeycutt* to 18 U.S.C. § 981(a)(1)(C)

18 U.S.C. § 981(a)(1)(C) provides that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [various sections] of this title or any offense constituting 'specified unlawful activity' . . . or a conspiracy to commit such offense" is subject to forfeiture. 18 U.S.C. § 981(a)(1)(C).

The Supreme Court has not yet decided the application of *Honeycutt* to other forfeiture statutes, and circuit courts are currently split on the issue.

The Third, Fourth, Fifth, and Eleventh Circuits have held that the limitation of joint and several liability based on *Honeycutt*'s reasoning is applicable to 18 U.S.C.

§ 981(a)(1)(C), as well as to certain provisions within § 982, such as § 982(a)(2) and (a)(7). *See United States v. Carlyle*, 712 F. App'x 862, 864 (11th Cir. 2017) (per curiam) (vacating and remanding the forfeiture judgment to the district court because § 853 and § 981(a)(1)(C) "are largely the same in terms of their pertinent language"); *United States v. Gjeli*, 867 F.3d 418, 427-28 (3d Cir. 2017) (finding that the text and structure of 18 U.S.C. § 981(a)(1)(C) is substantially similar to the one in consideration in *Honeycutt*), *cert. denied*, 138 S. Ct. 700 (2018); *United States v. Brown*, 714 F. App'x 117, 118 (3d Cir. 2018) (holding joint and several liability was imposed in error because *Honeycutt* applies to § 982(a)(2)); *United States v. Chittenden*, 896 F.3d 633, 639 (4th Cir. 2018) (holding that, because § 982(a)(2) mirrors § 853(a)(1), forfeiture under § 982(a)(2) "is limited to property the defendant acquired as a result of the crime"); *United States v. Elbeblawy*, 899 F.3d 925, 941 (11th Cir. 2018) (holding that the same reasoning in *Honeycutt* should apply to the healthcare fraud forfeiture statute, i.e., § 982(a)(7)), *cert. denied*, 139 S. Ct. 1322 (2019); *United States v. Sanjar*, 876 F.3d 725, 749 (5th Cir. 2017) (reasoning joint and several liability should not be applied to forfeitures pursuant to § 982(a)(7) because of the similarity in language to § 853(a)(1) and because § 982(a)(7) "incorporates many of the drug law provisions" on which *Honeycutt* relied), *cert. denied sub nom. Main v. United States*, 138 S. Ct. 1577 (2018).

Conversely, the Sixth and Eighth Circuits have held that *Honeycutt*'s rationale does not extend to other forfeiture statutes. *United States v. Peithman*, 917 F.3d 635, 652 (8th Cir. 2019) (reasoning that the "plain language under § 981 is broader than § 853 and less

---

[11] Constantine himself recognizes the limited nature of the holding in *Honeycutt*. In his Opposition, he concedes that "[t]here is no dispute that the *Honeycutt* decision only contemplated forfeiture in narcotics cases pursuant to 21 U.S.C. § 853(a)(1)." (Constantine Opp'n at 5.)

focused on personal possession"); *United States v. Sexton*, 894 F.3d 787, 799 (6th Cir. 2018) (holding that the reasoning of *Honeycutt* is not applicable to § 981(a)(1)(C) because that statute does not contain the phrase "the person obtained," "the linchpin of the Supreme Court's decision in *Honeycutt*"), *reh'g denied* (July 16, 2018), *cert. denied*, 139 S. Ct. 415 (2018).[12]

However, the First, Seventh, Ninth, Tenth and D.C. Circuits have yet to rule on the issue. *See United States v. Kwok Cheung Chow*, 772 F. App'x 429, 433 (9th Cir. 2019) (reversing and remanding to the district court to consider if *Honeycutt* impacts the forfeiture in that case since the Circuit has "not yet addressed whether *Honeycutt*'s reasoning extends to the criminal forfeiture statutes at issue"); *United States v. Bikundi*, 926 F.3d 761, 794 (D.C. Cir. 2019) (holding that, although § 982(a)(1)(7) is broader than § 853, the question need not be resolved because "the forfeitures here do not impose joint and several liability"); *United States v. Bogdanov*, 863 F.3d 630, 635 (7th Cir. 2017) (holding that because the defendant did not "raise any challenge to the order of forfeiture" based on *Honeycutt*, it would not decide the issue).

Moreover, due to governmental concessions regarding the applicability of § 981, the Second Circuit has yet to rule on the issue as well. *See United States v. Fiumano*, 721 F. App'x 45, 51 n.3 (2d Cir. 2018) ("In light of the government's concession, we need not here decide whether *Honeycutt*'s ruling, made with respect to a forfeiture order under 21 U.S.C. § 853(a)(1), applies equally in all respects to forfeiture orders under other statutes, including 18 U.S.C. § 981(a)(1)(C), applicable here."),

*cert. denied*, 139 S. Ct. 651 (2018); *United States v. Gil-Guerrero*, 759 F. App'x 12, 18 (2d Cir. 2018) ("In light of the Government's concession, we need not here decide whether *Honeycutt*'s reasoning applies equally in all respects to forfeiture orders under 18 U.S.C. § 981(a)(1)(C)."). However, courts within this Circuit continue to allow for joint and several liability under 18 U.S.C. § 981(a)(1)(C). *See United States v. McIntosh*, No. 11-CR-500 (SHS), 2017 WL 3396429, at *6 (S.D.N.Y. Aug. 8, 2017) ("What the Supreme Court emphatically did not do in *Honeycutt* is overrule the Second Circuit's Section 981 cases, which rest on specific textual grounds distinguishable from Section 853. This Court therefore remains bound by the Second Circuit's repeated holdings that Section 981(a)(1)(C) allows joint and several liability for criminal forfeiture."), *appeal docketed*, No. 17-2623 (Aug. 24, 2017); *see also Pierce v. United States*, No. 16-CV-7669 (WHP) (JLC), 2018 WL 4179055, at *8 (S.D.N.Y. Aug. 31, 2018) (report and recommendation) (holding that *Honeycutt* does not affect forfeiture under § 981 or § 982); *Lasher v. United States*, No. 12 CR. 868 (NRB), 2018 WL 3979596, at *10 (S.D.N.Y. Aug. 20, 2018) ("Second Circuit precedent mandates joint and several liability under Section 981, and this precedent binds the Court unless and until the Supreme Court or Second Circuit says otherwise." (citing *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012))).

Here, given the split of authority regarding the impact of *Honeycutt* on forfeiture under 18 U.S.C. § 981(a)(1), the government's reply focuses on its concurrent ability to obtain forfeiture under 18 U.S.C. § 982(a)(1) based upon the money-

---

[12] The Fourth Circuit also has held in an unpublished, nonprecedential opinion that *Honeycutt* does not apply to forfeiture pursuant to § 982(a)(1). *See United States*

*v. Alquza*, 722 F. App'x 348, 349 (4th Cir. 2018).

laundering conviction in this case. It is to this issue that the Court now turns.

### 3. Application of *Honeycutt* to 18 U.S.C. § 982(a)(1)

Whether *Honeycutt* precludes joint and several forfeiture liability under 18 U.S.C. § 982(a)(1), for a conviction of a money-laundering offense, is an issue of first impression in this Circuit.[13] For the reasons set forth below, this Court holds that *Honeycutt* does not preclude joint and several liability under 18 U.S.C. § 982(a)(1).

