


U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JHK:DCL:MMO

*610 Federal Plaza*
*Central Islip, New York 11722*

May 20, 2021

Honorable Joseph F. Bianco
United States Circuit Judge
United States Court of Appeals for the Second Circuit
Long Island Federal Courthouse
Central Islip, New York 11722

        Re:    United States v. Kenner and Constantine
                   No. CR-13-607 (S-2) (JFB)

Dear Judge Bianco:

      The government respectfully submits this letter pursuant to the Court's directive on April 28, 2021 to address: 1) the government's revised discovery demands to third-party petitioner Danske Bank A/S London Branch ("Danske"); 2) the government's proposed plan for an interlocutory sale of the DCSL Resort; and 3) the government's view regarding a sale of Danske's note to Silverpeak.[1]

    I.    <u>The Government's Revised Discovery Demands to Third-Party Petitioner Danske</u>

      In its oral ruling on summary judgment, the Court previously found that there were remaining issues of fact in several areas: 1) the amount of the claims that are linked to the Initial Loan; and 2) whether Danske is a bona fide purchaser for value as to the entire amount of the Additional Loans that the bank made, including the loans after the 2015 protective order. *See* Transcript of Oral Ruling, dated November 23, 2020 ("Oral Ruling Tr.") at p. 5. In addition, the Court specified that there are issues of fact regarding: 1) whether Danske was a bona fide purchaser for value of the Additional Loans because the Additional Loans were not innocent arm's length transactions; and 2) whether Danske was a bona fide purchaser for value for the funds advanced after the Bill of Particulars was filed. *See* Oral Ruling Tr. at pp. 16, 23-24, 26-27. The Court held that an issue of fact remains as to whether Danske systematically depleted the equity in the DCSL Resort through its modified and/or amended loan agreements, and, therefore, did not engage in arm's length transactions. *See* Oral Ruling Transcript at pp. 16-17. The Court clarified that the issues with regard to the Additional Loans includes all of the Additional Loans, not just the loans made after the protective order was entered in 2015. *See* Transcript dated December 10, 2020 at

---

      [1]   The defined terms used in the government's prior submissions are also used herein.

p. 5. The Court also allowed discovery to address any gaps in the documentation previously provided by Danske. *See* Oral Ruling at p. 25. Finally, the Court recognized that the Trimont records provided by Danske showed a loan amount of $100,240,922, not the $107,538,327.83 claimed by Danske. *Id*. at p. 15.[2]

Under the above circumstances, the government submits the following revised discovery demands, tailored to the above rulings, to third-party petitioner Danske:

- Trimont Invoices to support the transactions of $6,297,406 included in the Initial Loan of $107,538,328;
- Complete draw request packages for the sample of 20 draw requests identified in Table 1 below,[3] containing the documents required to be provided as identified in Section 11.1 of the loan agreements, entitled "Documents to be Furnished for Each Disbursement," which should include, but is not limited to:
    a. All invoices, contracts or other information that support that the DCSL Resort incurred all costs included in the draw request;
    b. Paid receipts or other proof of payment of all construction and development costs;
    c. Complete funding memos for the disbursements;
    d. Any and all correspondence, status reports and documents prepared according to such servicing agreements for the draw requests;
    e. All required construction documents as identified in the Loan Agreements under Article VIII, Section 8.1, Replacement Facility C - Required Construction Documents, and under Article IX, Section 9.2, Construction Budget-Replacement Facility C, for each disbursement and/or loan advance; and
    f. M. Delvin & Associates reports and supporting work papers pertaining to the disbursements.

| TABLE 1. SAMPLE OF FACILITY C DISBURSEMENTS | | | | | |
|---|---|---|---|---|---|
| SAMPLE NO. | FACILITY | DANSKE STATEMENT NUMBER | DATE | TRANSACTION DESCRIPTION | AMOUNT |
| 1 | C | 5 | 05/06/14 | OUTWARD 4022-41266802658 | $2,000,000 |
| 2 | C | 6 | 07/23/14 | OUTWARD 4022-42049409644 | $2,000,000 |
| 3 | C | 7 | 10/07/14 | OUTWARD 4022-42802014522 | $2,000,000 |
| 4 | C | 7 | 12/30/14 | OUTWARD 4022-43644982596 | $1,587,637 |
| 5 | C | 8 | 03/04/15 | OUTWARD 4022-50637156334 | $2,000,000 |

---

[2] The Oral Ruling states that this amount is $100,240,992, but the government's consultant believes the correct amount is $101,240,992.

