

Thomas McC. Souther
Telephone: (646) 558-6052
souther@freehsporkinsullivan.com

Thomas McC. Souther
Freeh Sporkin & Sullivan LLP
350 Fifth Avenue
Suite 6903
New York, New York 10118

June 3, 2021

**BY ECF**

The Honorable Joseph F. Bianco
United States Circuit Judge
United States Court of Appeals for the Second Circuit
100 Federal Plaza
Central Islip, New York 11722

Re:   United States of America v. Kenner, et al, Cr. No. 13-607 (JFB)

Dear Judge Bianco:

     Kevin P. Mulry of Farrell Fritz, P.C. and I represent Diamante Cabo San Lucas, LLC ("DCSL"), Diamante Cabo San Lucas S. de R.L. de C.V. (the "borrower"), KAJ Holdings, LLC, Diamante Properties, LLC, and Kenneth A. Jowdy (together, the "DCSL Parties") in connection with the forfeiture proceeding in this case.  The DCSL Parties urge the Court to permit Danske Bank to transfer and assign to Silverpeak Real Estate Partners LP, or an affiliate thereof ("Silverpeak") Danske's interest in the note representing the loans outstanding to the borrower.  The DCSL Parties believe that such a transfer and assignment is in the best interest of all parties and provides the most practical short-term solution to give the project a chance to preserve value.

     Six years ago significant progress had been made at the resort after years of challenges and hurdles and there was reason for optimism.  A large beachfront parcel of land had been sold to a hotel developer who was committed to building a Hard Rock Hotel and a Nobu Hotel; Danske and the borrower had renegotiated the existing loan agreement to include terms that would be favorable to the borrower if certain benchmarks were achieved; and for the first time a third-party had concluded that the equity in the project had a positive value.  That third party was Silverpeak, and they offered to acquire up to 50% of the equity in the resort for up to $10 million, which meant that the equity in

the project after the proposed amendments to the loan agreement with Danske was valued at $20 million.

Unfortunately, within a matter of days of this proposal being presented to the equity holders in DCSL, the government obtained the protective order in August 2015 and the project's momentum was derailed. Efforts were made to persuade the government in the weeks and months following the entry of the protective order that the parties should explore the sale of Kenner's 39% ownership interest in DCSL through Baja Ventures 2006, LLC to Silverpeak as part of the proposed transaction. Such a sale would have yielded a payment of $7.8 million, which could have been escrowed pending the outcome of the forfeiture proceeding. The government's response, however, was that such discussions were premature, and that Mr. Jowdy should "maintain the status quo" at the property while the forfeiture proceeding ran its course.

It is now nearly six years since the government obtained the protective order. Throughout this period, the DCSL Parties have advocated that the best way to attempt to create and preserve value in this project would be if all parties worked collaboratively toward that common objective. Regrettably, the government elected to adopt an adversarial posture and has pursued capitulation over collaboration. That strategy has proven to be detrimental to all the stakeholders, including the victims of the defendants' criminal schemes.

The forfeiture and sale plan proposed by the government is flawed on its face. After acknowledging that the US government cannot readily forfeit and sell real property located in Mexico, the government essentially recommends that the Court order Danske and the borrower, which is a Mexican entity, to act as agents of the government and take direction from the government to do what the government is prohibited from doing itself. Moreover, the government's plan would require Danske and the borrower to bear significant financial and litigation risk with no consideration given to indemnification of either party against those risks. This is not a viable path for anyone, and the DCSL Parties believe it certainly is not going to yield any benefit to the stakeholders, including the defendants' victims.

In addition to ignoring the significant hurdles that the government would face in attempting to forfeit and sell real property located in Mexico, the government's plan fails to consider and address the collateral consequences that flow from its proposed plan. The most obvious of the collateral consequences of a forced sale of the property is the negative impact such a sale would have on the value of the property. The process involves more than just hiring a broker to list the property for sale, as one might do when selling a residence. Rather, it would involve extensive due diligence by any potential buyers and likely would take an extended period of time. The government's plan provides no information about how the property might deal with any cash flow issues that may arise during this sale process. Moreover, the government is operating in a vacuum because it has yet to seek any input or cooperation regarding the sale process from the current manager of the property.

The DCSL Parties also understand that the forfeiture and proposed sale of the resort property, along with the continued challenge by the government as to the amount of Danske's claim, would trigger a significant tax liability for the borrower in Mexico, which in turn may result in a US tax liability for the equity holders. This would include the equity holders who were Kenner's clients and victims of his fraud. Rather than potentially providing compensation to the victims, the government's

2

suggested course of action likely would result in some of the victims incurring a tax liability from the sale of the resort in Mexico without receiving any sales proceeds, compensation, or foreign tax credits to offset that US tax liability.

When this potential tax issue was raised with the government earlier this year, the government's solution was that the terms of any sale would require tax liabilities to be paid either out of the proceeds of the sale, or by the buyer. Obviously, neither of these proposed solutions are remotely feasible. In effect, the government simply would be shifting the tax liability in such a way as to either make it more expensive for a buyer to purchase the property, or require Danske, or the then current noteholder to receive less than it is entitled to receive under the loan documents.