First, the language of § 982(a)(1) is significantly broader than § 853(a)(1). *See United States v. Turkette*, 452 U.S. 576, 580 (1981) ("In determining the scope of a statute, we look first to its language"); *United States v. Abdur-Rahman*, 708 F.3d 98, 100 (2d Cir. 2013), *as amended* (Mar. 13, 2013) (reasoning that analysis of statutes begins with the "language employed by Congress and the assumption that ordinary meaning of that language accurately expresses the legislative purpose" (quoting *United States v. Aleynikov*, 676 F.3d 71, 76 (2d Cir. 2012))). 21 U.S.C. § 853(a)(1) provides that "[a]ny person convicted of a violation of this subchapter . . . punishable by imprisonment for more than one year shall forfeit to the United States . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation." 21 U.S.C. § 853(a)(1). 18 U.S.C. § 982(a)(1) provides that the "court, in imposing sentence on a person convicted of an offense . . . shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."

The *Honeycutt* Court found it highly significant that 21 U.S.C. § 853's "obtained" language clearly indicated that forfeitable property was defined "solely in terms of personal possession or use," 137 S. Ct. at 1632, but § 982(a)(1) defines forfeitable property in much broader terms (i.e., property "involved in" the offense). Accordingly, the contrasting plain language of § 982(a)(1) ("involved in" instead of § 853(a)(1)'s "obtained") provides a compelling reason to conclude that *Honeycutt*'s holding does not apply to the money-laundering statute. *See Bermudez*, 413 F.3d at 306 (finding that § 853(a) differs significantly from § 982(a) because "while § 982(a)(1) provides for forfeiture of any property 'involved' in a money-laundering offense, § 853(a) provides for forfeiture of, *inter alia*, 'any property constituting, or derived from, any proceeds the person *obtained*' in a covered offense" (citing 21 U.S.C. § 853(a)(1))); *see also United States v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019) (highlighting that under § 1956, a court "shall order that the person forfeit to the United States any property, real or personal, *involved in* such offense").

Second, the *Honeycutt* Court's concerns that joint and several liability, pursuant to § 853, would be contrary to the statute's subsections, are lacking with § 982. *See* 137 S. Ct. at 1632. The *Honeycutt* Court found that § 853(p) "la[id] to rest any doubt that the statute permits joint and several liability" because it demonstrates that "Congress contemplated situations where the tainted property itself would fall outside the Government's reach" and thus set forth procedures for confiscation of property "only from the defendant who initially acquired the property and who bears responsibility for its dissipation." *Id.* at 1634.

---

pursuant to §§ 981 and 982. 2018 WL 4179055, at *8.

Here, § 982(b)(1) provides that the "forfeiture of property under this section, including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 . . . of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 853)." 18 U.S.C. § 982(b)(1). However, while § 982(b)(1) incorporates § 853(p)'s substitute asset procedures,[14] it does not incorporate § 853(p)'s limitation of forfeiture to any property described in § 853(a). (See Gov. Reply at 6.) Moreover, the Second Circuit has held that the "'proceeds' limitation of § 853(a)(1) has no logical connection to § 982(a)(1) forfeitures" and thus, in "the money-laundering context, § 853(p) defines what assets may be substituted for assets forfeitable under § 982(a)(1)," which are, broadly, those funds involved in the offense. Bermudez, 413 F.3d at 306. Accordingly, assets that were merely "involved in" the offense, pursuant to 18 U.S.C. § 982(a)(1), can be forfeited.

Furthermore, the Honeycutt Court's concern about the liability of low-level conspirators is addressed by the safe harbor provision in § 982(b)(2). See 137 S. Ct. at 1631-32. Section 982(b)(2) protects less culpable money launderers, stating that a defendant may not be ordered to forfeit substitute assets where he "acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant . . . conducted three or more separate transactions involving a total of $100,000 or more in any twelve month period." 18 U.S.C. § 982(b)(2). The Court here agrees with the government that Congress would not have needed to enact this forfeiture provision for certain individuals who "handled but did not retain the property" unless § 982 actually reached such property. (Gov. Reply at 7); see also Bermudez, 413 F.3d at 307 (finding that the clear implication of § 982(b)(2) is that a defendant can be subject to forfeiture of substitute assets up to the amount laundered, even if "he merely laundered the property"). Therefore, this subsection further clarifies congressional intent.

Third, an examination of the amendments to 18 U.S.C. § 982(a)(1) supports the Court's reading of the plain text. When § 982(a)(1) was enacted in 1986, the statute provided for forfeiture of "gross receipts the person obtained" from the conduct or "which is traceable to such gross receipts." Pub. L. No. 99-570, § 1366, 100 Stat. 3207-39 (1986). However, in 1988, the statute was amended from requiring a defendant to forfeit "gross receipts" to forfeit funds "involved in [the] offense" or "property traceable to such property." Pub. L. No. 100-690, § 6343, 102 Stat. 4181, 4374 (1988).[15] This language further indicates congressional intent to broaden § 982's scope.

---

[14] Section 853(p) provides that, "Paragraph (2) of this subsection shall apply if any property described in subsection (a), as a result of any act or omission of the defendant" cannot be reached for five enumerated reasons. 21 U.S.C. § 853(p)(1).

[15] Congress also enacted the first clause of § 982(b)(2) in 1988, protecting the "low-level" money launderer from having to forfeit substitute assets. Pub. L. No. 100-690, § 6464, 102 Stat. 4375 (1988). Congress later amended § 982(b)(2) in 1990 to narrow this exception, adding the requirement that a defendant could not conduct three or more separate transactions with a total of $100,000 in a twelve-month period in order to receive its protections. Pub. L. No. 101-647, Tit. XIV, § 1403, 104 Stat. 4789, 4835 (1990). These developments further evince congressional intent for § 982 to apply broadly.

Other courts that have addressed this issue have reached the same conclusion. *See, e.g., United States v. Miller*, No. 17-CR-213, 2019 WL 6792762, at *5 (E.D. Va. Dec. 12, 2019) (finding that *Honeycutt* does "not bar the entry of the preliminary forfeiture order or forfeiture of the subject properties" under § 982(a)(1)); *United States v. Fujinaga*, No. 2:15-CR-0198-GMN-NJK, 2019 WL 2503939, at *5 n.1 (D. Nev. June 17, 2019) (finding that *Honeycutt* does not apply to forfeiture pursuant to § 982(a)(1) because of its use of the phrase "involved in" rather than "obtain," "acquired," or "possessed").[16]

In sum, the Court finds that the plain text of 18 U.S.C. § 982(a)(1) is materially different from 21 U.S.C. § 853(a)(1) and, therefore, the Supreme Court's holding in *Honeycutt* is not applicable to § 982(a)(1). Accordingly, joint and several liability of defendants in this case under § 982(a)(1) is not precluded.

## B.  Criminal Forfeiture

The government seeks forfeiture of: "(1) legitimate funds that were commingled with fraud proceeds during the course of a money laundering transaction and/or were commingled with fraud proceeds so as to conceal or disguise the source of the proceeds; (2) any property, real or personal, that facilitated a money laundering offense; and (3) any property, real or personal, that was the subject, or corpus, of the purchase or sale for which the proceeds were wired." (Gov. Mot. at 8.)  The Court finds that the government has shown, by a preponderance

of the evidence, that the sought-after property is forfeitable.