[3] It is the government's understanding that there are approximately 70 draw requests. The government has identified a sampling of 20 draw request packages to be produced, but respectfully reserves the right to request the production of additional draw request packages. The government's document request is based upon the definition of the documents that, under the terms of the Loan Agreements, Danske required to be furnished with respect to each draw request.

| TABLE 1. SAMPLE OF FACILITY C DISBURSEMENTS ||||||
| SAMPLE NO. | FACILITY | DANSKE STATEMENT NUMBER | DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|---|---|---|
| 6 | C | 9 | 04/02/15 | OUTWARD 4022-50928178314 | $1,750,000 |
| 7 | C | 10 | 07/03/15 | OUTWARD 4022-51841485826 | $1,500,000 |
| 8 | C | 10 | 08/04/15 | OUTWARD 4022-52162524448 | $1,250,000 |
| 9 | C | 10 | 09/15/15 | OUTWARD 4022-52583918698 | $1,750,000 |
| 10 | C | 11 | 11/06/15 | OUTWARD 4022-53105862840 | $1,394,488 |
| 11 | C | 11 | 12/10/15 | OUTWARD 3826-53447096398 | $1,250,000 |
| 12 | C | 12 | 01/06/16 | OUTWARD 4022-60068010908 | $1,402,000 |
| 13 | C | 21 | 02/23/18 | OUTWARD 4022-80542422980 | $2,000,000 |
| 14 | C | 22 | 04/12/18 | OUTWARD 4022-81024789440 | $2,500,000 |
| 15 | C | 22 | 06/22/18 | OUTWARD 4022-81738787708 | $2,100,000 |
| 16 | C | 23 | 09/28/18 | OUTWARD 4022-82714119646 | $1,905,000 |
| 17 | C | 24 | 12/19/18 | OUTWARD 4022-83538891662 | $2,250,000 |
| 18 | C | 24 | 11/30/18 | OUTWARD 4022-83347713714 | $2,000,000 |
| 19 | C | 26 | 05/24/19 | OUTWARD 4022-91448050600 | $1,800,000 |
| 20 | C | 28 | 11/05/19 | OUTWARD 4022-93098099318 | $1,000,000 |

- Documentation and correspondence pertaining to any agreements and/or proposed agreements in which Danske would be conferring a, direct or indirect, personal or financial benefit on Kenneth Jowdy ("Jowdy"), individually, or seeking to confer a, direct or indirect, personal or financial benefit on Jowdy, individually, including, but not limited to, any agreements between Danske and Jowdy/the Borrower in which Danske agreed to pay Jowdy for Jowdy's services from Danske's own funds, and Danske's proposed settlement agreements that would permit Jowdy to purchase the DCSL Resort in a forfeiture related sale;
- Documentation addressing the loan repayments and allocation of funds to the different loan facilities;
- Documentation identifying the procedures, policies, and practices of Danske, and its officers, employees or owners, for receiving, soliciting, preparing, reviewing, approving or denying loans or client relationships;
- Documentation or information available to or within the knowledge of Danske concerning the conduct or assets of Jowdy, his associates, relatives, representatives, and related entities;
- Documentation pertaining to any agreements and guarantees between Danske and any and all Jowdy related entities, including, but not limited to, Legacy Cabo, LLC, Legacy Properties, LLC, KAJ Holdings LLC and Silverpeak;
- Documentation, or correspondence between Danske and the Borrower and/or Jowdy, regarding the Borrower's ability or inability to meet its loan obligations to Danske and/or Lehman;
- Documentation, agreements, and correspondence between, Danske and Jowdy and/or the Borrower and/or the Trustee, regarding: (a) Jowdy's future ownership interest(s), direct or

indirect, in the DCSL Resort and/or Equity Interests; (b) foreclosure or forfeiture on the DCSL Resort loan in Mexico or in the United States; (c) bankruptcy or insolvency proceedings concerning the DCSL Resort or the Equity Interests in either Mexico or the United States; and (d) Jowdy's direct or indirect management of the DCSL Resort during and/or after the instant criminal case;