Similarly, the government's continued challenge to the amount of the debt currently owed to Danske may trigger a significant tax liability for the borrower in Mexico in and of itself, which again may result in a US tax liability for the equity holders. The following hypothetical example illustrates the potential for equity holders to face an unfunded tax liability. If Danske currently is owed $220 million and the government is successful in persuading the Court that Danske's claim is limited to $100 million, to the extent that the borrower's remaining debt of $120 million is eliminated it would become income to the borrower. That income would trigger a Mexican tax liability to the borrower, which in turn could give rise to a US tax liability to the equity holders with no cash distribution available to the equity holders to cover that liability and no foreign tax credit to offset that US tax liability. If the government's objective is to try to compensate the victims of the defendants' criminal conduct, the DCSL Parties believe that the path the government currently is pursuing actually will have the opposite effect. In short, the forfeiture and sale of the resort property is not a viable course of action.

The latest crisis facing the resort is Danske's recent determination that it no longer is willing to continue to fund this project directly or indirectly through the release of its collateral. This decision obviously has the potential to have a dramatic impact on the resort in a variety of ways, none of which are positive. Danske, however, has identified a possible solution to avoid the near-term collateral consequences of Danske's effort to extricate itself from this drain on its resources. Danske has proposed that it sell its note to Silverpeak, which has familiarity with the project and is willing to purchase the note, provided Silverpeak is allowed to simply stand in the shoes of Danske as the forfeiture proceeding continues to run its course. Significantly, Silverpeak has expressed a willingness to consider permitting the borrower to continue to sell real estate parcels and time share memberships and allow the borrower to continue to utilize those sales proceeds to fund operations and development, rather than requiring some or all of the sales proceeds to be escrowed for the benefit of the lender in accordance with the terms of the applicable loan documents.

This proposed approach presents a practical, logical solution that is in the best interest of all the stakeholders. The government, however, objects. It offers a variety of reasons, but it is apparent from recent discussions with the government, as well as from its recent correspondence filed with the Court, that the government seems more concerned with interfering with a sale to Silverpeak in order to gain leverage it is not entitled to and preventing Mr. Jowdy from receiving a benefit in any form from his role as the developer of the resort than in preserving value, if any, that may at some point be realized to provide partial compensation to some of the defendants' victims.

Ironically, the government is content with having Mr. Jowdy and his management team continue to manage and develop the resort property and, indeed, participate in the conduct of its sale. Yet, if Danske, or Silverpeak, believes that giving the developer (Mr. Jowdy) a financial incentive to maximize the value of their investment, a common practice in the real estate development business, and that financial incentive comes out of the lender's pocket and not out of any proceeds that might otherwise be available for possible distribution to defendants' victims, the government objects. Putting aside the due process concerns that are raised by the government attempting to insert itself in arms-length transactions between third parties, one would think that the government also would be looking to maximize the value that may be realized by the resort property. So the record is clear, however, Mr. Jowdy is not a party to any agreement that may be reached between Danske and Silverpeak regarding the sale of Danske's note to Silverpeak, and he would not hold any direct or indirect equity interest in the entity that may purchase the note from Danske.

Since inception, Mr. Jowdy and his management team have overcome constant adversity, kept the project alive, and attempted to create and preserve value at the resort. If the stakeholders in the resort, including the homeowners, the time share members, the lender, and the equity holders all believe that the resort would be better off with a new management team overseeing the management and development of the resort, Mr. Jowdy and his team would disagree strongly and argue that their replacement likely would negatively impact the value of the resort. They would accept that decision, however, and move on from the project. But as far as the DCSL Parties are aware, no one with a financial stake in the resort property is arguing to the Court that such a course should be pursued. Accordingly, the parties should focus on working collaboratively to maximize the value of the resort.

The DCSL Parties believe that the most viable path forward for this project, and for the defendants' victims to have any potential for receiving any compensation, is if the government (1) abandons its effort to forfeit and sell the resort property; (2) withdraws its objections to Danske's note sale to Silverpeak and recognizes that as the assignee of the note Silverpeak stands in the shoes of Danske; (3) seeks the forfeiture of the equity interests in DCSL, which the DCSL Parties regrettably believe currently have no value, and engages with Silverpeak to determine if a nominal value may be assigned to the forfeited equity in DCSL; and, (4) seeks to sell the forfeited equity in DCSL to Silverpeak. If the government persists in its desire to obtain further limited discovery, the DCSL Parties believe that the parties should be directed to move expeditiously to complete the record with the government's overly broad discovery request significantly narrowed. The Court then would have a complete record to enable it to determine the amount of debt that the noteholder is lawfully entitled to recoup as a bona fide purchaser for value with priority over any claim by the government or any other claimant in the ancillary proceeding.

Thank you for the Court's consideration.

Respectfully submitted,

*/s/ Thomas McC. Souther*

Thomas McC. Souther

cc: All parties of record via ECF
George Kostolampros, Esq. (By Email)
Kevin P. Mulry, Esq. (By Email)
Marc Wolinsky, Esq. (By Email)
John D. Holden, Esq. (By Email)