### 1.  Forfeitable Assets

The Court grants forfeiture of all three assets: (1) the Falcon 10 aircraft; (2) the Sugar Mill property; and (3) DCSL, as well as the corporate ownership entities in DCSL. As discussed in detail below, the Court finds that the government has proven, by a preponderance of the evidence, that these properties are traceable to defendants' wire fraud and conspiracy to commit wire fraud. Moreover, the properties are forfeitable in their entirety as property that was involved in, and traceable to, defendants' money-laundering conspiracy.  In particular, these properties facilitated money-laundering transactions by providing a cover for the transfer of proceeds. Finally, the properties were involved in the money-laundering transactions in that they were the subject, or corpus, of wire transfers or commingled funds.

As an initial matter, Constantine does not oppose forfeiture of these assets.  In fact, he concedes that they are forfeitable. (Constantine Opp'n at 15.)  Kenner, in turn, states that he "ignored [the Falcon 10 and Sugar Mill] portion of the forfeiture demands."  (Kenner Opp'n at 216.) Regardless of these concessions, the Court finds that forfeiture is appropriate as the evidence demonstrates that defendants stole or diverted funds for their purchases.

Specifically, as to the Falcon 10 aircraft, defendants diverted funds from the GSF[17] –

---

[16] As noted *supra*, the Fourth Circuit has also held in an unpublished, nonprecedential opinion that *Honeycutt* does not apply to forfeiture pursuant to § 982(a)(1). *See Alquza*, 722 F. App'x at 349.

[17] As noted *supra*, defendants were convicted of participation in a conspiracy involving three

fraudulent schemes: (1) the Hawaii Project, whereby investors were told funds would go to Hawaii land development; (2) "Eufora," a prepaid credit card company run by Constantine where investor funds were used for personal benefit; and (3) the GSF, where

that were meant to be used for litigation against Jowdy – for its purchase without investors' knowledge or authorization. (*See* GXs 80, 1102, 4203, 4222; Trial Tr. at 391, 423-29, 687-99, 1815, 2175, 2749-51, 2833, 3052.) For the Sugar Mill property, Kenner diverted the victims' lines of credit, again without authorization, for its purchase. For example, on February 23, 2005, Kenner transferred $400,000 from Sergei Gonchar's ("Gonchar") line of credit[18] to the Little Isle IV LLC ("Little Isle IV") account. (*See* GXs 2015, 2139.) $380,000 was then wired from the Little Isle IV to Title Guaranty Escrow services (*see* GX 2015), with $350,000 going towards Sugar Mill's purchase (*see* FORF[19] 56, 93, 94). As set forth at trial and this Court's October 13, 2017 Order (ECF No. 501), the Little Isle IV account – in conjunction with the Ula Makika LLC ("Ula Makika") account – was created for the Hawaii Project. Victims were told investment funds would be wholly for Hawaiian land development, but the funds were repeatedly diverted to other unauthorized uses (e.g., several transfers to Constantine's company, Constantine Management Group Ltd. ("CMG")). (*See* Order at 50.)[20] Additionally, lines of credit were extended in victims' names, without authorization, and were wired to the Little Isle IV account before being laundered through the Ula Makika account for unauthorized uses, such as the property purchases discussed below. (*See, e.g.*, Order at 7; Trial Tr. at 381-431; GX 2003.)

Finally, as to DCSL, its purchase was also made with other stolen or diverted client funds. (*See* GX 2101; FORF 93.) For instance, Ethel Kaiser wired $300,000 to the Kau Holding Company LLC ("Kau Holding") to fund the Hawaii Project; in particular, the funds were intended for the purchase of the Waikapuna property. (*See* GX 2019; Trial Tr. at 932-33). Instead, Kenner laundered a portion of these funds through the Ula Makika and Baja Development accounts before they were wired to Propiedades DDM, the DCSL subsidiary account. (*See* GX 2102.)

Accordingly, these properties are forfeitable under 18 U.S.C. § 981(a)(1)(C), as they are proceeds from defendants' wire fraud that they "would not have but for the criminal offense." *Nicolo*, 597 F. Supp. 2d at 346 (quoting *Grant*, 2008 WL 4376365, at *2 n.1).

However, even assuming *arguendo* that § 981 does not support forfeiture, the assets are forfeitable under § 982(a)(1) as they facilitated defendants' money laundering, and disguised the proceeds of the fraud. First, Constantine used GSF funds to pay additional expenses (i.e., insurance premiums and renovations) for the Falcon 10 (*see* GXs 80, 1102, 3941-47, 4203, 4222; Trial Tr. at 3302, 3374, 3805-06, 3808, 3816), and courts have held that property can be forfeited when fraud proceeds are used to pay for expenses or improvements to that property, *see, e.g.*, *United States v. Schlesinger*, 261 F. App'x 355, 361 (2d Cir. 2008) (holding that forfeiture of real property was appropriate where fraud proceeds were used to pay lease and taxes on real property).

---

defendants induced investment to fund litigation against developer Jowdy but money was diverted for unauthorized and personal uses.

[18] Gonchar testified at trial that he was unaware of *any* existing line of credit existing in his name. (Trial Tr. at 4845-56.)

[19] Citations to "FORF" refer to the exhibits admitted at the forfeiture hearing.

[20] As relevant here, stolen funds were repeatedly laundered through the Little Island IV, Ula Makika, and CMG accounts before funds were used for unauthorized property purchases.

Second, as to Sugar Mill, the victims' line of credit funds were laundered through the Little Isle IV account before they were sent on for purchase. (*See* GXs 2015, 2139.) Accordingly, because the evidence shows "some direct financial link between [defendants'] money laundering and [their] real property," forfeiture is warranted. *See Nicolo*, 597 F. Supp. 2d at 355-57 (citing *United States v. 10.10 Acres on Squires Rd.*, 386 F. Supp. 2d 613, 617 (M.D.N.C. 2005) ("Real property is involved in a money laundering offense if laundered funds are used to make payments toward purchase of the property and to pay for improvements.")).

Finally, as to DCSL, defendants used pooled tainted and untainted funds for its purchase. For example, with KAJ Holdings LLC, which owns part of DCSL, LLC, and is managed by Jowdy, Kenner diverted client funds intended for other investments, while also borrowing legitimate client money for capital contribution towards DCSL's purchase. (*See* GX 2101; 3/9/16 Forf. Tr. at 80; FORF Chart 26.) This commingling of clean and illicit funds makes defendants' "prohibited conduct less difficult" and thus facilitates the money-laundering conspiracy. *Schlesinger*, 396 F. Supp. 2d at 272; *see also Nicolo*, 597 F. Supp. 2d at 351 (finding forfeiture of commingled funds proper when defendant pooled the funds to "disguise" his illegal scheme); *United States v. Contents of Account Numbers 208–06070 & 208–06068– 1-2*, 847 F. Supp. 329, 335 (S.D.N.Y. 1994)

(noting that "legitimate money . . . serve[s] to further disguise the source of the illegitimate funds and make the proceeds of the [criminal] scheme more difficult to trace, and thereby facilitate [a claimant's] money laundering scheme").[21]