- Documentation regarding the due diligence performed by Danske regarding the entering into loan agreements and/or modifications with the Borrower, including deliverables, obligations, and the satisfaction of conditions by DCSL Mexico as required under all extensions, modifications, facility increases, advances and amendments to the Loan Documents;
- Danske's internal correspondence and documents regarding its decision to continue lending, documentation regarding the DCSL Resort's defaults, and documentation regarding Danske's decisions pertaining to foreclosure;
- Danske's non-privileged settlement proposals, settlement materials, notes of meetings with the government, and emails regarding its bona fide purchaser for value status;
- Documentation showing the amount and calculation of Danske's claimed default interest;
- Notices of default of the DCSL Resort loan, and any and all documentation that notices of default were sent to the Borrower and/or Trustee of the Mexican trust;
- Documentation or an explanation for why Danske did not account for capitalized interest until April 2013 even though interest began accruing in March 2009 after the DCSL Resort first failed to make required interest payments;
- Loan statements for Facilities A and B dating after February 28, 2020, and Facility C loan statements dating after January 1, 2020, to support Danske's claim for costs incurred after those respective dates;
- Documentation or an explanation as to why $3,020,424 of interest payments included in Trimont's Invoices were not included in Danske's bank statements;
- Documentation or explanation for the notable inconsistencies between the various Trimont documents provided by Danske, as well as the discrepancies between the Danske loan statements and the Trimont Invoices;
- Documentation for the at least $6,516,433 in claimed miscellaneous fees and closings costs;
- All reports furnished by the Borrower to Danske pursuant to the Loan Agreements, Section 13.5, Reporting Covenants, including, but not limited to: Section 13.5(a) Weekly Reports, Section 13.5(b) Monthly Reports, Section 13.5(c) Quarterly Reports, and Section 13.5(d) Annual Reports; and
- Documentation to support Danske's assertion that the increase in the PPF reflected Danske's view of how the risk profile of the DCSL Loan had changed as a result of Danske advancing additional funding.

The government additionally requests video depositions of, initially, Kenneth Jowdy; Danske's consultant, Michael Delvin; and Danske's employees in London who had the relationship with Jowdy and controlled the lending decisions. The government respectfully reserves the right to request additional depositions if necessary.

4

II. The Government's Proposed Plan for an Interlocutory Sale of the DCSL Resort

The Court directed the government to submit a proposed plan for an interlocutory sale of the DCSL Resort. Under relevant law, if a court orders an interlocutory sale of property over the objection of any interested party, the sale must comply with the provisions of 28 U.S.C. §§ 2001 and 2002. These statutes provide procedural safeguards to ensure that court-ordered sales are made on terms that best preserve the parties' interests. Section 2001(a) authorizes public sales of property and sales by court-appointed receivers. Section 2001(b) permits private sales of property for cash or other consideration "[a]fter a hearing, of which notice to all interested parties shall be given by publication or otherwise as the court directs," and after the court "finds that the best interests of the estate will be conserved thereby."

In this case, the Court can order a public sale of the Resort Property. A prompt sale of the Resort Property is in the best interests of all parties. Section 2001(a) provides that a public sale of property ordered by "any court of the United States shall be sold as a whole or in separate parcels . . . at the courthouse of the county, parish, or city in which the greater part of the property is located, or upon the premises or some parcel thereof located therein, as the court directs. Such sale shall be upon such terms and conditions as the court directs." Notice of the public sale must be "published once a week for at least four weeks prior to the sale in at least one newspaper regularly issued and of general circulation in the county, state, or judicial district" wherein the realty is situated. 28 U.S.C. § 2002. If the property "is situated in more than one county, state, district or circuit," the notice must be "published in one or more of the counties, states, or districts wherein it is situated, as the court directs." *Id.* The notice shall "contain [a] description of the property by reference or otherwise" and be substantially in such form as the court approves. *Id.*