DCSL was also purchased using diverted loan money. As explained in detail below, defendants mortgaged a Hawaiian property, purchased with client funds, to secure a $3 million promissory note loan from Centrum Financial Services ("Centrum"). (Trial Tr. at 2698.) This loan was financed using clients' lines of credit. (*See* GXs 2021, 2133, 2135, 2136, 2137, 2422.) Although the loan was to be used exclusively for Hawaiian property development (*see* GX 3703), $1.5 million was diverted, without authorization, from the Little Isle IV account to Propiedades DDM for DCSL's down payment (*see* GX 2013; 4/4/16 Forf. Tr. at 77-80).[22] Accordingly, DCSL and the corporate entities created to facilitate its purchase are forfeitable as they are "traceable to" forfeitable property. *See Nicolo*, 597 F. Supp. 2d at 348 (quoting *Bornfield*, 145 F.3d at 1134).[23]

Although Kenner claims that Baja Ventures 2006's capital contribution came from "clean, non-co-mingled [sic] sources of Baja Ventures 2006 funds" and therefore are not forfeitable (Kenner Opp'n at 8), this argument is without merit. First, even assuming *arguendo* that Baja Ventures is a completely clean fund, the fact that one of

---

[21] The Court also notes that there is additional evidence supporting forfeiture of DCSL (e.g., the laundering and use of Jozef Stumpel's money to fund DCSL's purchase without receiving any ownership interest). (*See* GX 2102; FORF 36.) However, this additional evidence is unnecessary to support the Court's determination, based upon other evidence in the record, that DCSL is forfeitable.

[22] Kenner even conceded at trial that Centrum Loan funds were used for DCSL's purchase. (*See* Trial Tr. at 4637.)

[23] The forfeiture of the DCSL property will be subject to the preliminary forfeiture order's carve-outs (discussed at various conferences) that attempt to protect third-party ownership, timeshare membership, and the property right interests of innocent third parties. (*See* ECF Nos. 693-1, 693-2.)

Kenner's DCSL's ownership vehicles "may have contained some untainted funds cannot in itself defeat the government's forfeiture claim; were it otherwise, it would be all too easy to avoid the reach of the forfeiture statutes." *Nicolo*, 597 F. Supp. 2d at 354-55; *see also Portillo*, 2019 WL 1949861, at *2-3 (holding that "otherwise 'clean' property used to conceal or otherwise facilitate money laundering is also forfeitable"). Second, even Baja Venture's "clean" capital accounts would be forfeitable, as they helped to facilitate DCSL's purchase by concealing the tainted funds. *See Contents of Account Numbers 208–06070 & 208–06068–1–2*, 847 F. Supp. at 335.

In sum, the government has shown, by a preponderance of the evidence, that the Falcon 10 Airplane, Sugar Mill, and DCSL properties were both traceable to and facilitated defendants' wire fraud and money-laundering conspiracies. Accordingly, the Court grants forfeiture of these assets.[24]

2. Forfeiture Money Judgment

The government also seeks a forfeiture money judgment, originally in the amount of $36,739,048.59. This amount comprised proceeds from the Frailes property, the three Palms Units, Del Mar, the GSF, the Hawaii Project, the victims' lines of credit, the Eufora Fraud, and the Centrum Loan Fraud, and included deductions to prevent double

counting. The government requested that defendants be held jointly and severally liable for $36,739,048.59. Thereafter, the government provided updated figures to reflect additional deductions that avoid double counting. (ECF No. 799.)

On January 22, 2020, the Court held a status conference, at which it raised concerns about the scope of the money judgment based upon the evidence, and instructed the government to submit revised charts outlining the money judgment amount for each defendant separately. Specifically, the Court directed the government to provide a chart for defendant Kenner that included only monies or funds related to the following frauds: the GSF, victims' lines of credit, the Hawaii Project money, the Eufora Fraud, and the Centrum Loan Fraud. In response, the government revised the calculations for Kenner (ECF No. 799), which are reproduced below:

| Forfeitable Asset | Money Judgment |
|---|---|
| GSF | $2,514,853.00 |
| Victims' Lines of Credit | $9,151,542.00 |
| Hawaii Project | $2,415,000.00 |
| Eufora Frauds | $1,625,000.00 |
| Centrum Loan Fraud | $2,000,000.00 |
| **Total for Kenner** | **$17,706,395.00** |

---

[24] The Court recognizes that certain third parties, notwithstanding efforts taken by the Court to minimize the impact of the DCSL forfeiture on innocent third parties, are still concerned about the impact of the forfeiture on their property rights. (*See, e.g.*, ECF No. 697.) Although some of Kenner's clients knowingly and voluntarily contributed money to CSL Properties for the purpose of obtaining DCSL (*see* FORF 93), this does not, at this time, affect the forfeiture analysis because "the extent of the [defendants'] ownership or interest in the property is not at issue in determining whether the court should enter a preliminary order of

forfeiture." *Schlesinger*, 396 F. Supp. 2d at 273 (citing Fed. R. Crim. P. 32.2(c)). Rather, "[t]he extent of the defendants' interest in the property and any other party's interest will be decided, if necessary, in an ancillary hearing." *Id.*; *see also Pacheo v. Serendensky*, 393 F.3d 348, 351 (2d Cir. 2004). As discussed at the conferences, the Court intends to move forward with the ancillary hearings in an expeditious manner in order to minimize any negative impact to the property rights of innocent third parties.

For Constantine, the updated chart from the government (ECF No. 795), reflects proceeds from the following frauds: the GSF, the Hawaii Project, the Eufora Fraud, and the Centrum Loan Fraud:

| Forfeitable Asset | Money Judgment |
|---|---|
| GSF | $2,514,853.00 |
| Hawaii Project | $2,415,000.00 |
| Eufora Frauds | $1,625,000.00 |
| Centrum Loan Fraud | $2,000,000.00 |
| **Total for Constantine** | **$8,554,853.00** |

As set forth below, the Court finds that both defendants are jointly and severally liable for the proceeds from the following funds: (1) GSF; (2) Hawaii Project; (3) the Eufora Fraud; and (4) the Centrum Loan Fraud.[25] More specifically, the Court concludes that the government has proven, by a preponderance of the evidence, that these funds (in the amounts set forth above) are proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and property that facilitated money laundering transactions and was involved in money laundering transactions.[26]

Second, the Court concludes that the government has proven that Kenner is liable for a money judgment for the full amount of the proceeds of the victims' lines of credit (in the amount set forth above) because the value of those funds are traceable to defendants' wire fraud and conspiracy to commit wire fraud violations, and that were involved in, and traceable to, defendants' money-laundering conspiracy. The Court, however, reaches a different conclusion as to Constantine with respect to forfeiture of the proceeds from the lines of credit. As discussed in detail in the Court's October 13, 2017 Memorandum and Order, "the Hawaii Project evidence showed a long-running and multi-faceted scheme in which Constantine played an integral role by (1) siphoning funds intended to finance that development; (2) manufacturing a fraudulent pretext for those payments; and (3) securing additional funding for the Hawaii Project via loan proceeds that he subsequently diverted to his and Kenner's benefit." (Order at 52, ECF No. 501.) Thus, there is no question that Constantine was involved in the conspiracy to defraud the victims with respect to the Hawaii Project, and in a conspiracy to launder that money. However, there is no evidence that, as part of that conspiracy, Constantine understood that Kenner was going to create, and then utilize in a fraudulent manner, lines of credit as part of that conspiracy. Therefore, under existing case authority discussed below, the Court concludes that Constantine should not be

---

[25] As the government argues, Kenner and Constantine "should each be held liable for the full proceeds and, therefore, the imposition of joint and several co-conspirator liability is not necessary." (ECF No. 780 at 2.) Nevertheless, the government requests that defendants be held jointly and severally liable in order to conform with the Second Circuit's decision in *United States v. Tanner*. (*Id.* citing 942 F.3d at 67-68).) For the purpose of these funds, although the Court agrees with the government regarding the liability of defendants, the Court (as the government requests) holds them jointly and severally liable for the GSF funds, the Hawaii Project funds, the Eufora funds, and the Centrum Loan funds in order to prevent double recovery.