Under Mexican law, non-citizens cannot own land, or an interest in land, within 50 kilometers of the coast. Such land is, therefore, held by a trust established, typically, with a Mexican bank and is called a fideicomiso. In this case, the Resort Property is held by Mexican guaranty trust numbered F/00321 (the "Trust") because Danske is a foreign entity. Therefore, Danske is the first beneficiary of the Trust. Diamante Cabo San Lucas S. DE R.L. DE C.V. ("DCSL Mexico"), a Mexican limited liability company, is the second beneficiary of the Trust. Jowdy is the General Administrator of DCSL Mexico.

Mexico, as a sovereign nation, is not under the jurisdiction of this Court. Likewise, the United States Marshals Service has no jurisdiction to conduct operations in a foreign country without its consent.[4] Therefore, the United States respectfully suggests that the Court exercise its discretion under 28 U.S.C. § 2001 *et seq.* to fashion a public sale in the following form:

---

[4] Although the government is not moving for an interlocutory sale at this time, and submits this proposed plan pursuant to the Court's directive, the government notes that the most effective way to sell the DCSL Resort is through the interlocutory sale process with the cooperation of all parties. A sale after the entry of a final order of forfeiture would require assistance from the Mexican government through the Mutual Legal Assistance Treaty ("MLAT") process which would prolong the sale process.

1) The Protective Order entered on August 21, 2015, as modified on February 7, 2017, shall remain in place until closing of the sale of the Resort Property, or in the event no closing occurs, until final resolution of the ancillary proceeding of the criminal action;
2) Jowdy, on behalf of DCSL Mexico, shall engage Colliers International and/or a broker entity with whom Colliers International subcontracts, *e.g.*, CBRE (collectively, "Colliers") to serve as the exclusive broker to oversee all aspects of the marketing and sale of the Resort Property;
3) The Resort Property shall be sold "as is, where is," and subject to the current Master Plan that has been filed with and/or approved by the relevant Mexican authorities;
4) Colliers shall market, sell and dispose of the Resort Property through any reasonable commercial method without further order of the Court. Colliers shall conduct the marketing and sale process subject to the U.S. Marshals Service's oversight and approval;
5) Legacy Properties, LLC will continue to manage the subject Resort Property during the marketing and sale process, with oversight and reasonable and customary reporting, and, upon request, shall provide a report within one business day to Colliers, the Government, and the U.S. Marshals Service;
6) The Government and the U.S. Marshals Service shall have exclusive authority to approve the buyer and the terms of the sale;
7) Danske, as the First Place Beneficiary of the Trust, and, Jowdy, on behalf of DCSL Mexico, the Second Place Beneficiary under the Trust, shall provide instructions to the Trust to effectuate the interlocutory sale in a timely manner, including, but not limited to, instructing the Trust to take direction from Colliers, and instructing the Trust to allow the resort to continue to sell parcels during the interlocutory sale process and to release said lots from the Trust;
8) All bidders on the Resort Property shall comply with U.S. Marshals Service Policy Directive 13.7;
9) The Resort Property shall be sold for the best and highest market price reasonably obtainable;
10) All closing-related costs, including, but not limited to, Colliers' brokerage commission, all necessary costs and expenses incurred in the marketing and sale of the Resort Property, all outstanding taxes, trustee fees, notary fees, recording fees, expenses of transfer, and outstanding mechanics' liens, materialmen's liens, are to be paid from the gross sale proceeds. The proceeds remaining after the payments of such necessary costs and expenses shall be considered the "net proceeds" of the sale.
11) The net proceeds of the sale shall be held by the U.S. Marshals Service in the Seized Asset Deposit Fund pending further order of the Court.
12) The net proceeds of the sale of the DCSL Resort shall be substituted for the DCSL Resort real property and premises (the "DCSL Preliminarily Forfeited Property") ordered forfeited in the Preliminary Orders of Forfeiture, DE 825 and DE 826, with any unresolved claims of interest in the DCSL Preliminarily Forfeited Property attaching to the net proceeds derived from the sale of the DCSL Resort.
13) Danske, as the First Place Beneficiary of the Trust, and, Jowdy, on behalf of DCSL Mexico, the Second Place Beneficiary under the Trust, are authorized and required, pursuant to the applicable laws, to execute documents, to transfer title and to otherwise effect the transfer of all rights, title and interest to the DCSL Resort to any purchaser thereof.