[26] With respect to the wire fraud, the Court again notes that, even if *Honeycutt* applies to § 981(a)(1)(C), Kenner and Constantine are jointly and severally liable for the entire amount of the forfeiture of these funds because Kenner was the mastermind of the entire conspiracy, and Constantine exercised substantial control and supervision over these aspects of the conspiracy, such that joint and several liability is warranted (*see supra* at 7 n.8).

subject to forfeiture of the proceeds from the lines of credit.[27]

Third, the Court concludes that neither defendant must forfeit proceeds from the Frailes property, the Palms Units, or Del Mar, in light of the fact that the government has not demonstrated that the investments in those properties that did not originate from the Hawaii Project were the product of fraud by either defendant, or that they were used to facilitate or conceal the money-laundering conspiracy. The Court does conclude that the diversion of the Hawaii Project money into these properties (as well as the Falcon 10, GSF, and DCSL) was part of the money laundering scheme and, thus, the Hawaii Project money (and the lines of credit money as to Kenner) is part of the forfeiture. However, the government did not prove that the other non-Hawaii Project money invested in these properties by various individuals was part of the fraud (and did not seek to prove that at trial or at the forfeiture hearing). Nor did the government prove that those additional monies were placed in these properties to conceal or facilitate the diversion of the Hawaii Project money to those same properties. In other words, with respect to monies invested in these properties that were not from the Hawaii Project, the GSF, or the lines of credit, the government did not demonstrate that defendants "pooled the funds to facilitate or 'disguise' [their] illegal scheme." *Nicolo*, 597 F. Supp. 2d at 351 (quoting *Puche*, 350 F.3d at 1153).

a. Constantine's Money Judgment

Based on the evidence submitted at trial and at the forfeiture hearing, the Court finds that Constantine was personally involved in the wire fraud conspiracy and money-laundering conspiracy as it relates to the proceeds from the following funds: the GSF, the Hawaii Project, the Eufora Fraud, and the Centrum Loan Fraud.

As explained *supra*, *Honeycutt* does not apply to forfeiture of money laundering proceeds. Nevertheless, even though joint and several liability would therefore apply, the Court concludes that the proceeds that the government seeks for forfeiture from Constantine related to the victims' lines of credit were not reasonably foreseeable to Constantine. *See United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012) ("[A] court may order a defendant to forfeit proceeds received by others who participated jointly in the crime, provided the actions generating those proceeds were reasonably foreseeable to the defendant"); *Fruchter*, 411 F.3d at 384 (affirming the district court's forfeiture amount and noting that "the [district] court took care to exclude from the forfeiture amount any proceeds from conduct of which [the defendant] – as the government conceded – was not aware and had no reason to be aware").

First, to the extent the government says that Constantine was the mastermind of the entire scheme (including the lines of credit) along with Kenner (Gov. Reply at 8 n.6), the Court disagrees. The evidence established that Kenner was responsible for opening and managing the Northern Trust lines of credit. (*See, e.g.*, Tr. at 2065-66 (Owen Nolan); Tr. at 2725-28 (Steven Rucchin).) Despite Constantine's participation in other aspects of the Hawaii Project, it was Kenner who devised this part of the plan and acquired these proceeds, as demonstrated at trial.

---

[27] Although the government alleged that Constantine conceded that he participated in the Palms Units investment and obtained lines of credit proceeds during the course of that alleged fraud, Constantine responds that money he received from the Hawaii Project "originated from the money Kenner obtained from the hockey players' lines of credit" unbeknownst to him. (ECF Nos. 795, 801.)

Second, not only was Constantine not the mastermind as it related to the lines of credit, but also the fraudulent use of the lines of credit by Kenner was not reasonably foreseeable to Constantine. There is no evidence in the record that demonstrates that Constantine knew that Kenner was improperly opening the lines of credit, or that he was aware of what Kenner was doing with them. To the contrary, witnesses and victims testified that Constantine was not involved with these accounts.[28] (*See, e.g.*, Tr. at 811 (Kristin Peca); Tr. at 922-23 (Aaron Mascarella).)

Accordingly, the Court concludes that Constantine is only jointly and severally liable for the GSF funds, the Hawaii Project Funds, the Eufora Fraud, and the Centrum Loan Fraud. As to these funds, the evidence was clear that Constantine was fully aware of, and involved in, the fraud and money laundering related to these funds (as outlined in detail in the Court's October 13, 2017 Memorandum and Order).

### b. Kenner's Money Judgment

Turning to Kenner's liability, the Court concludes that the government has proven that he is liable for a money judgment with respect to the following funds, which were part of the wire fraud and wire fraud conspiracy, as well as the money-laundering transactions and money-laundering conspiracy: the GSF, the Hawaii Project, the victims' lines of credit, the Eufora Frauds, and the Centrum Loan Fraud.

With respect to the lines of credit, the Court finds that Kenner is individually liable for such proceeds, given his explicit role in opening and managing the lines of credit in a fraudulent manner and laundering the proceeds of that fraud through various other accounts and entities.

As to the Palms Units, Del Mar property, and Frailes property, the government did not prove these alleged frauds with respect to the money from other sources that funded these properties (i.e., beyond the funds that were the subject of the trial, such as the lines of credit and the Hawaii Project money). In particular, the government did not demonstrate that the additional funds that Kenner obtained from investors that were specifically earmarked for these properties – namely, the Palms Units, Del Mar, or Frailes – for which no fraud was proven, were intended to conceal the ill-gotten proceeds from lines of credit. Thus, the Court concludes that this independent money that was invested into these properties was not used in any meaningful way to conceal or facilitate the underlying money-laundering conspiracy. Instead, the Court finds that Kenner's goal with these proceeds was to legitimately invest the funds, not improperly divert them or conceal illicit money laundering.

### 3. Evidence Supporting the Money Judgments

Although the evidence supporting the convictions regarding the fraud and money laundering counts against each defendant is discussed in great detail in the Court's

---

[28] Similarly, Constantine is not liable for the forfeiture of funds (unrelated to the GSF funds, the Hawaii Project funds, the Eufora funds, and the Centrum Loan funds) which were invested by Kenner and others in properties such as the Palms Units, Del Mar, and Frailes properties. Constantine was not involved in those independent investments and, even if he were,

he would also not be liable for the same reasons the Court finds Kenner not to be liable for a money judgment as to those properties (discussed *supra*).

October 13, 2017 Memorandum and Order, the Court summarizes the evidence below in order to explain how the government has met its burden of proof under the legal standard for forfeiture with respect to the forfeiture money judgment that the Court is imposing against each defendant.

### a. Global Settlement Fund

The government argues that defendants are liable for $2,514,853 as to the GSF. (ECF Nos. 795, 799.)[29] In particular, the government asserts that defendants are jointly and severally liable for a money judgment in that amount because it represents:

> the GSF money that is proceeds of defendants' wire fraud and conspiracy to commit wire fraud, and is property that facilitated money laundering transactions (i.e., made the wire transfers of proceeds and commingled funds less difficult or more or less free from obstruction), was involved in money laundering transactions (i.e., was the subject, or corpus, of wire transfers of proceeds and commingled funds), and was involved in defendants' money laundering conspiracy.