III. <u>The Government's View Regarding a Sale of Danske's Note to Silverpeak</u>

During the April 28, 2021 court conference, the Court directed the government to discuss with Danske and Silverpeak a proposed sale of Danske's note to Silverpeak, and to file a letter by May 21, 2021 identifying any concerns the government may have about the potential sale. On May 7, 2021, Danske provided the government with a "term sheet" for the proposed sale. On May 12, 2021, counsel for the government, IRS Special Agent Josh Wayne, the U.S. Marshals Service, and counsel for Danske, Jowdy, the DCSL Resort, Owen Nolan, and Silverpeak participated in a phone conference to discuss the potential sale. Remarkably, Danske and Silverpeak refused to provide the government with material terms of the proposed sale, such as the consideration to be exchanged, and instead provided only the following bare details: 1) the parties to the sale will be Danske and Silverpeak; 2) Danske will be assigning its loan on the DCSL Resort to Silverpeak; 3) Danske will be released from its obligations to the borrower; and 4) Danske will consent to the jurisdiction of the Court for matters pertaining to the determination of Danske's claim and for compliance with discovery. Silverpeak and Danske contend that, other than these few terms identified in the "term sheet," the sale terms are irrelevant and need not be disclosed.

Contrary to their contention, however, Silverpeak and Danske cannot conceal from the government and the Court the details of the transaction and must demonstrate, at a minimum, that the transaction is not fraudulent or a sham. *See, e.g.*, *United States v. Watts*, 786 F.3d 152, 161-62 (2d Cir. 2015) ("If . . . the August 11, 2011 Assignment is void as a fraudulent conveyance under New York law, D & B has no cognizable interest in the funds and petitioners have no standing to seek an ancillary hearing."); *United States v. Rodriguez-Perez*, 2019 WL 188400, at *4 n.5 (S.D.N.Y. Jan. 11, 2019) (recognizing that 21 U.S.C. § 853(n)(6)(B) prevents "sham" transactions and "manipulative scheme[s]" involving mortgages that were granted after the defendant committed the act giving rise to forfeiture, because the lien interests will not be deemed superior).[5] Moreover, if Danske were to transfer its claimed interest in the DCSL Resort

---

[5] The government questions the legitimacy of the proposed transaction given that Silverpeak is owned and managed by former Lehman employees, including those who were responsible for the original note on the DCSL Resort; the fact that a Silverpeak-related entity was employed by Jowdy's management company to advise and facilitate the capitalization for developments at the DCSL Resort and was being paid $20,000 per month, an annual asset management fee of 1.5% of the financing arranged by them, and a capital advisory fee of 3.0% of any sale price, financing or capital infusion for the DCSL Resort, yet the only lender/financer the government is aware of is Danske; and the fact that the original proposed Silverpeak deal, which was negotiated by Danske, Jowdy and Silverpeak in 2015, would have materially benefitted Jowdy, and Jowdy's personal mortgage was to be paid off from the sale escrow funds as part of the deal. In light of these concerns, the government requested documentation from Silverpeak, Danske and DCSL, including documentation of Silverpeak's prior involvement in the DCSL Resort, and was told it would be provided the requested documentation, but, to date, the government has not received any of the promised documentation. Consequently, the government's concern about the proposed transaction has been compounded by Danske and Silverpeak's lack of transparency regarding the proposed sale transaction and Silverpeak's prior affiliation and involvement with the DCSL Resort.

to Silverpeak, Silverpeak would be required to file *its own* petition in the instant ancillary proceeding, asserting *its own* interest under 21 U.S.C. § 853, if it wanted to litigate its newly acquired interest and avoid forfeiture of any portion of its interest that remains in dispute. *Rodriguez-Perez*, 2019 WL 188400, at *6; 21 U.S.C. § 853(n)(2). Notably, however, the time has run for Silverpeak to file a timely petition in this case since publication of notice of the forfeiture concluded in July of 2020. *See* 21 U.S.C. § 853(n)(2) ("Any person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property.").