(Gov. Mot. at 53.)

The Court finds that the government has proven that inclusion of these funds in a money judgment in the amount of $2,514,853

is warranted. Specifically, victims were induced to contribute to the GSF under the guise that these funds were to be used for litigation against Jowdy. (See Trial Tr. at 423-29, 687-88, 2175, 3052-53, 2833-36, 2749-51.) However, defendants diverted this money for unauthorized and personal purposes. (FORF 1; GXs 80, 1102.)[30] As explained supra, GSF funds were also tied to the Falcon 10 airplane. (See GXs 80, 1102, 4203, 4222).

Accordingly, forfeiture is warranted on two independent grounds. First, defendants would not have received these investment proceeds but for their fraudulent conduct in that the victims were tricked into a sham investment, and a "defendant may be ordered to forfeit all monies received by him as a result of the fraud." Uddin, 551 F.3d at 181.

Second, the monies in the GSF were commingled with other tainted funds such as the diverted clients' lines of credit and Centrum Loan funds and used to purchase properties, thus facilitating the money-laundering conspiracy by making the illegal scheme more difficult to discover (both in the commingling and the purchase of property). (See, e.g., Trial Tr. at 4015-18; GX 80.) Accordingly, the Court grants a money judgment of $2,514,853 against both defendants jointly and severally under both § 981(a)(1)(C) and § 982(a)(1).

Constantine objects to this proposed money judgment. Although Constantine's arguments are based on a misguided reading

---

[29] Originally, the government requested $2,394,853. (Gov. Mot. at 60). The higher figure set forth above, based upon the Court's direction to the government to submit a calculation that excludes certain other properties, now includes funds that were initially deducted to avoid double counting.

[30] As set forth in this Court's Order denying Constantine's Rule 29 motion, there was ample

evidence that defendants also used GSF funds for other unauthorized personal uses, including rent and legal assistance. (See Order at 59-61, ECF No. 501; Trial Tr. at 423-29, 1660-61, 1669-70, 1815, 2175-76, 2749-51, 2833-36, 3052-53; FORF 1; GX 80.)

of *Honeycutt*, the Court will briefly address their merits. As to the GSF, Constantine argues that because Gonchar's contributions to the GSF exceeded those used for Constantine's benefit, and because Gonchar authorized Constantine to use these funds for various purposes, he did not "acquire" any forfeitable funds. (Constantine Opp'n at 13.) This argument is unavailing. Essentially, Constantine maintains his previously rejected argument that Gonchar was not a fraud victim. [31] In this Court's Order denying Constantine's Rule 29 motion, it held that "it was the jury's prerogative to reject Gonchar's testimony that he permitted Constantine to use all of his funds for personal expenditures, especially given his initial answer" that he could not recall giving Constantine such permission. (Order at 60, ECF No. 501.) This Court further held that "[i]nsofar as Constantine contends that Gonchar's subsequent contributions [to the GSF] account for that differential, Gonchar's testimony and bank records contradict that argument." (*Id.*) There was ample evidence indicating that Constantine's "withdrawals still eclipsed [Gonchar's] deposits." (*Id.* at 61, ECF No. 501; Trial Tr. at 4820-23; GXs 80, 767, 1102.)

Although Constantine "insists on his relative lack of culpability, his 'willful participation' in th[e] conspiracy, even if less egregious than that of his codefendants, is sufficient to support the forfeiture." *United States v. Viloski*, 814 F.3d 104, 113-14 (2d Cir. 2016) (quoting *United States v.*

*Sabhnani*, 599 F.3d 215, 263 (2d Cir. 2010) (noting that the Second Circuit has upheld a civil forfeiture against a building owner who was "willfully blind" to the fact that the building was used to facilitate drug trafficking (internal quotation marks omitted))).[32] The Court rejects Constantine's recycled arguments here and finds that the GSF funds are forfeitable as they were "integral to the fraud" by inducing the investment of legitimate funds, and these funds, in turn, "facilitated the money laundering" by disguising other stolen funds. *See Schlesinger*, 396 F. Supp. 2d at 272.

### b. Hawaii Project Monies

The government asserts that defendants are liable jointly and severally for a money judgment in the amount of $2,415,000 for the victims' investments in the Hawaii Project.[33] (ECF Nos. 795, 799.) The Court agrees. These investments (*see* FORF 1; GXs 2101, 2106), were meant for the Hawaii Project (*see, e.g.*, Trial Tr. at 2720-26, 3035-37, 3479-82, 4846-48), but were diverted to other purposes that were not authorized by the victims. Thus, the diverted funds are subject to forfeiture under § 981(a)(1)(C).

Moreover, the entire amount of the fund is subject to forfeiture as part of the money laundering offense under § 982(a)(1). As explained *supra*, as part of the Hawaii Project, defendants placed clients' investment funds in the Little Isle IV account. However, these funds – as well as the

---

[31] This argument is repeated regarding the Eufora funds where Constantine argues that Gonchar's $100,000 contribution should be deducted from the forfeitable amount "because he is not a crime victim." (Constantine Opp'n at 14.)

[32] The Court highlights that Constantine previously conceded that he "did play a significant role" in the GSF objective of the fraud conspiracy. (Constantine's Rule 29 Mot. at 14, ECF No. 346.)

[33] The amount originally requested by the government was $2,370,000. (Gov. Mot. at 55-56.) This higher amount includes proceeds that were originally deducted to prevent double counting.

Centrum Loan funds – were used in a fraudulent and unauthorized manner and repeatedly laundered (see, e.g., Trial Tr. at 2065, 2721, 4845-56), to facilitate numerous property purchases such as DCSL and Sugar Mill (see, e.g., GXs 1751, 2101, 2109, 2138; 2/12/16 Forf. Tr. at 51-53; 3/9/16 Forf. Tr. at 26-28; FORF 13, 56, 93). Because the evidence indicates clear intent to launder these monies, the funds were "involved in" the money-laundering offense and are forfeitable. 18 U.S.C. § 982(a)(1); see also Nicolo, F. Supp. 2d at 351 (finding that the "corpus of a money-laundering conspiracy is the funds that the defendant conspired to launder" (quoting United States v. Huber, 404 F.3d 1047, 1056 (8th Cir. 2005))).[34] Moreover, the mere fact that some of these funds were used for legitimate purposes, such as the purchase of the Honu'apo property as part of the Hawaii Project, does not make forfeiture improper. Again, legitimate uses do not vitiate forfeiture if those funds "disguised" or facilitated the money-laundering conspiracy.[35] See Portillo, 2019 WL 1949861, at *2-3.

c. Victims' Lines of Credit

The government argues that defendants are liable for a money judgment in the amount of $9,151,542 for the victims' established lines of credit.[36] (ECF No. 799.) As with the actual investments obtained, the lines of credit extended by bonds and equities (see FORF 1), were meant for the Hawaii Project (see, e.g., Trial Tr. at 2720-26, 3035-

37, 3479-82, 4846-48). However, as discussed in detail in the Court's October 13, 2017 Memorandum and Order, and supra, Kenner diverted line of credit funds for unauthorized and fraudulent purposes. The lines of credit funds were also commingled by Kenner with other investment funds and stolen Centrum Loan funds in the Little Isle IV and Big Isle IV accounts. Moreover, the establishment of the lines of credit was "the outgrowth of [the defendant's] fraudulent beginnings." United States v. Warshak, 631 F.3d 266, 332 (6th Cir. 2010). Thus, even assuming arguendo that some of the lines of credit were used for a legitimate purpose (namely, the funding of the Hawaii Project) those funds are still forfeitable because they were obtained by the overall fraud. The Court also notes that even where the funds were used for a legitimate purpose (such as the Honu'apo property in Hawaii), that property was then used by Kenner to secure the $3 million Centrum Loan, which funds were diverted and laundered.