Even if Silverpeak could somehow file a timely petition, Silverpeak would have the burden of demonstrating standing by establishing a "legal interest" in the DCSL Resort within the meaning of 21 U.S.C. § 853(n)(2). *See Watts*, 786 F.3d at 160 (stating that in order to advance a claim in an ancillary proceeding, a third-party petitioner must first establish a "legal interest" in a particular asset identified in the order of forfeiture, within the meaning of 21 U.S.C. § 853(n)(2)); *United States v. Timley*, 507 F.3d 1125, 1129 (8th Cir. 2007) ("[U]nder both § 853 and Rule 32.2, 'a party seeking to challenge the government's forfeiture of money or property used in violation of federal law must first demonstrate [a legal] interest in the seized item sufficient to satisfy the court of its standing to contest the forfeiture.' " (citation omitted)). Thus, Silverpeak would have to demonstrate that it is a bona fide purchaser for value of Danske's note under New York law. *See Rodriguez-Perez*, 2019 WL 188400, at *6 ("[T]he Court must first determine whether [the assignee lien holder petitioners] qualified as bona fide purchasers under New York law); *In re Cerrato*, 504 B.R. 23, 33 (Bankr. E.D.N.Y. 2014) ("In New York, to qualify as a bona fide purchaser, a purchase must be made in good faith, without notice of any adverse interests in the property, and for valuable consideration."). This would require Silverpeak to reveal, among other things, the consideration paid, in order to demonstrate that it purchased its interest for value. Even if Silverpeak were to do that, it simply could not demonstrate that it was unaware of the government's adverse interest in the property. *See Rodriguez-Perez*, 2019 WL 188400, at *7 (holding that the assignee lien holder petitioners "were not bona fide purchasers for value within the meaning of New York law" because the assignment occurred "almost a year after the Government filed its notice of pendency, which provided [p]etitioners with constructive notice, at the time of purchase, that the Government was seeking forfeiture of the entire parcel of real property").

In addition, Silverpeak would have to disclose the details of the sale transaction in order to meet the detailed pleading requirements set forth in 21 U.S.C. § 853(n)(3):

> The petition shall be signed by the petitioner under penalty of perjury and shall set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought.

8

*See United States v. Preston*, 123 F. Supp. 3d 117, 125 (D.D.C. 2015) (dismissing petition and holding that "[e]ven if the [p]etition could be construed as asserting a legal interest in the [property] sufficient to establish statutory standing, it . . . fail[ed] to satisfy the more detailed pleading requirements of Section 853(n)(3)").

Lastly, even assuming that Silverpeak could file a timely petition, make a threshold showing of standing under Section 853(n)(2) by establishing a legal interest in the forfeitable property, and comply with 21 U.S.C. § 853(n)(3)'s pleading requirements, Silverpeak would have the burden of proving under Section 853(n)(6)(B) that it acquired the property from Danske as a bona fide purchaser for value that was reasonably without cause to believe the property was subject to forfeiture – something it plainly cannot do. *United States v. Ribadeniera*, 105 F.3d 833, 835 (2d Cir. 1997); *Timley*, 507 F.3d at 1130–31. It is beyond dispute that Silverpeak would not be able to prove that it was reasonably without cause to believe that the DCSL Resort is subject to forfeiture.

Notwithstanding the foregoing, the government previously indicated to Danske that the government was willing to consider the possibility of Danske selling its note if the government and Danske reach a final settlement of Danske's claim that is approved by the Court and is not objected to by any third parties, and after such time that the government has accepted a bid from a qualified bidder in an interlocutory sale of the DCSL Resort.

Thank you for Your Honor's consideration of this submission.

            Respectfully submitted,

            MARK J. LESKO
            Acting United States Attorney

By:  /s/ Madeline O'Connor
    Madeline O'Connor
    Diane C. Leonardo
    Assistant U.S. Attorneys
    (631) 715-7870
    (631) 715-7854

cc: Philip Kenner, by mail
   All counsel of record by ECF