In sum, the Court finds that Kenner used the lines of credit funds for fraudulent purposes, and to facilitate money laundering transactions and the overall money-laundering conspiracy. Thus, the Court finds Kenner is liable for a money judgment in the entire amount of the lines of credit under § 981(a)(1)(C) and § 982(a)(1).

As stated above, the Court finds that the lines of credit proceeds were not reasonably foreseeable to Constantine. See Contorinis,

---

[34] Forfeiture is also appropriate given that these diverted funds were commingled with stolen Centrum Loan funds, helping to conceal the Centrum Loan fraud.

[35] The Court also recognizes that the purchase of Hawaiian property allowed for defendants to secure the $3 million Centrum Loan, only adding to the money-laundering conspiracy. (See GXs 3703, 3712, 3716, 9031C.)

[36] Regarding the victims' lines of credit, the government deducted line of credit funds that were used to purchase the forfeitable real property. (See Gov. Mot. at 55 n.9.) In addition, the original amount requested for these assets was $6,296,542. (Gov. Mot. at 55-56.)

692 F.3d at 147.  Although there was ample evidence at trial demonstrating Constantine's participation in the overall conspiracy to defraud the victims of their Hawaii Project money (and launder the proceeds of that fraud), as discussed *supra*, there was no evidence to demonstrate that Constantine was aware, or had reason to be aware, of the way in which Kenner opened and managed these lines of credit, such that he should be liable for such funds for forfeiture purposes.  *See Fruchter*, 411 F.3d at 384.  Accordingly, the Court finds that only Kenner is liable for this portion of the money judgment related to the victims' lines of credit.

### d.  Eufora Fraud Funds

The government seeks a money judgment of $1,625,000 for the funds that defendants gained from the Eufora fraud victims. (Gov. Mot. at 57-58; ECF Nos. 795, 799.)

Based upon the evidence in the record, the Court finds that the government has proven that a forfeiture money judgment in this amount is warranted against both defendants jointly and severally.  Both defendants were integrally involved in the Eufora fraud (*see, e.g.*, Order at 52-56, 66), which induced victims to invest in a sham company that purportedly sold prepaid credit cards with credit builders (*see* GX 210). These funds were instead diverted to Constantine's CMG and Kenner's personal bank accounts. (Trial Tr. at 675-79, 1913-18; GXs 760, 1706.)  As discussed *supra*, the CMG bank account was used for numerous property purchases (*see, e.g.*, GXs 1753, 4408; 2/12/16 Forf. Tr. at 33), and contained other stolen funds such as the diverted line of credit money (2/12/16 Forf. Tr. at 45, 50, 82-83; GX 1751).

For the same reasons that support the money judgment of the GSF funds, the Court

finds that the evidence supports forfeiture of the Eufora funds under § 981(a)(1)(C) and § 982(a)(1).  First, defendants would not have received these investment proceeds but for their fraudulent conduct, *see Uddin*, 551 F.3d at 181, and the Eufora funds were commingled with other tainted funds before being used to purchase properties, thereby disguising and facilitating the money-laundering conspiracy – both with the commingling and property purchases (*see, e.g.*, Trial Tr. at 4015-18; GX 80). Accordingly, the Court grants a money judgment of $1,625,000.

Again, Constantine mistakenly argues that only the unlawful proceeds he actually "obtained" should be forfeited.  Constantine concedes that $725,000 of Eufora investor money was placed in an account controlled by him, but argues that Gonchar's money (i.e., $100,000) should not be included because he is not a "crime victim." (Constantine Opp'n at 14.)  First, as explained *supra*, the Court does not agree that Gonchar was not a crime victim.  After being lied to, he invested in Eufora and received nothing in return. (Trial Tr. at 677-79.)  Second, even if the Court were to accept Constantine's argument that Gonchar's funds were "legitimate," the Eufora investment funds, as a whole, would be forfeitable because "the commingling of tainted funds with legitimate money . . . facilitates the laundering and enables it to continue."  *Certain Funds on Deposit in Account No. 01–0–71417, Located at the Bank of New York*, 769 F. Supp. at 84-85; *see also Contents of Account Numbers 208–06070 & 208–06068–1–2*, 847 F. Supp. at 335 (noting that "legitimate money . . . serve[s] to further disguise the source of the illegitimate funds and make the proceeds of the [criminal] scheme more difficult to trace, and thereby facilitate [a claimant's] money laundering scheme").  Thus, the Court finds

that the money judgment for the Eufora funds is warranted.

### e.    Centrum Loan Funds

The government asserts that defendants are liable for a money judgment in the amount of $2,000,000, representing the Centrum Loan funds that defendants unlawfully diverted and laundered for the purchase of certain properties, including the DCSL. (*See* ECF Nos. 795, 799; GXs 2013, 2102; Trial Tr. at 4637.)[37]

The Court finds that the government has proven that these funds are forfeitable as part of a money judgment against both defendants jointly and severally. Specifically, the evidence shows that defendants secured a $3 million loan from Centrum Financial by mortgaging the Honu'apo property. (*See* GXs 3703, 3712, 3716.)    As mentioned earlier, although these funds were to be used exclusively for the Hawaiian property development (*see* GX 3703), defendants, nonetheless, repeatedly diverted and laundered Centrum Loan funds through the Little Isle IV, Propiedades DDM, the Ula Makika, CMG, and Baja Development accounts. (*See* GXs 2013, 2102). According to the "Statement of Use of Loan Proceeds" for the Centrum Loan, the loan money was to be used "exclusively" for the development of the Hawaii property (GX 3703), but then was diverted to these other uses (including the down payment on the purchase of DCSL) without the knowledge of defendants' clients. Therefore, the Centrum Loan funds are proceeds of defendants' wire fraud and conspiracy to commit wire fraud that are

forfeitable in a money judgment under § 981(a)(1)(C).    Moreover, the Centrum Loan funds facilitated the money-laundering conspiracy by assisting with the property purchases, which further concealed the illegal conduct. (*See, e.g.*, GXs 2013, 2018, 2102, 4408.)[38] These funds are thus also forfeitable in their entirety under § 982(a)(1) because: (1) defendants intended to launder these diverted funds in order to finance their purchases; and (2) the diverted funds facilitated the money-laundering conspiracy by providing significant capital and disguising the illegal scheme through property purchases.

Accordingly, the Court holds that defendants are jointly and severally liable for a $2,000,000 money judgment from the Centrum Loan funds.

### C.  Defendants' Oppositions

Defendants have filed numerous written submissions with the Court opposing the government's forfeiture motion.    Although the Court finds all of the arguments to be without merit as it relates to the forfeiture being ordered by the Court in this Memorandum and Order, the Court will only focus here on defendants' main arguments.

### 1.  Kenner's Opposition

Kenner's lengthy opposition and numerous supplemental submissions primarily attack the underlying evidence, arguing that the government is just "rehash[ing] their trial theories that were exposed as false throughout Kenner's Rule

---

[37] The government's original calculation was $1,300,000 (Gov. Mot. at 59-60) to avoid double-counting, but is now $2,000,000 based upon the Court's decision not to include monies in the forfeiture order from other properties that received funds from the Centrum Loan Fraud.

[38] In addition, the CMG account contained diverted Centrum Loan funds.  In July 2005, large amounts were transferred from the Little Isle IV account, which, as discussed, contained Centrum Loan funds, through the Ula Makika account and onto the CMG account.  (*See* GXs 2013, 2018, 2102.)

33 submission, only supported by overwhelming witness hearsay perjury." (Kenner Opp'n at 5.) Kenner also contends that there was inappropriate FBI involvement. (*Id.* at 5-8.) He further alleges that he received less than $280,000 in proceeds in "loan repayments." (ECF No. 805, at 9.) Moreover, as to the money judgment, Kenner alleges that the amount cannot exceed $8.5 million, which comprises $6,509,552 from the Hawaii Project, $700,000 from Eufora, and $1,200,000 from the GSF. (*Id.* at 25.) Kenner has revised that number in supplemental submissions.

The Court finds none of Kenner's arguments persuasive. Although he now attempts to characterize diverted funds as "loans" (Kenner Opp'n at 13), this categorization is irrelevant because there was more than sufficient evidence at trial showing that the victims did not authorize, or were not informed about, numerous fund transfers. (*See, e.g.*, Trial Tr. at 393-397, 703-704, 4847; GX 505.3.) The Court also rejected this very argument in its October 13, 2017 Memorandum and Order, stating that the evidence did "not demonstrate that the

investors permitted Kenner to transfer their money to Jowdy-led developments in Mexico or to Constantine and CMG." (Order at 85, ECF No. 501.)[39]

One of Kenner's forfeiture supplements (ECF No. 713) makes similar arguments challenging the underlying conviction instead of the reasonableness of the proposed forfeiture. For example, he attacks witness credibility;[40] argues that Baja Ventures was a clean entity;[41] claims that FBI proffer notes were altered;[42] and that he had authorization to use GSF monies.[43] These conviction-based evidentiary arguments are unavailing. Many were already heard (e.g., allegations of perjury) and rejected by the Court in connection with Kenner's Rule 33 motion. (*See* Order at 90-92.)[44]

In sum, Kenner's arguments regarding the forfeiture ordered by the Court are inconsistent with the evidence at the trial and at the forfeiture hearing and with the law of forfeiture.

---

[39] At the status conference held on December 6, 2019, Kenner also claimed that he was entitled to an offset of $350,000 due to a settlement between Owen Nolan and Ken Jowdy. However, such an offset would relate to restitution, not forfeiture.

[40] For instance, Kenner claims that witnesses' memories were consistent with Chronic Traumatic Encephalopathy ("CTE") and its symptoms. (Kenner Supp. at 23-27.)

[41] Kenner Supp. at 32. The Court has already explained its rationale for rejecting this argument. *See supra* at 16-17.

[42] Kenner Supp. at 49.

[43] Kenner Supp. at 58.

[44] The Court also does not .find that the proposed forfeiture is excessive under the Eighth Amendment,

as Kenner appears to suggest. (Kenner Opp'n at 26, 38.) This was a multi-year conspiracy that involved numerous criminal acts and substantial sums of money. Both defendants are clearly "within the class of persons for whom the federal mail- and wire-fraud and money-laundering statutes were designed— namely, those who use facilities of interstate or foreign commerce to engage in fraudulent schemes and financial transactions and then seek to conceal or disguise the nature of the proceeds of the fraud." *Viloski*, 814 F.3d at 114. The *Bajakajian* factors that courts consider when determining whether forfeiture is unconstitutionally excessive support the constitutionality of the proposed forfeiture here. *See United States v. Bajakajian*, 524 U.S. 321, 338-39 (1998).

2. Constantine's Opposition

Constantine's primary contention is that he is not jointly and severally liable for the forfeiture money judgment because *Honeycutt* prevents such a determination. Accordingly, Constantine argues that his forfeiture should be reduced to the amount of funds that he actually "acquired." (*See generally* Constantine Opp'n.) For example, Constantine submitted a forensic accounting memorandum outlining cash flows relating to the case (ECF No. 600), and suggests that it demonstrates that Constantine never actually obtained any of the proceeds. However, as explained in detail *supra*, the Court finds that the material differences in statutory language and congressional intent between 21 U.S.C. § 853(a)(1) and 18 U.S.C. § 982(a)(1) do not warrant extending *Honeycutt*'s rationale to the money laundering statute. Accordingly, Constantine's argument fails.[45]

Finally, Constantine requests that the forfeitable assets be disposed in a manner "that causes the victims of the crimes of conviction to obtain renumeration," and thus "the amount of this renumeration should be deducted from the restitution obligation that will be imposed by the Court as part of his sentence." (Constantine Opp'n at 7.) This request is denied. The Second Circuit has been clear that restitution and forfeiture serve different purposes, and courts cannot order that the forfeitable assets be deducted from the restitution obligation without specific statutory authorization. *See United States v. Bodouva*, 853 F.3d 76, 78-79 (2d Cir. 2017) (holding that "district courts are bound not to reduce the amount of a mandatory criminal forfeiture order by the amount of past or future restitution payments, in the absence of specific statutory authorization to do so"). In

light of *Bodouva*, courts in this district have correctly held that they have "no basis to order the Government to apply forfeited funds to any restitution order." *United States v. Pratt*, No. 17-CR-262 (MKB), 2018 WL 2871840, at *4 (E.D.N.Y. June 11, 2018).

IV.  CONCLUSION

For the foregoing reasons and pursuant to Federal Rule of Criminal Procedure 32.2, the Court enters a preliminary order of forfeiture finding that defendants must forfeit: (1) the forfeitable assets of the Falcon 10 Airplane; Sugar Mill property; and DCSL, including the corporate ownership entities; (2) the sum of $8,554,853, representing the total value of the property involved in the wire fraud, wire fraud conspiracy, and money-laundering conspiracy for which defendants are jointly and severally liable; and (3) $9,151,542, representing the money judgment amount pertaining to the victims' lines of credit, for which Kenner is liable.

SO ORDERED.

S/ JOSEPH F BIANCO

JOSEPH F. BIANCO
United States Circuit Judge
(sitting by designation)

Dated: March 10, 2020
Central Islip, NY

\*\*\*

The United States is represented by Assistant United States Attorneys Saritha Komatireddy, Matthew Haggans, Diane C. Leonardo-Beckmann, and Madeline M. O'Connor of the United States Attorney's Office for the Eastern District of New York,

---

[45] Similarly, to the extent that Kenner signs on to Constantine's forensic accounting memorandum to show that he did not obtain the funds at issue (*see* ECF

No. 736), such an argument is unpersuasive due to his involvement in the conspiracy, described *supra*.

271 Cadman Plaza East, Brooklyn, New York 11201.

Defendant Phillip A. Kenner is proceeding *pro se*.

Defendant Tommy C. Constantine is represented by Sanford Talkin of Talkin, Muccigrosso & Roberts LLP, 40 Exchange Place, 18th Floor, New York, New York 10005; and by Michael Morrissey of Mitchell Stein Carey P.C., One Renaissance Square, 2 North Central Ave., Suite 1900, Phoenix, Arizona 85004.